**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------------------------------------------------

**ALBERT EINSTEIN MEDICAL CENTER**      :
5501 Old York Road                      :
Philadelphia, PA  19141;                :
                                        :
**JEANES HOSPITAL**                     :
7600 Central Avenue                     :
Philadelphia, PA  19111**;**            :    **Civil Action No._____**
                                        :
**JEFFERSON HEALTH SYSTEM, INC.**       :
259 N. Radnor Chester Road              :
Radnor, PA  19087;                      :
                                        :
**MAIN LINE HOSPITALS, INC.**           :
130 S. Bryn Mawr Avenue                 :
Bryn Mawr, PA 19010**;**                :
                                        :
**PENN PRESBYTERIAN MEDICAL             :
CENTER**                                :
51 N. 39th Street                       :
Philadelphia, PA  19104;                :
                                        :
**PENNSYLVANIA HOSPITAL**               :
800 Spruce Street                       :
Philadelphia, PA  19107**;**            :
                                        :
**TEMPLE EAST, INC.**                   :
d/b/a Northeastern Hospital             :
2301 East Allegheny Avenue              :
Philadelphia, PA 19134;                 :
                                        :
**TEMPLE UNIVERSITY CHILDREN'S          :
MEDICAL CENTER**                        :
3509 N Broad Street                     :
Philadelphia, PA  19140;                :
                                        :
**TEMPLE UNIVERSITY HEALTH              :
SYSTEM, INC.**                          :
3509 North Broad Street                 :
Philadelphia, PA  19140;                :
                                        :
**TEMPLE UNIVERSITY HOSPITAL, INC.**    :
3401 North Broad Street                 :
Philadelphia, PA  19140;                :
                                        :
**THE CHILDREN'S HOSPITAL OF            :
PHILADELPHIA**                          :
Civic Center & 34th Street              :
Philadelphia, PA  19104;                :

**THE FRANKFORD HOSPITAL OF THE
CITY OF PHILADELPHIA**
Red Lion and Knights Road
Philadelphia, PA  19114;

**THE HOSPITAL OF THE UNIVERSITY
OF PENNSYLVANIA**
3400 Spruce Street
Philadelphia, PA 19104**;**

**THOMAS JEFFERSON UNIVERSITY
HOSPITALS, INC.**
1020 Walnut Street
Philadelphia, PA  19107; and

**TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA D/B/A THE
UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM**
3400 Spruce Street
Philadelphia, PA  19104**,**

                **Plaintiffs,**

        **v.**

**MICHAEL O. LEAVITT, SECRETARY**
Department of Health and Human Services
200 Independence Ave., S.W.
Washington, DC  20201,

                **Defendant.**

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

---------------------------------------------------------------------------------------------------------------------

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Background

      1.     This action challenges on constitutional and other grounds the enactment and

application of an amendment to the Social Security Act included at § 6085 of the Deficit

Reduction Omnibus Act of 2005, Pub. L. 109-171 (the "Default Rate Provision" or "§ 6085").

As applied in Pennsylvania, the Default Rate Provision, in conjunction with other,

complementary Federal laws will force hospitals to accept confiscatory, below cost fees for emergency medical services ("EMS"), for the direct benefit of privately owned HMOs.

2.    Plaintiffs (also referred to herein collectively as the "Hospitals") comprise health systems and their constituent hospitals all located in the Philadelphia, Pennsylvania area. The Hospitals all participate in the Medicaid and Medicare programs, operate emergency departments, and are legally compelled (under both federal and state law) to provide EMS to all patients who present, or are transferred to the Hospital for treatment of a medical emergency (as broadly defined under federal and state law).

3.    Federal (and state) law has long required Hospitals to provide EMS on an immediate basis and without ascertaining in advance the availability or source of the patient's payment. Historically, federal law has not prescribed or limited Medicaid payments for those services. Effective January 1, 2007, however, the Default Rate Provision requires Hospitals to accept Medicaid program fee-for-service ("FFS") rates as payment in full for EMS from privately owned managed care organizations ("MCOs" or "HMOs") with which they do not have contracts.

4.    As a result of other recent amendments to federal law, Medicaid FFS rates may be and are set in many states at levels that are insufficient to cover the costs hospitals incur in serving Medicaid patients. Pennsylvania's Medicaid FFS rates do not cover Hospitals' costs of providing inpatient care, and cover only a small fraction of the costs of providing outpatient EMS.

5.    Section 6085 of the DRA transfers the benefit of provider subsidiaries of EMS resulting from below-cost FFS rates entirely to privately owned and operated HMOs, and was adopted as a last minute rider to a budget bill Conference Committee, without public debate or review by the congressional oversight committees. This result – robbing Peter to pay Paul –

effects an unconstitutional taking under the Supreme Courts recent decision in <u>Kelo v. City of New London</u>, 125 S. Ct. 2655 (2005).

6.      Because Medicaid MCOs ordinarily receive fixed monthly "capitation" payments from the states and do not pass along any specific costs or savings attributable to EMS to the states, the subsidies of private HMOs mandated by the Default Rate Provision inure directly to the benefit privately owned HMOs, and thus serve a private rather than a public purpose.

7.      Effective January 1, 2007, the Default Rate Provision will cause ongoing immediate and irreparable harm to the Hospitals.  As applied in conjunction with the BBA and other federal laws, the Default Rate Provision not only forces Hospitals to accept confiscatory payments for emergency care for the benefit of privately owned HMOs, but also interferes with and affords the HMOs artificial bargaining leverage over Plaintiffs in their contract negotiations. Hospitals are, moreover, precluded by yet another federal law (the "anti-supplementation" law) under penalty of a felony, from billing Medicaid HMOs in excess of the amounts permitted by the Title XIX during the pendency of a legal challenge to § 6085.  Accordingly, an injunction to maintain the status quo is appropriate pending a ruling on the merits of Plaintiffs' request for permanent injunctive relief.

