IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE URBAN HEALTH CARE COALITION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. A. No. 06-2220 (RWR) ) |
| MICHAEL O. LEAVITT, Secretary, Department of Health and Human Services, | ) ) ) |
| Defendant. | ) ) |

## DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

defendant Michael O. Leavitt, Secretary of Health and Human Services, respectfully moves this

Court to dismiss this action for lack of subject matter jurisdiction, or, in the alternative, for

failure to state a claim upon which relief can be granted.  The grounds for this motion are set out

in Defendant's Memorandum in Support of Motion to Dismiss for Lack of Subject Matter

Jurisdiction or, in the Alternative, for Failure to State a Claim, filed herewith.

Dated: February 27, 2007                    Respectfully submitted,

OF COUNSEL:                                 PETER D. KEISLER
                                            Assistant Attorney General
DANIEL MERON
General Counsel                             JEFFREY A. TAYLOR
                                            United States Attorney
KATHLEEN H. MCGUAN
Associated General Counsel                  SHEILA M. LIEBER
                                            Deputy Director
MARK D. POLSTON                             Federal Programs Branch
Deputy Associate General Counsel
  for Litigation                            [*signature block continued on next page*]

SUSAN MAXSON LYONS                     /s/ Robert J. Katerberg
ROBERT W. BALDERSTON                  ROBERT J. KATERBERG
Attorneys                               (D.C. Bar No. 466325)
Department of Health and Human Services  Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue, N.W., Room 6112
                                        Washington, D.C. 20001
                                        Telephone:    (202) 616-8298
                                        Facsimile:    (202) 616-8460
                                        Robert.Katerberg@usdoj.gov

                                        Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE URBAN HEALTH CARE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. A. No. 06-2220 (RWR) |
| MICHAEL O. LEAVITT, Secretary, Department of Health and Human Services, | ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
OR, IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associated General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
  for Litigation

SUSAN MAXSON LYONS
ROBERT W. BALDERSTON
Attorneys
Department of Health and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

ROBERT J. KATERBERG
  (D.C. Bar No. 466325)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Rm. 6112
Washington, D.C. 20001
Telephone:    (202) 616-8298
Facsimile:    (202) 616-8460
Robert.Katerberg@usdoj.gov

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

BACKGROUND ........................................................................................................ 4

    A.    The Medicaid Program Generally ........................................................ 4

    B.    Various Systems for Delivery of Health Care to Medicaid Beneficiaries ............ 5

    C.    The Need to Contain Medicaid Costs and the
          Problem Addressed By § 6085 .......................................................... 6

    D.    The Instant Litigation ..................................................................... 11

ARGUMENT ........................................................................................................ 11

    I.    THE COURT LACKS SUBJECT MATTER JURISDICTION
        OVER PLAINTIFFS' CLAIMS ..................................................... 11

        A.    Plaintiffs Lack Standing Because Their Alleged Injury is
            Neither Traceable To Any Action By the Secretary Nor
            Redressable By an Order Against Him .................................... 13

        B.    This Case is Non-Justiciable Because It Essentially Seeks an
            Advisory Opinion on a Legal Issue Anticipated in Future Litigation ...... 20

        C.    No Applicable Waiver of Sovereign Immunity Permits
            This Suit Against the Government ........................................ 23

        D.    This Suit is Not Based on Any Recognized Cause of Action ................. 25

    II.    THE COMPLAINT FAILS TO STATE A CLAIM UPON
        WHICH RELIEF CAN BE GRANTED ......................................... 26

        A.    Plaintiffs' Claim for a Declaratory Judgment is Specious
            Because Section 6085 Clearly Applies in Pennsylvania ........................ 26

        B.    The Complaint Fails to State a Claim Against the Secretary That
            Section 6085 Is Unconstitutional Under Any Aspect of the Fifth
            Amendment .................................................................... 28

        C.    Every Court That Has Addressed the Issue Has Rejected Plaintiffs'
            Argument That the Statute Was Not Properly Enacted ........................ 31

CONCLUSION ...................................................................................................... 32

# TABLE OF AUTHORITIES

## CASES                                                                  Page(s)

Akins v. Penobscot Nation,
    130 F.3d 482 (1st Cir. 1997) ......................................................................... 26

Alaska Dep't of Health & Social Servs. v. Centers for Medicare and Medicaid Services,
    424 F.3d 931 (9th Cir. 2005) ....................................................................... 30

Ass'n of Inv. Brokers v. SEC,
    676 F.2d 857 (D.C. Cir. 1982) .................................................................... 15

Burditt v. U.S. Dep't of Health & Human Services,
    934 F.2d 1362 (5th Cir. 1991) ..................................................................... 29

Cal. Dep't of Soc. Servs. v. Leavitt,
    444 F. Supp. 2d 1088 (E.D. Cal. 2006), appeal on other grounds pending,
    No. 06-56136 (9th Cir.) ............................................................................... 31

Calderon v. Ashmus,
    523 U.S. 740 (1998) ................................................... 3, 12, 20, 21, 22, 23

Cale v. City of Covington,
    586 F.2d 311 (4th Cir. 1978) ...................................................................... 25

City of New Orleans v. Dukes,
    427 U.S. 297 (1976) .................................................................................... 29

Coffman v. Breeze Corporations, Inc.,
    323 U.S. 316 (1945) ............................................................ 3, 21, 22, 23, 25

Conyers v. Bush,
    No. 06-11972, 2006 WL 3834224 (E.D. Mich. Nov. 6, 2006) ...................... 31

Cookeville Regional Med. Ctr. v. Leavitt,
    Civ. A. No. 04-1053 (JR), 2006 WL 2787831 (D.D.C. Sept. 26, 2006) ........ 31

Council of & for the Blind of Delaware County Valley, Inc. v. Regan,
    709 F.2d 1521 (D.C. Cir. 1983) .................................................................. 25

Doe v. Pryor,
    344 F.3d 1282 (11th Cir. 2003) .................................................................. 18

Earnest v. Lowentritt,
      690 F.2d  1198 (5th Cir. 1982) ........................................................ 26

FDIC v. Meyer,
      510 U.S. 471 (1994) ...................................................................... 24

Flemming v. Nestor,
      363 U.S. 603 (1960) ...................................................................... 29

Garelick v. Sullivan,
      987 F.2d 913 (2d Cir.), cert. denied, 510 U.S. 821 (1993) ........................... 29

Gillis v. U.S. Dep't of Health and Human Services,
      759 F.2d 565 (6th Cir. 1985) ........................................................ 25

Godwin v. Secretary of Housing & Urban Development,
      356 F.3d 310 (D.C. Cir. 2004) ...................................................... 25

Gras v. Stevens,
      415 F. Supp. 1148 (S.D.N.Y. 1976) .............................................. 18

Hall v. Commissioner of Social Security,
      No. CV-05-4192 (FB) (MDG), 2006 WL 3056518 (E.D.N.Y. Oct. 6, 2006) ............... 30

Hope Clinic v. Ryan,
      249 F.3d 603 (7th Cir. 2001) (en banc) .......................................... 18

Kentucky v. Graham,
      473 U.S. 159 (1985) ................................................................ 12, 23

Lujan v. Defenders of Wildlife,
      504 U.S. 555 (1992) ................................................................ 13, 14

Marshall Field & Co. v. Clark,
      143 U.S. 649 (1892) .................................................................. 31

MedImmune, Inc. v. Genentech, Inc.,
      127 S. Ct. 764 (2007) .............................................................. 23

Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Welfare,
      742 F.2d 442 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985) ................. 29

Muskrat v. United States,
      219 U.S. 346 (1911) ........................................................ 2, 16, 17

Nat'l Wrestling Found. v. Dep't of Educ.,
    366 F.3d 930 (D.C. Cir. 2004), cert. denied, 545 U.S. 1104 (2005) ............... 3, 14, 24, 25

Nova Health Sys. v. Gandy,
    416 F.3d 1149 (10th Cir. 2005) ............................................................. 15, 18

In re NYAHSA Litig.,
    318 F. Supp. 2d 30 (N.D.N.Y. 2004), aff'd on opinion below,
    444 F.3d 147 (2d Cir. 2006) ..................................................................... 29

Okpalobi v. Foster,
    244 F.3d 405 (5th Cir. 2001) (en banc) ..................................................... 18

OneSimpleLoan v. U.S. Sec'y of Educ.,
    No. 06 Civ. 2979 (RMB), 2006 WL 1596768 (S.D.N.Y. June 9, 2006),
    appeal pending, No. 06-2770-cv (2d Cir.) ...................................................... 31

Public Citizen v. Clerk, United States District Court,
    451 F. Supp. 2d 109 (D.D.C. 2006), appeal pending, No. 06-5232 (D.C. Cir.) ......... 3, 31

Raines v. Byrd,
    521 U.S. 811 (1997) ................................................................................ 13

Renne v. Geary,
    501 U.S. 312 (1991) ................................................................................ 13