## Jurisdiction and Venue

8.      Plaintiffs seek a declaration that the Default Rate Provision is, by its terms, inapplicable to hospitals located in Pennsylvania.  Plaintiffs seek an order declaring that the Default Rate Provision is unconstitutional as applied to Plaintiffs and enjoining its application against Plaintiffs.

9.      This court has jurisdiction under 28 U.S.C. §§1331 and 2201.  Venue is appropriate in this court under 28 U.S.C. § 1391(b).

## Parties

10.    Plaintiffs all are nonprofit health systems and/or their constituent, nonprofit Hospitals located in Philadelphia and surrounding areas of the Commonwealth of Pennsylvania.

11.    Plaintiff Jefferson Health System, Inc. ("JHS"), is a nonprofit corporation whose principal place of business is 259 N Radnor Chester Road, Radnor, PA  19087.  JHS is the parent of certain health care provider subsidiaries, including the following separately incorporated, nonprofit Plaintiff Hospitals:

A.    Plaintiff Thomas Jefferson University Hospital, Inc. ("TJUH") operates a 925 bed academic medical center with a Level I trauma center with its principal place of business at 1020 Walnut Street, Philadelphia, PA  19107.

B.    Plaintiff Albert Einstein Medical Center ("AEMC") is a 478 bed teaching hospital with a Level I trauma center with its principal place of business at 5501 Old York Road, Philadelphia, PA  19141.

C.    Plaintiff Main Line Hospitals, Inc. has a principal place of business at 130 South Bryn Mawr Avenue, Bryn Mawr, PA  19010.  It operates three hospitals:  Bryn Mawr Hospital, Paoli Hospital, and The Lankenau Hospital.

D.    Plaintiff The Frankford Hospital of the City of Philadelphia operates general hospitals on three campuses and includes a Level II trauma center.  Its principal place of business is Red Lion and Knights Roads, Philadelphia, PA 19114.

E.    A substantial portion of JHS' hospital business (approximately 11.5 percent (11.5%) of aggregate patient revenues) is attributable to Medicaid patients.

12.    Plaintiff Temple University Health System, Inc. ("TUHS") is a nonprofit corporation whose principal place of business is 3401 North Broad Street, Philadelphia, PA 19140.  TUHS is comprised of various health care providers, including the following nonprofit Plaintiff Hospitals:

A.     Plaintiff Temple University Hospital, Inc. ("TUH") is a 677 bed teaching hospital with a Level I trauma center (with pediatric capabilities).  TUH's principal place of business is 3401 N. Broad Street, Philadelphia, PA  19140.  Nearly 50% of TUHS's total inpatient days are Medicaid days.

B.     Plaintiff Jeanes Hospital is a general hospital whose principal place of business is 7600 Central Avenue, Philadelphia, PA  19111.  Over 10% of the Hospital's total inpatient days are Medicaid days.

C.     Plaintiff Temple University Children's Medical Center is a specialized pediatric hospital located at 3509 N. Broad Street, Philadelphia, PA  19140.  Over 70% of the Hospital's total inpatient days are Medicaid days.

D.     Plaintiff Temple East, Inc., d/b/a Northeastern Hospital ("NEH") is a general hospital.  NEH's principal place of business is 2301 East Allegheny Avenue, Philadelphia, PA 19134.  Approximately 41% of the Hospital's total inpatient days are Medicaid days.

13.     Plaintiff The Children's Hospital of Philadelphia ("CHOP") is a nonprofit corporation.  CHOP's principal place of business is Civic Center & 34th Street, Philadelphia, Pennsylvania, 19104.  CHOP operates over 400 beds, is the oldest freestanding children's hospital in the United States, and provides highly specialized pediatric care, including a Level I pediatric trauma program.  Approximately 41% of CHOP's total inpatient days are Medicaid days.

14.     Plaintiff Trustees of the University of Pennsylvania, a nonprofit corporation d/b/a The University of Pennsylvania Health System ("UPHS"), is comprised of various health care providers including the following nonprofit Hospitals:

A.      Plaintiff The Hospital of University of Pennsylvania ("HUP"), is a 685 bed academic medical center with a Level I trauma center.  HUP's principal place of business is 3400 Spruce Street, Philadelphia, PA  19104.

B.      Plaintiff Pennsylvania Hospital is a teaching hospital whose principal place of business is 800 Spruce Street, Philadelphia, PA  19107.

C.      Plaintiff Penn Presbyterian Hospital is a teaching hospital with its principal place of business at 51 N. 39th Street, Philadelphia, PA  19104.

D.      A substantial portion of UPHS' aggregate hospital business is Medicaid.

15.     Each of the Plaintiff Hospitals administers an emergency department and admits patients on an emergency basis as inpatients when medically indicated in accordance with federal and state legal requirements.

16.     Each of the system Plaintiffs negotiates contracts on behalf of its member hospitals, and each is injured when its member hospitals incur financial loss.

17.     Defendant, the Secretary of Health and Human Services (the "Secretary" of "HHS") is the federal official responsible for administering the Medicaid program under Title XIX of the Social Security Act.  Day to day administration of Medicaid and enforcement of the Medicaid statute, as amended by DRA, is invested in the Secretary, and has been delegated by the Secretary to the Centers for Medicare & Medicaid services ("CMS"), a division within HHS.

## Statutory Framework

**(i)      Medicaid Fee-For-Service**

18.     Medicaid is a program of medical assistance made available to financially needy patients pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.

19.     Participation in Medicaid by the states is voluntary, but every state in the United States, including Pennsylvania, participates in Medicaid.

20.     States that elect to participate in Medicaid are bound by Title XIX to submit a State Plan to CMS containing the details of their medical assistance programs, and must comply with federal law and regulations governing the operation of their Medicaid programs.

21.     Participating states receive federal financial participation (*i.e.*, matching funding) which covers at least fifty percent (50%) of the costs of providing medical assistance under Title XIX.

22.     Federal law prescribes that certain services must, and certain services may, be offered by participating states under their Medicaid programs.  Hospital and physician services, and EMS, are among those services that are mandated by Title XIX.