Rye Psych. Hosp. Ctr., Inc. v. Shalala,
    52 F.3d 1163 (2d Cir.), cert. denied, 516 U.S. 913 (1995) ............................. 29

Seegars v. Gonzales,
    396 F.3d 1248 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1187 (2006) ........................ 20

So. Pacific Transp. Co. v. Brown,
    651 F.2d 613 (9th Cir. 1980) ..................................................................... 17

St. Francis Hosp. Ctr. v. Heckler,
    714 F.2d 872 (7th Cir. 1983), cert. denied, 465 U.S. 1022 (1984) ................ 29

Steel Co. v. Citizens for a Better Environment,
    523 U.S. 83 (1998) ................................................................................ 13

Temple Univ. Hosp. v. Healthcare Mgmt. Alternatives, Inc.,
    832 A.2d 501 (Pa. Super. 2003) ................................................................ 6

Transohio Sav. Bank v. Director, Office of Thrift Supervision,
      967 F.2d 598 (D.C. Cir. 1992) ...................................................................... 24

United States v. Barnes,
      295 F.3d 1354 (D.C. Cir. 2002) .................................................................. 30

United States v. Houston,
      547 F.2d 104 (9th Cir. 1976) ....................................................................... 30

United States v. Lender,
      985 F.2d 151 (4th Cir. 1993) ....................................................................... 30

Univ. Med. Ctr. of So. Nev. v. Shalala,
      173 F.3d 438 (D.C. Cir. 1999) ............................................................... 15, 19

Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,
      454 U.S. 464 (1982) ..................................................................................... 13

Vencor Inc. v. Nat'l States Ins. Co.,
      303 F.3d 1024 (9th Cir. 2002) ....................................................................... 7

Vt. Assembly of Home Health Agencies, Inc. v. Shalala,
      18 F. Supp. 2d 355 (D. Vt. 1998) ................................................................ 30

Washington Legal Foundation v. Alexander,
      984 F.2d 483 (D.C. Cir. 1993) ..................................................................... 25

White v. Paulsen,
      997 F. Supp. 1380 (E.D. Wash. 1998) ........................................................ 26

Whitney v. Heckler,
      780 F.2d 963 (11th Cir.), cert. denied, 479 U.S. 813 (1986) ......................... 29

Women's Equity Action League v. Cavazos,
      906 F.2d 742 (D.C. Cir. 1990) ..................................................................... 25

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

U.S. Const., art. I, § 7 ............................................................................... 2, 11, 31

U.S. Const. art III ............................................................................................... 2

U.S. Const. amend. V .............................................................................. 2, 11, 28

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 .......................................... 2, 31

Deficit Reduction Act of 2005, § 6085, Pub. L. No. 109-171, 120 Stat. 4, 121 ................. <u>passim</u>

5 U.S.C. §§ 701-706 ................................................................................................ 26

5 U.S.C. § 702 ........................................................................................................ 24

5 U.S.C. § 704 ................................................................................................ 24, 25, 26

28 U.S.C. § 516 ...................................................................................................... 20

28 U.S.C. § 1331 .................................................................................................... 25

28 U.S.C. § 2201 .................................................................................................... 25

Social Security Act ("SSA") §§ 1901-1935, 42 U.S.C. §§ 1396-1396v ....................................... 4

SSA § 1902(a), 42 U.S.C. § 1396a(a) ........................................................................... 4

SSA § 1902(a)(13)(A), 42 U.S.C. § 1396a(a)(13)(A) ........................................................... 27

SSA § 1903(a)(1), 42 U.S.C. § 1396b(a)(1) .................................................................... 5

SSA § 1903(m), 42 U.S.C. § 1396b(m) .......................................................................... 5

SSA § 1905(b), 42 U.S.C. § 1396d(b) .......................................................................... 5

SSA § 1932, 42 U.S.C. § 1396u-2 .............................................................................. 5

SSA § 1932(b)(2), 42 U.S.C. § 1396u-2(b)(2) ............................................................... 8, 9

42 C.F.R. § 438.2 .................................................................................................. 6

42 C.F.R. § 438.6(c) ........................................................................................... 6, 10

70 Fed. Reg. 71856, 71857 (Nov. 30, 2005) ..................................................................... 5

## <u>OTHER MATERIALS</u>

Congressional Budget Office Cost Estimate, S. 1932,
        Deficit Reduction Act of 2005, Jan. 27, 2006 ................................................................. 10

Terese A. Mosher Beluris et al., <u>Developing Law Governing the Compensation of Nonparticipating Providers</u>, American Health Lawyers Association Member Briefing, at 3-13 (May 2006) ............................................................................. 8

Defendant Michael O. Leavitt, Secretary of Health and Human Services, files this memorandum in support of his motion to dismiss. The Court should dismiss for lack of jurisdiction because, among other reasons, plaintiffs lack standing to sue the Secretary over the alleged injuries of which they complain. In the alternative, this case should be dismissed for failure to state a claim upon which relief may be granted.

Plaintiff hospitals challenge the applicability and constitutionality of § 6085 of the Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4, 121, which provides that out-of-network health care providers who furnish emergency medical services to an individual enrolled in a Medicaid managed care organization ("MCO") cannot require the MCO to pay more than the amount the health care provider would receive under the Medicaid program if that individual were not enrolled in an MCO. First, plaintiffs claim that § 6085 does not apply to them, and therefore does not affect the amount they can require the MCOs to pay them for such services. Second, and presumably in the alternative, plaintiffs assert that to the extent § 6085 does apply to them, it is unconstitutional as applied here, under the Takings Clause of the Fifth Amendment, the Due Process Clause of the Fifth Amendment, and the Equal Protection component of the Fifth Amendment. The common underpinning for each of these challenges is plaintiffs' factual contention that the Pennsylvania fee-for-service Medicaid rates, made applicable by § 6085 to services plaintiffs provide to Medicaid beneficiaries enrolled with MCOs with which plaintiffs lack a contractual relationship, are inadequate, enabling MCOs to benefit from their services without paying full value.[1]

Whatever grievance plaintiffs may have, it is not with the Secretary of Health and Human

---

[1] Plaintiffs also claim that the entire Deficit Reduction Act of 2005 violates the Bicameralism Clause of the Constitution, U.S. Const. art. I, § 7.

Services.  They may have a genuine dispute with the Commonwealth of Pennsylvania, to the

extent they contend that Pennsylvania's fee-for-service rates are procedurally and/or

substantively inadequate -- in which case any constitutional issue would be with Pennsylvania's

fee-for-service rates, not with § 6085.  Likewise, it seems plausible that plaintiffs have (or soon

will have) a live controversy with Medicaid MCOs with whom plaintiffs do not contract, as such

Medicaid MCOs may be expected to invoke § 6085 and the Pennsylvania fee-for-service rates to

limit their monetary liability to plaintiffs for services furnished to their enrollees.  But nowhere in

their complaint do plaintiffs allege that the Secretary has done, or is about to do, anything

adverse to them at all.  Indeed, beyond the caption and the prayer for relief, the Secretary -- the

sole defendant in this action -- is scarcely mentioned at all.

        More is required in order for there to exist a justiciable "case or controversy" over which

Article III of the Constitution permits this Court to exercise jurisdiction.  Because the Complaint

neither alleges injuries that are traceable to any action of the Secretary, nor redressable by an

order against him, plaintiffs lack standing to pursue their claims against the Secretary.  See

Muskrat v. United States, 219 U.S. 346, 361-62 (1911) (holding that "attempt to obtain a judicial

declaration of the validity of [an] act of Congress" does not present a "case or controversy"

where the private parties whose interests under that act were adverse to those of the plaintiffs

were not named and would not be bound); Nat'l Wrestling Found. v. Dep't of Educ., 366 F.3d

930, 937-45 (D.C. Cir. 2004) (holding that plaintiffs aggrieved by universities' decisions to cut

men's sports programs did not have standing to sue Department of Education over validity of

Title IX regulations, because universities were not parties and would not be bound by any order

against Department), cert. denied, 545 U.S. 1104 (2005).  Plaintiffs' claims are similarly

nonjusticiable because a judgment in this case would not completely resolve any case or controversy, but rather would largely function as an advance ruling on an anticipated issue in future litigation (or negotiation) with other parties.  See Calderon v. Ashmus, 523 U.S. 740, 747 (1998); Coffman v. Breeze Corporations, Inc., 323 U.S. 316, 323 (1945).  Finally, plaintiffs' claims are barred because no waiver of sovereign immunity applies, and because this suit is not predicated on any recognized cause of action.