23.     The Medicaid FFS program is operated directly by the states.  Under the FFS program, providers enter into participation agreements with, and are paid directly by the state Medicaid agency for covered services rendered to Medicaid patients.

24.     Under the FFS program, all Medicaid recipients enjoy a statutorily protected "freedom of choice" to receive any covered services from any participating health care provider.

25.     Standards for setting the rates of payment for hospital services under the FFS Programs are prescribed by Title XIX at § 1902(a)(13) of the Social Security Act (42 U.S.C. § 1396a(a)(13)).

26.     At the outset of the Medicaid program, Title XIX required the use by the states of reimbursement methods and standards that fully covered all of the costs of participating hospitals under reimbursement and cost-finding principles derived from the Medicare program.

27.     In 1981, Congress, by amending Title XIX under what commonly is known as the "Boren Amendment," increased the states flexibility in this area.  Pub. L. No. 97-35, codified at 42 U.S.C. § 1396a(a)(13)(A).  The Boren Amendment permitted the States to adopt any of a variety of payment methods and standards, provided that they could "assure" the Secretary that the resulting rates were at least "reasonable and adequate to cover the costs of economically and

efficiently operated" hospitals.  This payment standard later was amended (under § 1923 of the Social Security Act) to provide for additional reimbursements to those hospitals that treat a "disproportionate share" of indigent patients.

28.    Under suits brought to enforce the Boren Amendment and a similar provision of Title XIX pertaining to payments for outpatient services (42 U.S.C.  § 1396a(a)(30)(A)), federal courts across the country had routinely invalidated budget-driven cuts to Medicaid reimbursements.  Thereafter, and at urging of National Governors Association, Congress repealed the Boren Amendment requirements under the Balanced Budget Act of 1997, Pub. L. No. 105-33 (the "BBA"), § 4711(a).

29.    The BBA replaced the Boren Amendment requirements to pay "reasonable and adequate" rates with a stripped down "public process" standard, currently codified at 42 U.S.C. § 1396a(a)(13)(A)(i)-(iv).  Under the BBA's public process provisions, states are obligated only to set hospital inpatient rates based on a public process, but no minimum level of payment is specified.

30.    As a result, many states, including Pennsylvania, have since 1997 prescribed FFS payments that are below the hospitals' actual costs of providing hospital services, provide no rate of return on invested capital, and are no longer adequate to cover the underlying costs to even the most economical and efficient hospitals of providing such care.

31.    Health care providers may elect to enroll as "participating providers" in their State Medicaid Programs.  Virtually all hospitals participate in Medicaid.  In the case of nonprofit hospitals, Medicaid participation also typically is compelled by mission statements, and (directly or indirectly) by state and federal tax laws.

32.    A substantial portion of the Plaintiff Hospitals' patients are covered by Medicaid. Most Plaintiff Hospitals qualify under § 1923 of the Social Security Act as hospitals that treat a disproportionate number of low income patients with special needs.  Such hospitals are even

9

more greatly impacted than most hospitals by the payments of below-cost rates for Medicaid patients.

**(ii)    Medicaid Managed Care**

33.     In addition to the FFS program, states also may establish managed care programs under which they contract with Medicare managed care organizations ("MCOs"), including HMOs, to provide medical assistance services.

34.     Historically, Medicaid enrollees enjoyed a free choice to receive services under the Medicaid FFS Program or to voluntarily enroll in a Medicaid managed care plan, and states could mandate enrollment in a Medicaid MCO only by establishing a mandatory managed care program through a federal "waiver" or "demonstration" program established pursuant to section 1115 or section 1915(b) of the Social Security Act (42 U.S.C. §§ 1315, 1396n).

35.     Under § 1932(a) of Title XIX (42 U.S.C. § 1396u-2(a)), enacted by § 4701(a) of the BBA of 1997, states were given increased flexibility to establish mandatory managed care programs for defined populations, without having to obtain a special waiver from CMS.

36.     There has been a proliferation of mandatory Medicaid managed care programs across the country in recent years.

37.     Under the prevailing Medicaid managed care model, states contract with MCOs to provide covered services on an "at risk basis" under which Medicaid MCOs provide all covered services for a prepaid fixed, or "capitated," per member per month ("PMPM") fee. MCOs accrue profits to the extent their total capitation fees exceed the costs of administering the plan and reimbursing providers for services rendered, and, conversely, lose money if their medical and administrative expenses exceed the capitation fees

38.     More than one Medicaid MCO typically operates in a given service area. Eligible Medicaid recipients (*i.e.*, "Members") must select or are assigned to particular a Medicaid managed care plan.

39.    To deliver covered services, most MCOs contract with and establish a "network" of physicians, hospitals and other in-plan medical service providers.

40.    Except for EMS and family planning services, Members are restricted to using in-plan, network providers.

41.    To the extent a MCO saves money by paying less for out of network emergency services, it "pockets" that money, and does not pass the savings through to the state.

42.    Under the prevailing model, MCOs must hold the states harmless for any losses they may incur throughout the life of their contracts with the MCOs, including any losses arising from the MCOs payments for non-contracted EMS.  Consequently, the MCO not the state absorbs the financial detriment of paying larger sums of money for non-contracted EMS.

43.    MCOs are not obligated to contract with any particular provider, nor are any particular providers participating in the FFS program obligated to enter into comprehensive network agreements with any particular Medicaid MCO.

44.    When MCOs do contract with providers of health care services, the rates generally are set through arms' length negotiations, based on market factors.

45.    Negotiated payment rates ordinarily are different from (e.g., per day versus per case inpatient rates) and materially higher than those Medicaid FFS rates for equivalent services.

46.    Not being required to do so, Plaintiffs ordinarily do not enter into or renew contracts with Medicaid MCOs under which they lose money.

**Pennsylvania's Medicaid Program**

47.    Pennsylvania's Medicaid agency, the Pennsylvania Department of Public Welfare ("PADPW"), establishes hospital-specific inpatient rates, and standardized physician and hospital outpatient services fee schedules, under the state's Medicaid FFS Program.