In the alternative, plaintiffs' complaint should be dismissed for failure to state a claim upon which relief can be granted.  Plaintiffs' claim for a declaratory judgment that § 6085 does not apply to them finds no support in the statutory language.  Plaintiffs' Takings Clause and other constitutional challenges ignore that any injury to plaintiffs is caused not by § 6085, but rather by the particular rates Pennsylvania has set.  In any event, § 6085 passes muster under the relevant due process and equal protection tests because it bears a rational relationship to the legitimate governmental interests in containing costs, eliminating incongruities in the administration of the Medicaid program, and ensuring that the Medicaid program will be able to continue to provide services to beneficiaries at current levels.  In addition, plaintiffs' equal protection challenge fails because the state-by-state differences of which plaintiffs complain are inherent in the joint federal/state character of the Medicaid program.  Finally, plaintiffs' argument that the Deficit Reduction Act is invalid under the Bicameralism Clause has been rejected by every court that has considered it because the signing of an enrolled bill by the Speaker of the House and President pro tem of the Senate constitutes "complete and unimpeachable" authentication not subject to challenge in the courts.  See, e.g., Public Citizen v. Clerk, U.S. District Court, 451 F. Supp. 2d 109 (D.D.C. 2006), appeal pending, No. 06-5232 (D.C. Cir.) (citing Marshall Field & Co. v.

3

Clark, 143 U.S. 649, 672 (1892)).

## BACKGROUND

### A.    The Medicaid Program Generally

Medicaid is a cooperative federal-state program through which the federal government

provides financial assistance to states so that they may furnish medical care to needy individuals.

See Social Security Act ("SSA") §§ 1901-1935, 42 U.S.C. §§ 1396-1396v.[2]   Although the

states' participation in the program is voluntary, participating states must comply with certain

requirements imposed by the statute and regulations promulgated by the Secretary of Health and

Human Services ("Secretary").   To qualify for federal assistance, a state must submit to the

Secretary and have approved a "plan for medical assistance," SSA § 1902(a), 42 U.S.C.

§ 1396a(a), that contains a comprehensive statement describing the nature and scope of the state's

Medicaid program.  The state plan is required to establish, among other things, a scheme to pay

health care providers for medical services provided to needy individuals.  The Commonwealth of

Pennsylvania participates in the Medicaid program and has submitted a state plan that has been

approved by the Secretary.

Upon the Secretary's approval of a state's plan, the state becomes entitled to

reimbursement from the federal government for a certain percentage of the amounts

"expended . . . as medical assistance under the State plan."  SSA § 1903(a)(1), 42 U.S.C. §

1396b(a)(1).  This reimbursement is known as "Federal financial participation" ("FFP") or

"matching funds."  The applicable percentage, which is known as the "Federal medical assistance

---

[2] Consistent with common usage and for ease of reference, citations to the Medicaid
statute herein will include both the Social Security Act citation and the United States Code
citation.

percentage," varies by state depending on a statutory formula but is generally between 50% and 80%. SSA § 1905(b), 42 U.S.C. § 1396d(b). For fiscal year 2007, the Federal medical assistance percentage in Pennsylvania, the state where the plaintiff hospitals in this case are located, is 54.39%. 70 Fed. Reg. 71856, 71857 (Nov. 30, 2005). Thus, expenditures under the Medicaid program in Pennsylvania are ultimately paid 54.39% by the federal government and 45.61% by the Commonwealth of Pennsylvania.

**B.    Various Systems for Delivery of Health Care to Medicaid Beneficiaries**

Traditionally, state Medicaid plans operated by having the relevant state agency directly pay health care providers who choose to participate in the program and who furnish care to eligible individuals, in what is known as the "fee-for-service" model. Under the fee-for-service model at issue in Pennsylvania, the state Medicaid plan sets the rates that it will pay for hospital services. The federal government then provides FFP to the state to match a percentage (in Pennsylvania's case, 54.39%) of the state's payments.

In more recent years, Medicaid managed care has emerged as an alternative to the fee-for-service model. See generally SSA § 1903(m), 42 U.S.C. § 1396b(m) (defining and listing requirements for Medicaid managed care organizations); SSA § 1932, 42 U.S.C. § 1396u-2 (authorizing states to make enrollment in managed care mandatory for Medicaid recipients). Under Medicaid managed care, rather than dealing directly with providers, the state contracts with one or more managed care organizations ("MCOs"), which, in turn, enter into contracts with providers. The state pays the Medicaid MCOs, typically in the form of a capitation fee,[3] rather

---

[3] A capitation payment is "a payment the State agency makes periodically to a contractor on behalf of each recipient enrolled under a contract for the provision of medical services under
(continued...)

5

than paying individual health care providers. The federal government then provides FFP to the state to match a percentage (in Pennsylvania's case, 54.39%) of the state's capitation fee payments to the Medicaid MCOs. Thus, under the fee-for-service and managed care models alike, the costs of the Medicaid program are borne by the states and federal government.

**C.    The Need to Contain Medicaid Costs and the Problem Addressed By § 6085**

Congress and state governments have long struggled to contain the burgeoning costs of the Medicaid program, which not only burden the state and federal fiscs but also impair the ability of the government to maintain current levels of services to Medicaid recipients over the long term. Obviously, one of the most significant drivers of those costs is the amounts that health care providers charge for their services, either directly to the state plan as in the fee-for-service model, or to a Medicaid MCO which in turn charges the state capitation fees. Thus, many budgetary efforts have focused on placing reasonable limits on the amounts that health care providers can charge for services they furnish to Medicaid recipients.

To understand the background for these efforts, it is important to appreciate a central tenet of health care economics: while health care providers, including hospitals, often purport to set "published" or "list" rates for their services, almost no one actually pays those rates. As the Pennsylvania case cited by plaintiffs in the Complaint observed, it is extremely rare for health care providers to recover anything close to their published rates. See Temple Univ. Hosp. v.

---

[3](...continued)
the State plan. The State agency makes the payment regardless of whether the particular recipient receives services during the period covered by the payment." 42 C.F.R. § 438.2. Capitation rates must be certified as "actuarially sound." 42 C.F.R. § 438.6(c). That is, they must be determined by a qualified actuary to be "appropriate for the populations to be covered, and the services to be furnished under the contract." Id. § 438.6(c)(1)(i)(B).

Healthcare Mgmt. Alternatives, Inc., 832 A.2d 501, 508-09 (Pa. Super. 2003) (finding that

plaintiff Temple University Health System received 80% or less of its published charges 94% of

the time, and that Temple's published charges at various times in the 1990s were as much as

300% of its actual costs); see also Vencor Inc. v. Nat'l States Ins. Co., 303 F.3d 1024, 1049 n.9

(9th Cir. 2002) ("It is worth noting that in a world in which patients are covered by Medicare and

various other kinds of medical insurance schemes that negotiate rates with providers, providers'

supposed ordinary or standard rates may be paid by a small minority of patients.").

Under the traditional Medicaid fee-for-service model, providers' published rates do not

impact the finances of the Medicaid program, because the state plan establishes its own rates, and

providers' published rates are irrelevant.  Likewise, under Medicaid managed care, providers'

published rates are usually irrelevant because health care services generally are provided pursuant

to a contract between a Medicaid MCO and a provider, under which the provider generally has

agreed in advance to accept a specified, mutually acceptable rate that is less than its full

published charges.  Thus, the Medicaid program is generally insulated from providers' full

published rates.

However, prior to § 6085, there was a gap in this insulation in Medicaid managed care

cases in which covered services were furnished to an MCO enrollee by a provider who did not

have a contract with that MCO.  Most often, this would occur in an emergency medical setting.[4]

The general premise of managed care is to contract in advance with a defined subset of health

care providers who will then furnish any necessary medical services to enrollees.  In medical

---

[4] An MCO may also authorize coverage of non-emergency services furnished by out-of-network providers, though the provider would be under no obligation to treat the MCO's enrollees in such a case.

emergencies, however, the overriding priority is always to get the patient treated and stabilized expeditiously, and it is generally irrelevant whether or not the emergency services provider is "within network." By statute, contracts between States and Medicaid MCOs must require the MCO "to provide coverage for emergency services . . . without regard to prior authorization or the emergency care provider's contractual relationship with the [MCO]." SSA § 1932(b)(2)(A)(i), 42 U.S.C. § 1396u-2(b)(2)(A)(i). Thus, because of the exigencies associated with emergency medical care, MCOs are compelled into transactions with providers with whom they have been unable to agree as to payment terms. Because there is no pre-existing contractual (or, before § 6085, federal statutory) constraint on what such providers can demand from the MCOs as payment, the providers generally could seek their full published rates or some other amount greatly in excess of the cost of providing emergency medical services. See generally Terese A. Mosher Beluris et al., Developing Law Governing the Compensation of Nonparticipating Providers, American Health Lawyers Association Member Briefing, at 3-13 (May 2006), available at http://www.mwe.com/info/pubs/AHLA0506.pdf.

Not only did this situation create a gap in the Medicaid program's controls over health care provider costs, it also arguably diminished the incentive for emergency services providers to negotiate and contract with Medicaid MCOs. Because Medicaid MCOs are obligated to cover emergency services without regard to the contractual status of the provider, there was little economic reason for a provider of such services to enter into a contract with an MCO. If a provider entered into such a contract, it would be agreeing to accept discounted rates for all services and to forgo seeking full published rates, but would receive little countervailing benefit, since it could always look to the Medicaid MCO for payment for emergency services furnished to

8

that MCO's enrollees -- with or without a contract.