48.    For nearly twenty (20) years, the Pennsylvania FFS rates have not been established through formal notice and comment rulemaking.  They have instead been established

and adjusted from time to time under a series of what are referred to as industry-wide "Rate Agreements."

49.     By adopting Medicaid rates in this fashion, Pennsylvania bypasses public notice and comment and circumvents the multi-step public process currently required for setting hospital payments under a state plan by § 1902(a)(13)(A)(i)-(iv) of the Social Security Act.

50.     The inpatient FFS rates PADPW sets for general hospitals (including childrens hospitals) under the Rate Agreements utilize prospectively determined per case rates.  A payment is made for each case by multiplying the base rate by a "weighting" factor that based is on the particular diagnosis related grouping ("DRG") into which each discharge is assigned.

51.     The base DRG rates still used in the Rate Agreements were derived from audited hospital-specific costs in 1987-1988.  The FFS rates have never been "rebased" to reflect the hospitals actual updated costs since then.  Instead, these rates have been adjusted (*i.e.*, trended) by PADPW over time based on a fixed, budget-driven inflation factor, without ever comparing the resulting rates to the hospitals' actual costs.  Pennsylvania currently is planning to modify its DRG system, but these modifications are "budget neutral" and will continue to pay hospitals less than their costs.

52.     The BBA amendment to § 1902(a)(13)(A) of the Social Security Act relieved Pennsylvania of any obligation to assure the Secretary that its FFS rates are adequate to cover Hospitals' costs of treating Medicaid patients.

53.     Now permitted by federal statutory law to do so, Pennsylvania uses DRG rates that yield payments that are well below Medicare levels and commercial insurance fees, and substantially below most hospitals' actual costs.

54.     In the case of some of the Hospitals, the Medicaid FFS rates produce payments that are approximately 40% below the actual costs of providing inpatient care to Medicaid patients, even when "add-ons" paid in recognition of the graduate medical education ("GME")

costs of teaching hospitals, and quarterly lump sum payments made to certain hospitals that provide a disproportionate share of indigent care (*i.e.*, "DSH payments"), are taken into account.

55.     The Medicaid FFS outpatient fees and fees for ambulatory EMS (*i.e.*, emergency room care) are even worse than the inpatient rates.  These fees tend to cover only a small fraction of the actual costs of and usual (stated) charges for providing such services.

56.     The Commonwealth of Pennsylvania operates a Medicaid FFS program in all parts of the Commonwealth.

57.     Pennsylvania also operates a mandatory Medicaid managed care program, known as "HealthChoices," pursuant to a federal § 1915 waiver in several parts of the state.

58.     Under HealthChoices, specified Medicaid populations (including indigent single mothers and dependent children, and including the majority of people who qualify for Medical Assistance) residing in certain geographic areas (including Pittsburgh and vicinity, and Philadelphia and its five surrounding counties) are required enroll in one of the HealthChoices plans.

59.     The majority of Plaintiffs' Medicaid patients are enrolled in HealthChoices, and are reimbursed by Medicaid MCOs.

## Legal Requirements to Provide EMS

60.     The Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, obligated hospitals with dedicated emergency departments, as a condition of Medicare participation, to provide EMS without delay, to any and all patients who present with an emergency medical condition, and to inquire about or seek payment only after the patient has been stabilized.  EMTALA thus prohibits Hospitals from denying EMS based on the inadequacy of what will be paid for EMS.

61.     Under federal law, emergency medical conditions are defined broadly and liberally under a "prudent layperson" standard.

62.    Under EMTALA, hospitals also are required to treat any and all patients for treatment who present in active labor.

63.    CMS recently adopted a rule further requiring hospitals with specialized capabilities, but lacking dedicated emergency departments, to provide services to medically unstable patients transferred from other hospitals that lack the capacity to provide the services required.  This rule further expands the scope of cases that are subject to the DRA Default Rate.

64.    A hospitals' participation in Medicare, which mandates compliance with EMTALA, is necessary as a practical matter, and as an essential condition of providing hospital services.

65.    Virtually every general hospital in the United States, participates in the Medicare program.

66.    Most citizens of age 65 and older, as well as disabled patients and patients (of all ages) with end stage renal disease ("ESRD"), are covered by Medicare.

67.    Hospitals also are required to participate in Medicare under state law as a pre-condition to participating in Medicaid.

68.    In Pennsylvania, hospitals that provide EMS additionally are obligated to treat medical emergencies first, and ask questions about the source of payment only after the patient is medically stable, under state law (including 40 P.S. § 991.2116 and licensure regulations issued by the Department of Health).

69.    On information and belief, virtually all states obligate general hospitals to participate in Medicare either as a condition of licensure, and/or as a condition of participating in Medicaid.

70.    IRS Revenue Ruling 69-545 indicates that nonprofit hospitals with emergency departments independently are required to treat patients who require EMS services without

regard to payment source, as a condition of maintaining their status as a nonprofit corporation under § 501(c)(3) of the Internal Revenue Code.

**Impact of the DRA Default Rate Provision on Plaintiffs**

**(i)    Payments for EMS Without the DRA Default Rate**

71.    Unless prohibited from doing so by state law, hospitals typically bill non-contracted MCOs and other health plans whose patients they treat on an emergency basis based on their non-discounted usual, or "stated," charges.

72.    When emergency patients are medically stable, they may lawfully be transferred by the MCO to an "in-network" hospital.  Hospitals and MCOs frequently negotiate case-specific discounts to cover the patient's entire stay.  These negotiated rates typically are based on a substantial percentage (e.g., 60-80%) of charges, and typically vastly exceed Medicaid FFS rates.

73.    Barring implementation of the Default Rate Provision, the payment due from a non-contracted health plan for EMS under Pennsylvania's HealthChoices program is determined by negotiations, or in the absence of negotiated agreement, under applicable state law.