Moreover, when viewed in the larger context, the absence of any controls on out-of-network emergency service providers' charges to MCOs created incongruities in the Medicaid program. Suppose there are three Medicaid-enrolled patients, A, B, and C, in a given state. A is enrolled in the state's Medicaid fee-for-service program. B and C are both enrolled in Medicaid managed care, but with different MCOs. Each of them has to receive emergency medical services from Dr. X, who participates in Medicaid and who has a contract with B's MCO, but not with C's MCO. The rates Dr. X can charge for the services he provided to A and B are both regulated and controlled -- by the state-established rate schedule in the case of A, and by the contract with the MCO in the case of B. In contrast, prior to § 6085, there were no federal limits on what Dr. X could charge for services to C -- even though the Medicaid program is the ultimate underwriter of those services just as it is for the services to A and B.

In § 6085 of the Deficit Reduction Act, Congress plugged the gap, eliminated the disincentives, and reconciled the incongruities. Section 6085 amends the pre-existing statutory provision that requires Medicaid MCOs to pay for emergency medical services without regard to whether MCO and the provider have a contract with each other. See SSA § 1932(b)(2), 42 U.S.C. § 1396u-2(b)(2). In effect, § 6085 counterbalances the coverage mandate that the pre-existing provision imposed on MCOs by adding corollary language to limit the MCOs' monetary exposure in such situations. The new provision, added as subsection (D) of SSA § 1932(b)(2), 42 U.S.C. § 1396u-2(b)(2), provides in pertinent part as follows:

(D) EMERGENCY SERVICES FURNISHED BY NON-CONTRACT
PROVIDERS.--Any provider of emergency services that does not have in effect a
contract with a Medicaid managed care entity that establishes payment amounts
for services furnished to a beneficiary enrolled in the entity's Medicaid managed
care plan must accept as payment in full no more than the amounts (less any
payments for indirect costs of medical education and direct costs of graduate
medical education) that it could collect if the beneficiary received medical
assistance under this title other than through enrollment in such an entity . . . .[5]

Thus, under Section 6085, in collecting payment from a Medicaid MCO, a provider of

emergency services is generally limited to the fee-for-service rate prevailing in the State. Thus,

in the above hypothetical, Dr. X now can charge C's MCO the same rate as he can collect

directly from the State plan for services provided to A. Section 6085 thus brings the various

distinct methods of payment for health care services under the Medicaid program into alignment

and parity, and helps to maintain the long-term cost-effectiveness of the Medicaid program. The

Congressional Budget Office estimated that § 6085 would save the federal government alone

$130 million between now and 2015. Congressional Budget Office Cost Estimate, S. 1932,

Deficit Reduction Act of 2005, Jan. 27, 2006, at p. 36, tbl. 15, available at http://www.cbo.gov/

cedirect.cfm?bill=s1932&cong=109.[6]

---

[5] A second sentence in the new provision establishes an alternate payment amount "[i]n a
State where rates paid to hospitals under the State plan are negotiated by contract and not
publicly released." According to plaintiffs, Pennsylvania's fee-for-service rates are not
negotiated by contract, and are publicly released. Compl. ¶ 125. Therefore, the second sentence
of the provision does not appear to be relevant to this case.

[6] Plaintiffs take the position that limiting MCOs' liability to providers of emergency
services benefits only the MCOs themselves. See Compl. ¶¶ 86-89. But this view overlooks that
in the long run, a meaningful reduction of MCOs' liability to health care providers is likely to
result in future capitation rates paid by the states (and shared by the federal government through
FFP) to the MCOs being lower by some margin than they would have otherwise been. See 42
C.F.R. § 438.6(c) (capitation rates must be certified as actuarially sound).

D.    **The Instant Litigation**

This litigation was filed on December 27, 2006, by fifteen hospitals in the metropolitan

Philadelphia area.  Plaintiffs named as a defendant only the Secretary of Health and Human

Services, in his official capacity, not the MCOs, who plaintiffs allege benefit from § 6085, and

not the Commonwealth of Pennsylvania, which plaintiffs contend set the rates for their services

at arbitrarily low levels.  On February 2, 2007, plaintiffs amended their complaint, adding the

Urban Health Care Coalition as a plaintiff and making a few new allegations.[7]

Count I of the Complaint seeks a declaratory judgment that § 6085 does not apply to

plaintiffs at all.  Presumably in the alternative to Count I, Counts II, III and IV assert that § 6085

is invalid, either facially or as applied to them, under the Takings Clause of the Fifth

Amendment, the Due Process Clause of the Fifth Amendment, and the Equal Protection

component of the Fifth Amendment.  Finally, in Count V, plaintiffs argue that the Deficit

Reduction Act as a whole is unconstitutional because its enactment allegedly violated the

Bicameralism Clause of the Constitution, U.S. Const., art. I, § 7.  Plaintiffs seek declaratory relief

and an injunction against the Secretary of Health and Human Services "from enforcing, § 6085,

as enacted, against Plaintiffs."  Compl. at 31.

**ARGUMENT**

I.    **THE COURT LACKS SUBJECT MATTER JURISDICTION
      OVER PLAINTIFFS' CLAIMS**

This action is brought against a single defendant, the Secretary of Health and Human

---

[7] The term "Complaint" and abbreviation "Compl." as used herein refer to plaintiffs' First
Amended Complaint for Declaratory and Injunctive Relief, filed February 2, 2007.

Services in his official capacity.[8]  However, the Complaint does not contain a single allegation

regarding anything the Secretary has done that has caused plaintiffs any harm.  Nor does the

Complaint contain any allegations about actions the Secretary is likely to take in the future to

plaintiffs' detriment.  Despite requesting an order "[e]njoining the Secretary from enforcing §

6085, as enacted, against Plaintiffs" (Compl. at p. 31), the Complaint fails to identify any actions

the Secretary has taken or is likely to take to enforce § 6085.  The injury that plaintiffs assert --

that § 6085, coupled with the particular fee-for-service rates Pennsylvania has set under its

Medicaid program, prevents them from charging non-contracted managed care organizations a

reasonable rate for their services -- arises independently of any actions the Secretary has taken or

might take.  For this reason, plaintiffs lack standing to sue the Secretary because their injuries are

neither traceable to any action by him, nor redressable through an order against him.  Moreover,

plaintiffs' claims are non-justiciable under Calderon v. Ashmus, 523 U.S. 740 (1998), because

they are essentially asking for an advance declaration of the inapplicability or invalidity of a

defense MCOs are likely to invoke against them in private litigation over the appropriate amount

of payment due.  In addition, there is neither an applicable waiver of sovereign immunity nor a

cause of action that permits plaintiffs' claims against the government.  Therefore, the complaint

should be dismissed for lack of jurisdiction.

---

[8] Although plaintiffs do not expressly specify in what capacity the Secretary is being sued, the context of the Complaint makes clear that plaintiffs are bringing only official-capacity, and not individual-capacity, claims.  An official-capacity claim against the head of an agency is treated as a claim against the agency itself.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985). As such, when the word "Secretary" is used herein it should be construed as meaning the Department as a whole.

**A.    Plaintiffs Lack Standing Because Their Alleged Injury is Neither Traceable To Any Action By the Secretary Nor Redressable By an Order Against Him**

The "judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited to the resolution of actual "cases" and "controversies." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982).  The doctrine of "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).[9]  The Supreme Court has observed that "[its] standing inquiry has been especially rigorous" in cases such as the one at bar, where "reaching the merits of the dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819-20 (1997); see also Valley Forge, 454 U.S. at 473-74 (holding that the need for attention to standing is most pronounced when the court is asked to "accept for adjudication claims of constitutional violation by other branches of government").

To have standing, a plaintiff first "must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (citations, footnote, and internal quotation marks omitted).  "Second, there must be a causal connection between the injury and the conduct complained of . . . ." Id.  In particular, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some

---

[9] "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 104 (1998).  Federal courts should presume that they lack jurisdiction "unless the contrary appears affirmatively from the record." Renne v. Geary, 501 U.S. 312, 316 (1991) (internal quotation marks omitted).

third party not before the court.'" Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S.

26, 41-42 (1976)). "Third, it must be likely, as opposed to merely speculative, that the injury will

be redressed by a favorable decision." Id. (internal quotation marks omitted).

      In addressing redressability, courts look to whether the relief requested in the case would

achieve any practical and tangible benefit for the plaintiffs, or whether effective redress of their

"injury in fact" would depend on other parties not subject to the court's jurisdiction. This

proposition was recently illustrated in National Wrestling Coaches Ass'n v. Department of

Education, 366 F.3d 930 (D.C. Cir. 2004), cert. denied, 545 U.S. 1104 (2005). There, plaintiffs

aggrieved by various universities' decisions to shut down men's sports programs sued the

Department of Education, claiming that the universities' decisions were driven by the

Department's allegedly unconstitutional and unlawful enforcement policies under Title IX of the

Education Amendments of 1972. The D.C. Circuit assumed that plaintiffs could show an injury-

in-fact, but held that they lacked standing because a decision invalidating the Department's

enforcement policies would not redress their injuries. Id. at 938. In particular, plaintiffs "f[e]ll

far short of establishing the requisite likelihood that the educational institutions whose choices lie

at the root of appellants' alleged injuries will behave any differently . . . if [plaintiffs] prevailed

on the merits and secured their requested relief." Id. at 939.