74.    Prior to January 1, 1999, the controlling law in Pennsylvania for cases where hospitals treated the patients of non-contracted MCOs without having negotiated case-specific rates was based on common law principles of unjust enrichment.  Applying these principles, Temple Univ. Hosp., Inc. v. Healthcare Management Alternatives, Inc., 832 A.2d 501 (Pa. Super. 2003), found that the applicable Pennsylvania Medicaid rates covered only about 80% of the Plaintiff Hospital's costs, and further concluded that payment for non-contracted EMS based on the Medicaid rates would be "absurd," and result in the MCO being "unjustly enriched."

75.    Effective January 1, 1999, MCO payments for non-contracted EMS services rendered by Pennsylvania hospitals is controlled by statute, 40 P.S. §991.2116 ("Act 68").  Act 68 is a consumer rights statute that obligates all Pennsylvania MCOs –  including without

exception or limitation those serving Medicaid patients – to directly pay EMS providers the "all reasonably necessary costs" consumers incur for EMS.

76.    This standard requires payment based on stated charges, or of some other amount that is substantially greater than Medicaid FFS notes.

77.    In <u>The Hospital and Health System of PA v. PADPW</u>, 888 A.2d 601 (Pa. 2005), the Pennsylvania Supreme Court declared that the adoption of mandated Medicaid FFS rates through a budget bill violated the State Constitution.  In so ruling, the Court rejected the State's claims that Act 68 – which applies to both Medicaid and commercial MCOs – could be satisfied by payment of the Pennsylvania Medicaid FFS rates, citing with approval the <u>Temple</u> decision's observations about the inadequacy of those rates.

**(ii)    Payments for EMS Under the DRA**

78.    As a result of the DRA, the Plaintiff Hospitals' entitlement to be paid higher rates under existing state law and contract law principles will be supplanted by the Default Rate Provision, effective January 1, 2007, under the Supremacy Clause.

79.    The Default Rate Provision was added to the bill amending Title XIX, Pub. L. No. 109-175, in the Conference Committee.  It provides as follows (emphasis added):

> *SEC. 6085.  EMERGENCY SERVICES FURNISHED BY NON-CONTRACT PROVIDERS FOR MEDICAID MANAGED CARE ENROLLEES.*
>
> *(a)    In General - Section 1932(b)(2) of the Social Security Act (42 U.S.C. 1396u-2(b)(2)) is amended by adding at the end the following new subparagraph:*
>
> > *(D)    EMERGENCY SERVICES FURNISHED BY NON-CONTRACT PROVIDERS - <u>Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity</u> that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan <u>must accept as payment in full the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance <u>under this title other than</u>*

> *through enrollment in such an entity.*  *In a state where rates paid to hospitals* *under the state plan are negotiated* *by contract* *and not publicly released*, *the payment amount applicable under this subparagraph shall be the* *average contract rate* *that would apply under the state plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.*

> (b)    *Effective Date - The amendment made by subsection (a)* *shall take effect on January 1, 2007.*

80.    A version of the Default Rate Provision included in an earlier version of the bill before the Conference Committee would have applied only to those hospitals voluntarily enrolled in Medicaid.  As finally enacted, however, the DRA Default Rates apply to "[a]ny provider of emergency services," regardless of whether or not the provider chooses to participate in Medicaid.

81.    On information and belief, the Default Rate Provision was proposed by lobbyists engaged by UnitedHealth Group ("UHG"), a publicly traded company that is the second largest managed care company in the United States.  UHG operates Medicaid managed care plans throughout the United States on a for-profit basis through a wholly owned or controlled subsidiary, AmeriChoice, Inc.

82.    On information and belief, UHG engineered the adoption of this amendment to Title XIX for its personal financial advantage in order to avoid greater liability to non-contracted hospitals located in Pennsylvania and in other states whose laws do not limit non-contracted reimbursement for EMS, or which prescribe payments substantially higher levels than the Medicaid FFS Rates.

83.    While the Default Rate Provision personally, directly, and substantially benefits private Medicaid MCOs, the same is not true for the states.

84.    On information and belief, most Medicaid MCOs operate on an "at risk" basis, and paid fixed capitated fees – typically set under multi-year contracts.

85. Consequently, MCOs must absorb the specific costs of EMS, without passing through to the State Medicaid agencies with which they have contracted any of the savings realized as a result of the enactment of § 6085.

86. Stated otherwise, the benefit of any limitation on non-contracted expenditures by the MCOs imposed under the DRA inures directly and exclusively to the benefit of privately owned MCOs, and is not passed through to the public.

**(iii)    Impact of DRA Default Rate Provision on Hospitals**

87. As a direct result of the BBA, which freed states to set their FFS rates below the costs incurred even by economically and efficiently operated providers, and of Pennsylvania's use of below-cost Medicaid FFS rates with this federal imprimatur, Hospitals will be forced to subsidize Medicaid MCOs

88. Effective January 1, 2007, the Default Rate Provision will force Hospitals to forego payments based on their charges, discounted charges, or some other more generous rate from HealthChoices plans and other Medicaid MCOs.

89. Although § 6085 applies only to EMS provided to patients enrolled in non-contracted Medicaid MCOs, these forced subsidies nonetheless can impose severe financial burdens on Hospitals.

90. Overall, Pennsylvania Hospitals operate at slender operating margins – just above 3.5% in the FYE June 2005, according to a recent Annual Report of the Pennsylvania Health Care Cost Containment Council ("PHC4"). Approximately 71% of all hospitals in the Commonwealth operated at a loss on operations, on average, over the past three years. Id.

91. The same PHC4 Report observes, in specific findings that are incorporated as allegations herein, that the failure to realize an adequate margin above operating costs from third-party payments can imperil the hospital's business as a going concern, and jeopardize the quality of health care it provides.

92.     Medicaid patients comprise a substantial portion of the census of each of the Hospitals, particularly of those located in urban settings or other areas in which significant numbers of indigent citizens reside.  For example, over 20% of Plaintiff TJUH's acute care inpatient census, over 40% of Plaintiff CHOP's inpatients, and over 33% of Plaintiff AEMC's acute care inpatient census are Medicaid patients.

93.     These services all are potentially subject to the DRA Default Rate Provision.

94.     A majority of Medicaid patients who reside in Plaintiff Hospitals' service areas are enrolled in mandatory Medicaid managed care plans.