      Similarly, where a hospital sued the Secretary of Health and Human Services alleging that

the Department wrongfully omitted it from a list of hospitals entitled to discounts on drug

purchases from drug manufacturers, the D.C. Circuit found redressability (and therefore

standing) lacking because "[w]hether [the hospital] can get the retroactive discounts apparently

depends on whether the manufacturers -- who are not parties to this action -- could be persuaded

14

to pay them . . . ."  Univ. Med. Ctr. of So. Nev. v. Shalala, 173 F.3d 438, 441-42 (D.C. Cir.

1999); see also, e.g., Ass'n of Inv. Brokers v. SEC, 676 F.2d 857, 862 (D.C. Cir. 1982)

(traceability and redressability both lacking in suit against SEC over legality of securities

industry employment application form because "[t]he self-regulatory organizations, not the SEC,

require petitioners' use of Form U-4" and therefore plaintiffs "have not established that any

directive this court might issue to the [SEC] with respect to SEC employment of Form U-4

would redress their grievance").[10]

   In this case, plaintiffs lack standing because they have not alleged any injuries that are

fairly traceable to any past or imminent action of the sole defendant, the Secretary of Health and

Human Services, and because there is no indication that their alleged injuries can be redressed by

a favorable decision in this case.[11]  The Secretary is mentioned only five fleeting times in the 31-

page Complaint:  the caption, ¶ 18 (identifying him as defendant), ¶ 28 (noting in passing

Secretary's role under historical, and now obsolete, statutory provision), ¶ 53 (same), and the

Prayer for Relief.  Since plaintiffs nowhere have alleged any action or omission whatsoever by

the Secretary of Health and Human Services (or his Department), ipso facto their asserted injury

is not "fairly traceable" to any such action or omission.

------

   [10]  The general precedential or persuasive value that a court decision may have among a
broader audience is not considered in the redressability inquiry.  See Nova Health Sys. v. Gandy,
416 F.3d 1149, 1159 (10th Cir. 2005).  Rather, the focus is on what the decree directly
accomplishes through its authority over the parties to the case who are bound by it.

   [11]  Other than with respect to plaintiff Urban Health Care Coalition, we assume arguendo
that plaintiffs are able to show a cognizable injury in fact.  As for Urban Health Care Coalition,
an organization that "monitors laws and regulations, and works with government officials to
assist the organization's inner-city hospital membership" (Compl. ¶ 11), nothing in the
Complaint remotely suggests that it has suffered any injury in fact, let alone the kind of injury
that would be sufficient for associational standing.

15

Nor is their asserted injury redressable by a favorable decision. The injury that plaintiffs assert is their inability to collect what they deem to be full payment from MCOs for certain emergency services. If the Court granted plaintiffs' request to enjoin the Secretary "from enforcing § 6085, as enacted, against Plaintiffs" (Compl. at p. 31) -- whatever that means, given the Complaint's failure to identify any actions the Secretary has taken or is likely to take to enforce § 6085 against them -- such a ruling would not in any event be binding on any MCOs with whom plaintiffs deal. The MCOs would be free to continue to refuse to pay plaintiffs anything more than the amount permitted by § 6085, and could continue to invoke § 6085 as a defense in any action by the hospitals for nonpayment. Nor would the court's decision bind Pennsylvania, which would be free to maintain the fee-for-service rates that plaintiffs claim are inadequate.

Plaintiffs may perceive a suit against a public official for declaratory and injunctive relief to be a familiar and convenient way of obtaining a judicial declaration on the applicability and constitutionality of a statute. However, courts have long rejected such suits as vehicles for testing the constitutionality of statutes adjusting rights and duties as between private parties. In Muskrat v. United States, 219 U.S. 346 (1911), certain Cherokee Indians sued the United States to challenge the constitutionality of statutes that expanded (with dilutive effect) the population of Cherokees eligible to share in certain benefits. Even though, unlike here, a special statute specifically authorized such a challenge to brought in an action naming the United States as defendant,[12] and even long before the "traceability" and "redressability" requirements had been

_____

[12] Here, in contrast to Muskrat, there is no statute that provides a cause of action for plaintiffs' claims, doubly underscoring the lack of jurisdiction. See infra § I.D.

refined into their current form, the Supreme Court found a lack of Article III "case or

controversy" and instructed the Court of Claims to dismiss the case for lack of jurisdiction.  As

the Court explained:

> The right to declare a statute unconstitutional arises because an act of Congress
> relied upon by one or the other of such parties in determining their rights is in
> conflict with fundamental law. . . . This attempt to obtain a judicial declaration of
> the validity of an act of Congress is not presented in a 'case' or 'controversy,' to
> which, under the Constitution of the United States, the judicial power alone
> extends.  It is true the United States is made a defendant to this action, but it has
> no interest adverse to the claimants.  The object is not to assert a property right as
> against the government, or to demand compensation for alleged wrongs because
> of action on its part.  The whole purpose of the law [creating the cause of action
> against the United States] is to determine the constitutional validity of this class of
> legislation, in a suit not arising between parties concerning a property right
> necessarily involved in the decision in question, but in a proceeding against the
> government in its sovereign capacity, and concerning which the only judgment
> required is to settle the doubtful character of the legislation in question.  Such
> judgment will not conclude private parties, when actual litigation brings to the
> court the question of the constitutionality of such legislation.  In a legal sense the
> judgment could not be executed, and amounts in fact to no more than an
> expression of opinion upon the validity of the acts in question.

Id. at 361-62.

In more recent years, the courts have reaffirmed and expanded on these principles.  For

example, the Ninth Circuit held that plaintiffs lacked standing to sue a state attorney general to

challenge the constitutionality of a law regulating settlements between employers and employees

for work-related injuries.  See So. Pacific Transp. Co. v. Brown, 651 F.2d 613, 614-15 & n.1 (9th

Cir. 1980) (noting that alleged injury to employer "in proceedings involving employee claims for

compensation" "could not have been traced to the action of the attorney general, against whom

relief is sought").  A three-judge district court held that a state attorney general and governor

were not proper defendants in an equal protection challenge to a state law allocating

responsibility for fees in private divorce proceedings because "[t]he Attorney General has no interest in the outcome of a divorce suit and no duty to enforce any order made in it." Gras v. Stevens, 415 F. Supp. 1148, 1151-52 (S.D.N.Y. 1976) (Friendly, J.).  The Eleventh Circuit ruled that jurisdiction was lacking over an equal protection lawsuit against the state attorney general challenging a state ban on homosexual conduct that had been used against the plaintiff by her private adversary in a custody proceeding, because, among other things, the adverse effects in the custody proceeding were "not fairly traceable to the Alabama Attorney General and they cannot be redressed through this action against him." Doe v. Pryor, 344 F.3d 1282, 1285 (11th Cir. 2003).  Even in the abortion area, where the requirements for justiciability have been significantly relaxed, three courts of appeals have rejected on standing grounds lawsuits against state officials to test the constitutionality of state laws conferring private rights of action or other privately enforceable remedies against abortion providers.  See Nova Health Sys. v. Gandy, 416 F.3d 1149, 1157-60 (10th Cir. 2005); Hope Clinic v. Ryan, 249 F.3d 603, 605 (7th Cir. 2001) (en banc); Okpalobi v. Foster, 244 F.3d 405, 424-29 (5th Cir. 2001) (en banc).  As the Seventh Circuit explained, "any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors." 249 F.3d at 605.

These principles apply with even greater force to the instant case, which involves purely economic regulation.  It is not the Secretary of Health and Human Services or any other official of the federal government who inflicts the injury of which plaintiffs complain.  Rather, plaintiffs' alleged injury stems from the anticipated reliance of private parties (MCOs) on the statute to limit their payment obligations.  That injury stands independent of anything the Secretary has done or might do, and a court order purely against the Secretary of Health and Human Services

cannot redress it.  Any judgment in this case will not bind MCOs, when actual, concrete litigation brings to the court the question of the constitutionality of § 6085 or its application to hospitals in Pennsylvania.  Nor would a judgment in this case alter the current fee-for-service rates in effect in Pennsylvania that are "borrowed" by § 6085.  In short, a judgment in this case would amount to little more than an advisory opinion.

Indeed, in some ways this case can be seen as the mirror image of University Medical Center, where the hospital's injury was having to pay drug manufacturers more for drugs than it would have had to pay but for an allegedly improper action (exclusion from a list) by the Secretary.  Even there, where there was at least a concrete action by the Secretary involved in the causal chain, the D.C. Circuit held that redressability was lacking, because an order against the Secretary would not have bound the non-party drug manufacturers.  173 F.3d at 441-42.  Here, the hospitals' asserted injury consists of having to accept from MCOs less for their services than they might receive but for the existence of an allegedly inapplicable or unconstitutional statute.  Just as in University Medical Center, the key problem is that the parties on the other side of the transaction the hospitals are complaining about are not in this lawsuit and will simply not be affected by any relief granted.  In addition, in this case, since no action or omission by the Secretary is identified as part of the causal chain leading to the alleged injury of these plaintiffs, there is no traceability either.