95.     Despite theories about "managing care" and the goal of avoiding unnecessary consumption of emergency services through managed care, it remains the case that about 50% or more of Hospitals' Medicaid patients are admitted on emergency, rather than pre-planned elective, basis.

96.     Under EMTALA, IRS rulings, and analogous state laws, Hospitals could refuse to treat patients covered by the Default Rate only at peril of fines, loss of licensure or operating certifications, loss of nonprofit corporate existence, or other serious sanctions.

97.     Plaintiff Hospitals all will be adversely impacted by the Default Rate Provision.

98.     None presently contracts with every HealthChoices MCO in the Commonwealth of Pennsylvania and bordering states, and all Hospitals have treated or will provide treatment on or after the effective date of the DRA to patients of non-contracted Medicaid MCOs located in Pennsylvania or other (*e.g.*, adjoining) states.

99.     Beginning January 1, 2007, the Default Rate Provision will force Hospitals to accept confiscatory (i.e., below cost) rates for EMS from Medicaid MCOs.

100.     This harm, though financial, will be irreparable unless the operation of § 6085 is enjoined as to Plaintiffs.

101.    Under § 1128B(d) of the Social Security Act, 42 U.S.C. § 1320a-7b(d), providers are subject to imprisonment and fines of $25,000 for charging more than the rates prescribed under Title XIX for services to "an individual enrolled with a Medicaid managed care organization."  Consequently, unless the application of the DRA Default Rate Provision is enjoined as to Plaintiffs, Plaintiffs will have no way to assert and preserve claims against MCOs for amounts in excess of the confiscatory rates imposed by § 6085 without subjecting themselves to potential criminal liability and exclusion from Medicare and Medicaid.

102.    The harm that will be caused Plaintiffs by the Default Rate Provision is not limited to confiscatory payments in individual cases, but also includes interference with Hospitals' ability to negotiate fair rates of payment from MCOs.

103.    It is typical for Hospitals to negotiate case-specific rates for individual patients of health plans with which Hospitals do not have a contract, or to enter into "emergency only" agreements with certain plans in the absence of a comprehensive "full network agreement." Such arrangements frequently are based upon a significant percentage (*e.g.*, 60% - 80%) of the hospitals' usual, stated charges.  The ability to force Hospitals to accept below-cost Medicaid FFS rates in the absence of an agreement eliminates or greatly reduces the incentives of Medicaid MCOs to negotiate payments for EMS with non-contracted hospitals.

104.    The DRA Default Rate Provision also impairs Hospital's contracting rights more broadly.

105.    On information and belief, Medicaid MCOs operating in Plaintiffs' service areas already have been emboldened by the DRA Default Rate provisions to offer less desirable contract terms than they would offer in the absence of the leverage afforded them by the Default Rate Provision.

106.    Many Plaintiffs currently have or will soon have contracts that are subject to negotiation or are up for renegotiation with some Medicaid MCO.

107.    The bargaining leverage afforded MCOs by the impending effective date of the Default Rate Provision gives Hospitals the Hobson's choice of either foregoing "low ball" contracts and losing elective business (and receiving confiscatory fees for EMS under § 6085), or entering into disadvantageous contracts that will be binding throughout their term, even if the DRA should later be declared unconstitutional or inapplicable to Hospitals.

108.    The adverse impacts of the Default Rate Provision are, moreover, aggravated by the declining availability of EMS.

109.    EMS is expensive to provide, and often is consumed by uninsured and underinsured patients from whom hospitals receive little or no reimbursement.

110.    The Default Rates comes to fruition at a time when numerous studies report a growing crisis in the nation's emergency care network.  According to various national and governmental studies, hospitals are increasingly closing emergency departments due to funding problems, and hospital emergency departments increasingly are being placed on "divert" status because of demands for EMS that outstrip its availability.

111.    Mandating below-cost reimbursements for the benefit of Medicaid HMOs only further exacerbate these problems by diminishing the already inadequate fees for EMS.

112.    In contrast with the precarious finances of the hospital sector, the Wall Street Journal reported on November 15, 2006 the "in Medicaid, private HMOs take a big, and profitable role," and that "four of the biggest Medicaid HMOs … have seen their shares surge on the New York Stock Exchange over the past few years…"  The same WSJ reports that Medicaid HMOs have invested heavily in lobbying for the adoption of favorable laws.

## COUNT I
## DECLARATORY RELIEF

113.    Paragraphs 1 through 112 of the Complaint are incorporated by reference as though fully set forth herein.

114.    42 U.S.C. § 1396u-2(b)(2), as amended by § 6085 of the DRA, establishes a default rate based on Medicaid FFS rates for EMS provided to patients enrolled in Medicaid managed care plans with which the EMS provider does not have a contract in effect.

115.    Section 6085 of the DRA lists two circumstances under which the Default Rate applies.  The first is in states in which rates are established in accordance with and "under Title XIX."  The second is in states where payments "under the state plan are negotiated by contract and not publicly released." (In the latter case, the DRA prescribes as the Default Rate "the average contract rate that would apply under the state plan for general acute care hospitals or … for tertiary hospitals.")

116.    For rates established "under Title XIX,"  § 1902(a)(13)(A) of the Social Security Act currently requires states to publish a notice of proposed rates, solicit comments, and promulgate rates that fulfill any applicable statutory criteria after the consideration of such public comments, and then publish final rates including "justifications for such [published] final rates." Id. at § 1902(a)(13)(A)(i)-(iv).

117.    Pennsylvania has not adopted its current rates for hospital services in the manner provided for "under" § 1902(a)(13)(A) for nearly fifteen (15) years.

118.    Instead, Pennsylvania has set its rates informally through periodic Rate Agreements which are driven by state budgetary needs, are not subject to notice and comment, and which completely bypass review by the state legislature and the Pennsylvania Independent Regulatory Review Commission.