At the end of the day, it appears that plaintiffs want an order from this Court because they believe it will give them an advantage over the MCOs (or neutralize an advantage that they perceive MCOs currently have) in pending or imminent contract negotiations.  See Compl. ¶¶ 109-111 (complaining that § 6085 "undermine[s] contract negotiations" by giving MCOs undue

19

"bargaining leverage").  However, the federal courts do not sit to give advisory opinions to adjust

or calibrate the bargaining leverage between parties in private negotiations.  And any declaratory

judgment or injunction from this Court will be just that -- an advisory opinion -- from the

standpoint of the MCOs, who are not parties to this litigation and will not be bound by it.[13]

### B.    This Case is Non-Justiciable Because It Essentially Seeks an Advisory Opinion on a Legal Issue Anticipated in Future Litigation

This suit against the Secretary of Health and Human Services is also non-justiciable under

Calderon v. Ashmus, 523 U.S. 740 (1998), which holds that an action for declaratory and

injunctive relief as to the validity of a defense the plaintiff expects to face in a future proceeding

is not justiciable under Article III if it would not finally and conclusively resolve the underlying

controversy.  At issue in Calderon were provisions of the Antiterrorism and Effective Death

---

[13] Plaintiffs profess concern that they "have no way to assert and preserve claims against MCOs for amounts in excess of the confiscatory rates imposed by § 6085" without exposing themselves to criminal liability. Compl. ¶ 104.  This speculative concern falls far short of the strict standard which must be met in the D.C. Circuit before an advance challenge to potential future criminal enforcement of a statute will be permitted.  See Seegars v. Gonzales, 396 F.3d 1248, 1254, 1255 (D.C. Cir. 2005) (holding that a "non-First Amendment preenforcement challenge to a criminal statute" fails on standing and ripeness grounds unless the record shows "that [plaintiff] has been personally threatened with prosecution or that his prosecution has 'any special priority' for the government"), cert. denied, 126 S. Ct. 1187 (2006).  Plaintiffs raise no First Amendment issues, and they assert neither that they have been personally threatened with prosecution nor that their prosecution would have "any special priority" for the government.  Indeed, in this action, plaintiffs have sued only the Secretary of Health and Human Services, who does not have authority to pursue criminal remedies.  See 28 U.S.C. § 516 (vesting exclusive criminal enforcement authority in Attorney General).  Moreover, any attempt to join the Attorney General as a defendant and seek to enjoin criminal prosecution for a violation of § 6085 clearly would not meet the rigorous standards enunciated in Seegars v. Gonzales for such challenges in this Circuit.  In any event, plaintiffs do not explain why they could not "assert and preserve claims against MCOs" for what they believe to be the appropriate amounts simply by communicating to the MCOs their belief that the higher charge will be vindicated following appropriate litigation, and accepting the lesser amount in the meantime only under protest.  For that matter, plaintiffs do not explain why a simple declaratory judgment action against the relevant MCOs in a court of competent jurisdiction could not suffice to preserve their claims.

Penalty of 1996 that provided certain procedural advantages to states in defending against federal capital habeas proceedings, on the condition that the state "qualify" by meeting certain standards with respect to appointment of counsel.  After California officials announced that they believed California was a "qualifying" state and would be entitled to the procedural advantages, a state capital prisoner who anticipated filing a habeas petition brought a class action against those officials for a declaratory judgment that California did not "qualify" and an injunction against invoking the procedural advantages.

The Supreme Court held that the plaintiff's claims were not justiciable because he was essentially seeking a "declaratory judgment as to the validity of a defense the State may, or may not, raise in a habeas proceeding" in the future.  Id. at 747.  "The 'case or controversy' actually at stake," the Court observed, "is the class members' claims in their individual habeas proceedings. Any judgment in this action thus would not resolve the entire case or controversy as to any one of them, but would merely determine a collateral legal issue governing certain aspects of their pending or future suits."  Id.  Because "[t]he present declaratory judgment action would not completely resolve those [future] challenges, but would simply carve out one issue in the dispute for separate adjudication," such an action "is not a justiciable case within the meaning of Article III."  Id. at 749.

The Court in Calderon was guided by Coffman v. Breeze Corporations, Inc., 323 U.S. 316 (1945), a case bearing even closer factual parallels to the instant case.  In Coffman, a patent licensor sued its licensee, which manufactured a device under the patent that it sold to the federal government.  In 1942, in the interest of containing wartime costs, Congress passed a statute limiting the amount of the royalties that patent licensors could charge their licensees who sold

devices to the federal government under the patent.  In its suit against its licensee, the patent

licensor sought an adjudication that the statute was unconstitutional, but did not directly seek a

money judgment for the unpaid royalties that would be due if the statute were unconstitutional.

Id. at 321.  The Supreme Court agreed with the court below that the suit "present[ed] no case or

controversy within the judicial power of the United States as defined by § 2 of Article III of the

Constitution."  Id. at 322.  The Court explained that "the constitutionality of the Act is without

legal significance and can involve no justiciable question unless and until [the licensor] seeks

recovery of the royalties, and then only if [the licensee] relies on the Act as a defense.  The prayer

of the bill of complaint that the Act be declared unconstitutional is thus but a request for an

advisory opinion as to the validity of a defense to a suit for recovery of the royalties."  Id. at 324.

Similarly, plaintiffs' request for relief in this case essentially seeks an advisory opinion as

to the validity of a defense to a suit for recovery of unpaid charges for emergency medical

services.  The "case or controversy actually at stake," Calderon, 523 U.S. at 747, is what amount

Medicaid MCOs should have to pay providers of emergency medical services with whom they do

not have a contract.  Section 6085 of the Deficit Reduction Act provides an available defense that

an MCO can assert in a suit by an emergency medical services provider for inadequate payment,

and the alleged unconstitutionality of § 6085, or its inapplicability in the particular circumstances

presented, is an argument that would overcome that defense.  Any judgment in this case,

however, will not resolve the entire case or controversy between plaintiffs and any MCO, but

instead simply carves out one subsidiary issue in that dispute for separate, advance adjudication.

Indeed, the utter lack of justiciability is even more evident here than in either Calderon or

Coffman.  In those cases, at least the parties would have been the same in the preemptive

declaratory judgment action and the anticipated future suits, meaning that the first suit would

have narrowed the issues to be adjudicated in the second.  Even then, the Court held that the

preemptive declaratory judgment suits were not justiciable.  In the instant case, the parties are

different from those in the anticipated future action:  the defendant in this case is the Secretary,

whereas the Medicaid MCOs will be the necessary parties to the anticipated future litigation over

the proper amount of payment due.  Because a judgment in this case concerning the applicability

and/or constitutionality of § 6085 will not bind the MCOs, that issue would have to be relitigated

in the future litigation.  Thus, not only is it true that "[a]ny judgment in this action thus would not

resolve the entire case or controversy as to any [plaintiff]," Calderon, 523 U.S. at 747 (emphasis

added), any judgment in this action would not resolve any part of "the case or controversy

actually at stake" as to any plaintiff.  See supra § I.A (pointing out that any judgment for

plaintiffs in this case will have no binding effect on any MCO).[14]

### C.    No Applicable Waiver of Sovereign Immunity Permits This Suit Against the Government

Because a suit against the Secretary of Health and Human Services in his official capacity

is treated as a suit against the government itself, Kentucky v. Graham, 473 U.S. 159, 166 (1985),

---

[14]  The Supreme Court recently distinguished Calderon and Coffman in the course of
holding that a patent licensee is not required to terminate or breach a license agreement prior to
seeking a declaratory judgment of patent invalidity.  See MedImmune, Inc. v. Genentech, Inc.,
127 S. Ct. 764, 771 n.7 (2007).  The Court's treatment of those cases in MedImmune does not
undermine their applicability to the present case.  The Court described Calderon's holding as
limited to situations where the relief sought "would not finally and conclusively resolve the
underlying controversy," id. (emphasis in original), which the Court said "is, of course, not the
case here [i.e., in MedImmune]," id.  After all, in MedImmune, a judgment that the patent was
invalid would have bound the licensor and afforded the licensee full and complete relief.  In the
instant case, for the reasons expressed in text, there is no way that the relief sought could resolve
any part of plaintiffs' underlying controversy with the MCOs.

there is no subject matter jurisdiction unless Congress has waived sovereign immunity for this type of suit.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994).  The Complaint does not identify any waiver of sovereign immunity.  For actions against federal officials seeking equitable relief, a waiver of sovereign immunity is generally supplied by the Administrative Procedure Act, 5 U.S.C. § 702, which provides:  "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed on the ground that it is against the United States or that the United States is an indispensable party."