119.    Consequently, Pennsylvania's FFS rates are not covered by the first sentence of § 6085.

120.    In lieu of following the usual notice and comment procedure or any other process authorized under § 1902(a)(13)(A), PADPW adopted the Rate Agreements developed in discussions with the Hospital and HealthSystem Association of Pennsylvania.

121.    The FFS rates adopted in this unconventional fashion are ostensibly "negotiated." The rates, however, apply even to hospitals that do not execute a Rate Agreement, and they are not "negotiated by contract." Further, and through a variety of means, the rates determined pursuant to the Rate Agreement are ascertainable through public information, and otherwise are "publicly released."

122.    Consequently, Pennsylvania's Medicaid FFS rates do not fit within the second alternative § 1395u-2(b)(2).

123.    In light of the foregoing, Pennsylvania's FFS Rates are not subject to § 6085 of the DRA.

## COUNT II
## TAKINGS CLAUSE

124.    Paragraphs 1 through 123 of the Complaint are hereby incorporated by reference as if fully set forth herein.

125.    The takings clause of the Fifth Amendment to the Constitution prohibits the taking of "private property" by the government "without just compensation."

126.    Takings are not limited to outright seizures or condemnations of physical property, but may include the forced diminution in the value of private property resulting from governmental regulation of the use of private business or property.

127.    The Default Rate Provision, in conjunction with the BBA, EMTALA and other federal law, affects an unconstitutional taking of Plaintiffs' property by, inter alia:

A.    Denying Plaintiffs fair, adequate and reasonable reimbursement for EMS to which they would otherwise be entitled by law in the ordinary course of business under existing law;

B.    Affirmatively mandating the payment of inherently confiscatory rates to Hospitals located in Pennsylvania (as in other states that, under the authority of the BBA, have adopted Medicaid FFS rates that pay less than it cost to provide medical assistance).

128.    The federally mandated Default Rates, as applied, will deny Hospitals payments that are consonant with a fair return on equity.

129.    Beyond forcing Plaintiff Hospitals to accept confiscatory payments for valuable services, § 6085 interferes with and the unfairly advantages MCOs in contract negotiations with Plaintiffs, now and in the future.

130.    The "public use" clause of the Fifth Amendment permits any taking of private property only for a public purpose.

131.    The takings affected by § 6085 are not for a public purpose.  In this regard:

A.    This provision forces Plaintiffs to absorb losses and thereby directly subsidize privately owned and operated MCOs;

B.    Given their prevailing "at risk" payment arrangements with Pennsylvania (and other states), privately owned MCOs are the sole, direct and substantial beneficiaries of the Default Rate;

C.    Any benefit to states that might result from Hospitals accepting lower payments losses is, at best, indirect, incidental, and attenuated;

D.    The Default Rate Provision was enacted at the instance and for the pecuniary benefit of the managed care industry as a means of enhancing the profitability of private HMOs; any intended or alleged public benefit is pretextual.

132.    The federal regulatory taking affected by the Default Rate Provision in combination with EMTALA is attended by a physical invasion of Plaintiffs' property:

A.    This includes the federally mandated use of Hospitals' real property, emergency medical facilities and services;

B.    The mandated use of Plaintiffs' property under EMTALA and the Internal Revenue Code for emergency patients precludes the Plaintiffs' contrary or alternative use of their property and services.

133.    Accordingly, the confiscatory payments mandated by the DRA affect an unlawful taking per se.

**COUNT III**
**DUE PROCESS VIOLATION**

134.    Plaintiffs hereby incorporate paragraphs 1 through 133 of the Complaint as if they were fully set forth herein.

135.    The Default Rate Provision fails to substantially enhance governmental cost-savings or to advance any other legitimate governmental purpose.

136.    The federal government funds Medicaid through cost-sharing payments to the States that are allocated under statutory formulas.  The enhanced margins Medicaid MCOs will retain for non-contracted EMS as a result of § 6085 of the DRA will not meaningfully reduce the federal share paid for medical assistance under § 1903 of the Social Security Act.

137.    Because the states, including Pennsylvania, pay Medicaid MCOs on an "at-risk" basis, § 6085 does not substantially advance Medicaid cost savings at the state level in Pennsylvania (or in states with similarly situated Medicaid managed care programs), but, instead, merely effects a cost-shifting from the MCOs to the Hospitals.

138.    By requiring hospitals to provide non-contracted EMS for below cost payments, the Default Rate Provision is detrimental to the legitimate public purposes of encouraging Medicaid MCOs to contract with as many hospitals in the community as possible and incenting MCOs to discourage Members' use of EMS.

139.    Section 6085 also results in cost-shifting among third-party payers for health care services by forcing hospitals to charge more to others (such as private employer plans) in order

to cover their subsidies to Medicaid MCOs, in contravention of the longstanding federal policy against such cost shifting.

140.    Because it fails to substantially advance the ostensible goal of public cost savings, or any legitimate state interest, but instead produces forced subsidiaries and cost shifting for the benefit of Medicaid MCOs, § 6085 of the DRA is unconstitutional under the Due Process Clause of the Fifth Amendment.

## COUNT IV
## EQUAL PROTECTION VIOLATION

141.    Plaintiffs hereby incorporate paragraphs 1 though 140 of the Complaint as if they were fully set forth herein.

142.    Freed by the repeal of the Boren Amendment from the requirement to pay "reasonable and adequate" rates, states have taken widely varying approaches in setting hospital rates under their Medicaid programs.

143.    In some states, including, on information and belief, New York and New Jersey, Medicaid rates are set at levels that often are more than adequate to cover hospital costs and to ensure the economic viability of hospitals that treat substantial volumes of Medicaid patients.

144.    In such states, the rates imposed by § 6085 are not confiscatory, and may even be fair and reasonable.

145.    In other states, including Pennsylvania, Medicaid rates for hospitals are set at levels that are woefully inadequate to cover the costs of providing EMS and other hospital services to Medicaid patients.

146.    The DRA Default Rate Provision arbitrarily and irrationally incorporates widely disparate Medicaid FFS rates set by the states, without examination or modification, as the federally mandated basis for payments by Medicaid MCOs without regard to such disparities.