By its terms, however, that waiver does not apply here, because there is no allegation that the Secretary, the Department, or any officer or employee thereof has "acted or failed to act," 5 U.S.C. § 702.  As we have observed, the Complaint is completely devoid of any allegations about anything the Secretary or Department has done or failed to do.  By their own pleading, plaintiffs' asserted injury seems to result from the combined effect of (a) the statute itself, and (b) the particular fee-for-service rates currently in effect in Pennsylvania, upon plaintiffs' transactions with other private parties.  The Secretary is simply not involved.  Thus, the waiver in 5 U.S.C. § 702 does not apply and sovereign immunity precludes a suit against the Secretary for these claims.

The waiver of sovereign immunity in 5 U.S.C. § 702 also does not apply because sovereign immunity is only waived as to claims "for which there is no other adequate remedy in a court."  5 U.S.C. § 704; see Nat'l Wrestling Coaches Ass'n, 366 F.3d at 947 ("the waiver of sovereign immunity under § 702 is limited by the 'adequate remedy' bar of § 704"); Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 607 (D.C. Cir. 1992) ("The

24

APA excludes from its waiver of sovereign immunity . . . claims for which an adequate remedy is available elsewhere . . . .").  Here, plaintiffs have a remedy elsewhere that is not only adequate, but superior:  they can bring their claims challenging § 6085 directly against the managed care organizations who would invoke § 6085 to limit their payment obligation.[15]  The resolution of the applicability of § 6085 and any constitutional issue in that forum would then be binding on the managed care organizations, unlike a ruling from this Court in the instant case.

### D.    This Suit is Not Based on Any Recognized Cause of Action

Finally, plaintiffs fail to invoke any cause of action enabling their claims.[16]  Just as it

---

[15]  In a long, unbroken line of cases, the D.C. Circuit has held that the "no other adequate remedy in a court" language of 5 U.S.C. § 704 bars an action against the federal government when the plaintiff could obtain effective redress in a lawsuit against the non-federal party who is most directly responsible for plaintiff's asserted injury.  See Godwin v. Secretary of Housing & Urban Development, 356 F.3d 310, 312 (D.C. Cir. 2004) (barring APA review of HUD's action on tenant's complaint challenging eviction by private landlord, because ability to sue landlord directly constituted "adequate alternative remedy"); Nat'l Wrestling Coaches Ass'n, 366 F.3d at 945-48 (barring APA claim against Department of Education where plaintiffs aggrieved by alleged discrimination by universities could sue those universities directly); Washington Legal Foundation v. Alexander, 984 F.2d 483, 487-88 (D.C. Cir. 1993) (same); Women's Equity Action League v. Cavazos, 906 F.2d 742, 750-51 (D.C. Cir. 1990) (same) (Ruth Bader Ginsburg, J.); Council of & for the Blind of Delaware County Valley, Inc. v. Regan, 709 F.2d 1521, 1531-33 (D.C. Cir. 1983) (en banc) (barring APA claim against Department of Treasury where redress was available through actions directly against state and local governments who were allegedly discriminating); see also Gillis v. U.S. Dep't of Health and Human Services, 759 F.2d 565, 575, 577-79 (6th Cir. 1985) (affirming dismissal of HHS as defendant because "plaintiffs . . . do not satisfy the 'no other adequate remedy in a court' requirement, since they may still sue defendant hospitals").  Cf. Coffman, 323 U.S. at 322 (holding, under pre-APA equity principles from which § 704 derives, that complaint seeking constitutional test of statute imposing limits on royalties "states no cause of action in equity" because plaintiff "does not in the present suit bring to our attention any facts showing or tending to show that a suit to recover a money judgment for the royalties would not afford complete and adequate relief without resort to an equitable remedy").

[16]  While the Complaint cites 28 U.S.C. §§ 1331 and 2201, those statutes merely provide, respectively, for federal question jurisdiction and declaratory judgments as a form of relief; a plaintiff must look elsewhere for a cause of action.  See, e.g., Cale v. City of Covington, 586

(continued...)

provides a waiver of sovereign immunity, the Administrative Procedure Act provides a generally

applicable cause of action to seek declaratory and injunctive relief against the government or

government officials. See 5 U.S.C. §§ 701-706. The APA's cause of action, however, requires

"final agency action." See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final

agency action for which there is no other adequate remedy in a court are subject to judicial

review."). As discussed above, in this case there is no agency action challenged by plaintiffs at

all, let alone the "final agency action" necessary for APA review. Nor is it true that plaintiffs

have "no other adequate remedy in a court," as the APA also requires. See supra note 15 and

accompanying text. Because plaintiffs' claims against the Secretary are not anchored in any

cause of action, they must be dismissed.

## II.  THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

For the reasons stated above, the Court should dismiss this case for lack of subject matter

jurisdiction. If, however, this Court finds that it does have subject matter jurisdiction, the

Complaint should be dismissed for failure to state a claim upon which relief can be granted.

### A.  Plaintiffs' Claim for a Declaratory Judgment is Specious Because Section 6085 Clearly Applies in Pennsylvania

Plaintiffs' first claim seeks a declaration that § 6085 does not apply to them at all because

---

[16](...continued)
F.2d 311, 313 (4th Cir. 1978) (calling it "elementary" that "the enactment of § 1331 did not of itself create any cause of action"); White v. Paulsen, 997 F. Supp. 1380, 1382 (E.D. Wash. 1998) ("§ 1331 is a pure jurisdictional statute that does not, on its own, create a private right of action"); Akins v. Penobscot Nation, 130 F.3d 482, 490 n.9 (1st Cir. 1997) (Declaratory Judgment Act does not create a "substantive cause of action"); Earnest v. Lowentritt, 690 F.2d 1198, 1203 (5th Cir. 1982) ("Section 2201 does not provide an independent cause of action for a determination of the constitutionality of a statute . . . .").

of the allegedly "unconventional fashion" in which Pennsylvania has set its fee-for-service rates. Compl. ¶¶ 117-127. This claim is at war with the words of the statute, and, indeed, appears to be premised on a misquotation of the statutory language.

According to plaintiffs, the first sentence of § 6085 applies only "in states in which rates are established in accordance with and 'under Title XIX.'" Compl. ¶ 119. Plaintiffs contend that Pennsylvania did not comply with certain procedural requirements in SSA § 1902(a)(13)(A), 42 U.S.C. § 1396a(a)(13)(A). Therefore, according to plaintiffs' logic, the first sentence of § 6085 simply does not apply in Pennsylvania.

However, the words "under Title XIX" that plaintiffs attribute to § 6085 simply do not appear in it.[17] Nor does the statute contain the slightest wisp of a suggestion that § 6085's operation is contingent on whether the state complied with the procedural requirements of 42 U.S.C. § 1396a(a)(13)(A) when promulgating fee-for-service rates. It simply says that the provider must accept as payment in fault whatever amount "it could collect if the beneficiary received medical assistance under this title other than through enrollment in such an [managed care] entity." Thus, plaintiffs' plea to create an nontextual exception to § 6085 out of thin air defies the plain language of the statute and should be rejected.[18]

_____

[17] Section 6085 does contain the words "under this title" (meaning Title XIX), but those words modify the phrase "received medical assistance": the provider "must accept as payment in full the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this title other than through enrollment in [a managed care] entity." Pub. L. No. 109-175, § 6085(a) (emphasis added). A beneficiary "receiv[es] medical assistance under this title other than through enrollment in [a managed care] entity" regardless of whether the state observed the procedural requirements of 42 U.S.C. § 1396a(a)(13)(A) when setting fee-for-service rates.

[18] If plaintiffs believe the state violated the Medicaid statute by promulgating its rates in
(continued...)

B.    **The Complaint Fails to State a Claim Against the Secretary That Section 6085 Is Unconstitutional Under Any Aspect of the Fifth Amendment**

The Takings Clause and Due Process Clause of the Fifth Amendment provide that no person shall "be deprived of life, liberty, or property, without due process of law" and that "nor shall private property be taken for public use, without just compensation."  U.S. Const., amend. V.  Plaintiffs contend in Counts II, III, and IV that § 6085 violates these guarantees, as well as equal protection principles that are deemed incorporated into the Fifth Amendment, because Pennsylvania's fee-for-service rates are allegedly insufficient.  To articulate the theoretical underpinning for plaintiffs' constitutional claims is practically to expose those claims' legal insufficiency.