147.    The DRA Default Rate Provision produces dramatically different payments in different states.  Whether or not a hospital is paid enough by Medicaid MCOs to cover its costs as a matter of federal law turns solely on the state in which the hospital is located.  For example, by operation of § 6085, hospitals located in New Jersey, just a few miles away from any of the Plaintiff Hospitals, would be entitled to payments that more than cover their costs for EMS, while Plaintiff Hospitals would be forced by the same federal law to subsidize the same MCOs for EMS provided to the same patients.

148.    As a result of these disparities, and the failure of Congress to impose any floor in what MCOs must pay, the DRA Default Rate Provision unfairly discriminates against Plaintiff Hospitals as compared with hospitals located in states that set Medicaid rates high enough to cover or exceed the costs of providing EMS.

149.    There is no rational basis for the discriminatory payment scheme imposed by Default Rate Provision.

150.    The DRA Default Rate Provision violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment as incorporated under the Fifth Amendment.

## COUNT V
## VIOLATION OF THE BICAMERAL CLAUSE

151.    Plaintiffs hereby incorporate paragraphs 1 through 150 above, as if they were fully set forth herein.

152.    The DRA is constitutionally invalid because the version of the Act passed by the House was not identical to the version passed by the Senate and signed by the President.

153.    In the fall of 2005, the House and Senate passed different versions of a budget bill referred to as S. 1932.

154.    To reconcile the differences between the House and Senate bills, the legislation was sent to a House-Senate Conference Committee.  The bill was modified in conference, and the final conference report was filed on December 19, 2005.

155.    On December 19, 2005, the House passed the conference report on S. 1932 by a vote of 212 to 206.

156.    On December 19, 20, and 21, 2005, the Senate considered the Conference Report. Several points of order were raised against the Report and sustained as violating the rules of the congressional budget process.  A motion was made to waive the points of order, but the motion was defeated.  As a result, the conference report did not pass in the Senate.

157.    On December 21, 2005, the Senate passed an amended version of S. 1932 that omitted the items that gave rise to the points of order.  The bill passed 51 to 50, with Vice President Cheney casting the tie-breaking vote.

158.    On information and belief, when the Senate clerk transmitted S. 1932, as amended, to the House, the Senate clerk made a substantive change to section 5101 of the bill. On February 1, 2006, the House voted on the versions of S. 1932 that contained the clerk's error and that, therefore, was not identical to the version of the bill passed by the Senate.  The House passed S. 1932, with the clerk's error, by a vote of 216 to 214.

159.    Because the legislation originated in the Senate, the House returned the legislation to the Senate for transmission to the President for his signature.  On information and belief, at this point, a Senate clerk altered the legislation passed by the House by changing the provision that provided for 36 months of payment for certain durable medical equipment back to the 13 months approved by the Senate.

160.    The version of S. 1932 transmitted to the President was the version passed by the Senate, but not by the House.  As part of the transmittal of S. 1932 to the President, House Speaker Dennis Hastert and president pro tem of the Senate Ted Stevens signed a statement

attesting that the legislation had been passed by both the House and the Senate, but that was not true.

161.    On February 8, 2006, president Bush signed the bill that was passed by the Senate, but not by the House.

162.    The Bicameral Clause of the United States Constitution, article 1, section 7, provides that "Every Bill [must] have passed the House of Representatives and the Senate" before it becomes at law.

163.    The Act signed by the President was never passed by the House of Representatives.  The Act therefore violates article 1, section 7 of the Constitution.

164.    Plaintiffs have been injured by the enactment of S. 1932.

## RELIEF

WHEREFORE, Plaintiffs pray for the entry of an Order:

A.    Declaring that Pennsylvania's uniquely and unconventionally determined Medicaid FFS rates are not covered by the DRA Default Rate Provision (Count I);

B.    Declaring that the DRA Default Rate Provision, as applied to Hospitals in conjunction with the BBA, EMTALA and other applicable law, violates the taking clause and imposes an unconstitutional regulatory taking of private property for a private benefit in violation of the Fifth Amendment to the Constitution (Count II);

C.    Declaring that § 6085 of the DRA is unconstitutional under the Due Process Clause of Fifth Amendment to the Constitution for failure to substantially advance a legitimate state purpose (Count III);

D.    Declaring that § 6085 of the DRA denies Plaintiffs rights to Equal Protection under law as guaranteed by the Fourteenth Amendment and Fifth Amendment (Count IV);

E.       Declaring that the DRA as a whole is unconstitutional under the Bicameralism requirement (Count V);

F.       Enjoining the Secretary from enforcing § 6085, as enacted, against Plaintiffs (all Counts); and

G.       Awarding Such other relief as the Court may deem just and proper (all Counts).

Respectfully submitted,

__December 27, 2006___                          _____/s/_____
Dated:                                          L. Barrett Boss (D.C. Bar No. 398100)
                                                COZEN O'CONNOR
                                                1627 I Street, NW, Suite 1100
                                                Washington, D.C., 20006
                                                Telephone (202) 912-4800
                                                Facsimile  (866) 413-0172
                                                bboss@cozen.com

                                                _____/s/_____
                                                Mark H. Gallant (D.C. Bar No. 913111)
                                                COZEN O'CONNOR
                                                1900 Market Street
                                                Philadelphia, PA  19103
                                                Telephone (215) 665-2000
                                                Facsimile (215) 665-2013
                                                mgallant@cozen.com

                                                Attorneys for Plaintiffs

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Albert Einstein Medical Center, et al.

## DEFENDANTS

Michael O. Leavitt, Secretary,
Department of Health and Human Services

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

L. Barrett Boss
Cozen O'Connor
1627 I Street, NW, Suite 1100
Washington, DC 20006
(202) 912-4800

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

◉ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☒ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities-Employment <br> ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 1331 claim challenging Medicaid default rates imposed by Deficit Reduction Act as unconstitutional taking under 5th Amendment.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ n/a  Check YES only if demanded in complaint  JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE 12/27/2006   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.