Plaintiffs cannot credibly claim that § 6085, in and of itself, violates the Takings Clause or the Due Process Clause.  After all, § 6085 does not set any rates.  It merely extends whatever pre-existing framework of Medicaid rates exists in a given state so that those rates apply to all emergency medical services furnished to Medicaid patients except where there is a contract with an MCO setting a different rate.  Section 6085 is entirely neutral and indifferent as to what particular rate the state has established.  Indeed, plaintiffs effectively concede this point when they point to certain other states that set Medicaid fee-for-service rates "at levels that often are more than adequate," resulting in situations where "the rates imposed by § 6085 are not confiscatory, and may even be fair and reasonable."  Compl. ¶¶ 147-148.  Thus, to the extent there is any insufficiency -- whether of constitutional dimension or not -- in the amounts providers can recover for services covered by § 6085, such insufficiency is a function of the

---

[18](...continued)
an improper manner, their remedy is against the state.

underlying state rates, not of § 6085.[19]

In short, any constitutional issue that may exist here has everything to do with the particular fee-for-service rates Pennsylvania has set, and nothing to do with § 6085, which is simply a mechanism giving those rates a broader scope.  Moreover, courts have repeatedly recognized that equal protection and due process review of economic and social welfare legislation such as Medicaid and Medicare provisions is on an exceedingly deferential basis, requiring only a rational relationship to a legitimate governmental purpose.  See, e.g., Rye Psych. Hosp. Ctr., Inc. v. Shalala, 52 F.3d 1163, 1172 (2d Cir.), cert. denied, 516 U.S. 913 (1995); see also City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (equal protection "require[s] only that the classification challenged be rationally related to a legitimate state interest"); Flemming v. Nestor, 363 U.S. 603, 611 (1960) (due process bars only statutes that "manifest[] a patently arbitrary classification, utterly lacking in rational justification").  To the extent that § 6085 is subject to such review, Congress could reasonably conclude that it would serve legitimate governmental interests in containing costs and eliminating program incongruities and disincentives for emergency services providers to contract with Medicaid MCOs.  See In re NYAHSA Litig., 318 F. Supp. 2d 30, 41 (N.D.N.Y. 2004) ("control of Medicaid costs" is "indeed a legitimate and laudable objective of the State, and the resulting measures cannot form

---

[19] Plaintiffs' Takings Clause claim also fails because courts have long recognized that health care providers' participation in the Medicaid and Medicare programs is voluntary, precluding takings challenges to the level of their compensation for services provided under those programs.  See, e.g., Garelick v. Sullivan, 987 F.2d 913, 916-17 (2d Cir.), cert. denied, 510 U.S. 821 (1993); Burditt v. U.S. Dep't of Health & Human Services, 934 F.2d 1362, 1376 (5th Cir. 1991); Whitney v. Heckler, 780 F.2d 963, 972 (11th Cir.), cert. denied, 479 U.S. 813 (1986); Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Welfare, 742 F.2d 442, 446 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985); St. Francis Hosp. Ctr. v. Heckler, 714 F.2d 872, 875-76 (7th Cir. 1983), cert. denied, 465 U.S. 1022 (1984).

the basis of a substantive due process claim" (citation omitted)), aff'd on opinion below, 444

F.3d 147 (2d Cir. 2006); Vt. Assembly of Home Health Agencies, Inc. v. Shalala, 18 F. Supp. 2d

355, 368 (D. Vt. 1998) (upholding limitation on reimbursement of home health agencies under

Medicare against substantive due process challenge because provision "is rationally related to the

purpose of reducing Medicare home health spending"). Likewise, Congress could reasonably

conclude that, although cost savings would inure in the first instance to the MCOs, in the long

run such savings would help stem future escalation in capitation rates paid by the states and

federal government and better enable the maintenance of Medicaid benefits at their current

levels. See supra at pp. 6-10. Plaintiffs' Fifth Amendment claims against the Secretary

challenging § 6085 should be dismissed for failure to state a claim.[20]

---

[20] Plaintiffs' equal protection claim, which appears to rest on the fact that how § 6085 affects any given provider varies depending on the provider's state, is particularly specious because the whole concept of Medicaid is that each state runs its own program of medical assistance. Inherent in this system is variance in program features, including rates of payment for hospital services, from state to state. See Alaska Dep't of Health & Social Servs. v. Centers for Medicare and Medicaid Services, 424 F.3d 931, 935 (9th Cir. 2005) ("Assuming that its plan meets federal requirements, a state has considerable discretion in administering its Medicaid program, including setting reimbursement rates."). Indeed, any state-by-state differences effected by § 6085 are no different in principle from the state-by-state differences in payment rates caused by having each state establish its own fee-for-service rates in the first place, a central feature of the Medicaid program. Courts have long held that "a federal statute which incorporates state law resulting in the disparate treatment of individuals depending upon their state of residence, does not violate equal protection." Hall v. Commissioner of Social Security, No. CV-05-4192 (FB) (MDG), 2006 WL 3056518, *2 (E.D.N.Y. Oct. 6, 2006); see also United States v. Barnes, 295 F.3d 1354, 1368 (D.C. Cir. 2002) (rejecting equal protection claim because "[t]he Congress's decision to incorporate state law governing forfeiture of civil rights was rational irrespective of differences among states regarding restoration"); United States v. Lender, 985 F.2d 151, 156 n.* (4th Cir. 1993) ("[I]t is not irrational for Congress to defer to state law with regard to the characteristics of a prior offense, and doing so is no more intentionally arbitrary than our system of federalism itself."); United States v. Houston, 547 F.2d 104, 107 (9th Cir. 1976) (disparate sentences resulting from incorporation of varying state laws do not violate equal protection).

### C.    Every Court That Has Addressed the Issue Has Rejected Plaintiffs' Argument That the Statute Was Not Properly Enacted

Plaintiffs' fifth and last claim is that the entire Deficit Reduction Act of 2005 violates the Bicameralism Clause of the United States Constitution, U.S. Const., art. I, § 7, based on an alleged discrepancy, in a single provision of no relevance here,[21] between the version of the statute passed in the Senate and that passed in the House of Representatives.  Over the past year, this issue has been considered by a number of courts, all of which have rejected plaintiffs' argument on the authority of Marshall Field & Co. v. Clark, 143 U.S. 649, 672 (1892), which held that the signing of an enrolled bill by the Speaker of the House and President pro tem of the Senate constitutes "complete and unimpeachable" authentication of the bill that may not be probed by the courts.[22]  Assuming arguendo that plaintiffs have standing to challenge an alleged defect in a provision that is not relevant to them, the Court should dismiss this claim for the same reasons that have led every other court to reject it.  In the alternative, the Court could hold Count V in abeyance pending the D.C. Circuit's decision in Public Citizen v. Clerk, United States District Court, No. 06-5232 (oral argument held February 9, 2007), which, when issued, will constitute the binding law of the Circuit on this precise issue.

---

[21]  The provision related to time periods under Medicare for payment for certain medical equipment.

[22]  See Public Citizen v. Clerk, United States District Court, 451 F. Supp. 2d 109 (D.D.C. 2006) (Bates, J.), appeal pending, No. 06-5232 (D.C. Cir.); Cookeville Regional Med. Ctr. v. Leavitt, Civ. A. No. 04-1053 (JR), 2006 WL 2787831, *4 (D.D.C. Sept. 26, 2006) (Robertson, J.); Conyers v. Bush, No. 06-11972, 2006 WL 3834224 (E.D. Mich. Nov. 6, 2006); OneSimpleLoan v. U.S. Sec'y of Educ., No. 06 Civ. 2979 (RMB), 2006 WL 1596768, *8-*9 (S.D.N.Y. June 9, 2006), appeal pending, No. 06-2770-cv (2d Cir.); Cal. Dep't of Soc. Servs. v. Leavitt, 444 F. Supp. 2d 1088, 1096-97 (E.D. Cal. 2006), appeal on other grounds pending, No. 06-56136 (9th Cir.).

31

## <u>CONCLUSION</u>

For the foregoing reasons, defendant respectfully requests that his motion to dismiss be granted and that the case be dismissed.

Dated: February 27, 2007                    Respectfully submitted,

OF COUNSEL:                                 PETER D. KEISLER
                                            Assistant Attorney General
DANIEL MERON
General Counsel                             JEFFREY A. TAYLOR
                                            United States Attorney
KATHLEEN H. MCGUAN
Associated General Counsel                  SHEILA M. LIEBER
                                            Deputy Director
MARK D. POLSTON                             Federal Programs Branch
Deputy Associate General Counsel
   for Litigation                            /s/ Robert J. Katerberg
                                            ROBERT J. KATERBERG
SUSAN MAXSON LYONS                            (D.C. Bar No. 466325)
ROBERT W. BALDERSTON                        Trial Attorney
Attorneys                                   U.S. Department of Justice
Department of Health and Human Services     Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue, N.W., Room 6112
                                            Washington, D.C. 20001
                                            Telephone:     (202) 616-8298
                                            Facsimile:     (202) 616-8460
                                            Robert.Katerberg@usdoj.gov

                                            Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE URBAN HEALTH CARE<br>COALITION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT, Secretary,<br>Department of Health and Human Services,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civ. A. No. 06-2220 (RWR)<br>)<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Upon consideration of defendant's motion to dismiss, plaintiffs' opposition thereto, and

the entire record herein, it is hereby

ORDERED that defendant's motion is GRANTED, and it is

FURTHER ORDERED that this action is DISMISSED WITH PREJUDICE.


Dated: _____          _____
                                        RICHARD W. ROBERTS
                                        United States District Judge