# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
THE URBAN HEALTH CARE                   )
COALITION, et al.,                      )
                                        )
      Plaintiffs,                     )
                                        )    Civ. A. No. 06-2220 (RWR)
    v.                                )
                                        )
                                        )
MICHAEL O. LEAVITT, Secretary           )
Department of Health and Human Services )
_____

## PLAINTIFFS' NOTICE OF ERRATA

      Plaintiffs, the Urban Health Care Coalition, et al., submit this errata to amend

typographical and ministerial or grammatical errors in their Opposition to Defendant's Motion to

Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Failure to State a

Claim (the "Opposition Memorandum") and accompanying exhibits filed with the Court via

email on April 11, 2007 and docketed as Document No. 10.  Plaintiffs have submitted the

corrected Opposition Memorandum as Attachment "1" hereto.  The changes made to the

Opposition Memorandum include only corrections of grammatical and typographical errors

(such as correcting internal page cross-references, fixing incorrect capitalizations, and the like),

none of which substantively changed the content of the document.   Plaintiffs also have

submitted corrected cover pages to the Opposition Memorandum's exhibits as Attachments "2",

"3", and "4" hereto.  The only changes to the exhibits were to add the case number to the exhibit

cover pages.

Dated:  April 23, 2007

Respectfully submitted,

 

 

<u>     */s/*     </u>

Of Counsel:

L. Barrett Boss (D.C. Bar No. 398100)

Mark H. Gallant (D.C. Bar No. 913111)

COZEN O'CONNOR

Salvatore G. Rotella, Jr. (D.C. Bar No. 442795)

1627 I Street, NW, Suite 1100

Gregory M. Fliszar

Washington, D.C., 20006

COZEN O'CONNOR

Telephone (202) 912-4800

1900 Market Street

Facsimile  (866) 413-0172

Philadelphia, PA  19103

Telephone: (215) 665-2000

Facsimile:  (215) 665-2013

Attorneys for Plaintiffs

PHILADELPHIA\3112524\1  193485.000

**Attachment 1**

Civ. A. No. 06-2220 (RWR)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE URBAN HEALTH CARE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. A. No. 06-2220 (RWR) |
| MICHAEL O. LEAVITT, Secretary, Department of Health and Human Services, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR,
IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

Mark H. Gallant (D.C. Bar No. 913111)
Salvatore G. Rotella, Jr. (D.C. Bar No. 442795)
Gregory M. Fliszar
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000

Of Counsel

L. Barrett Boss (D.C. Bar No. 398100)
COZEN O'CONNOR
1627 I Street, NW, Suite 1100
Washington, D.C., 20006
Telephone (202) 912-4800
Facsimile  (866) 413-0172

Attorney for Plaintiffs

**CORRECTED VERSION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...................................................................... iii

STATUTE AT ISSUE .............................................................................. 1

FACTUAL AND STATUTORY BACKGROUND .................................................. 1

NATURE OF THE CASE ........................................................................ 5

ARGUMENT ............................................................................................ 6

I.     PLAINTIFFS' POSSESS STANDING TO SUE UNDER ARTICLE III ......................... 7

     A.     Legal Standards for Motion to Dismiss for Lack of Article III Standing and Subject Matter Jurisdiction ................................................................... 7

     B.     Plaintiffs Have Adequately Alleged Specific and Concrete Injuries Flowing Directly From § 6085 .......................................................................... 8

            1.     Plaintiffs are Injured in Fact by the Default Rates....................................... 8

            2.     Plaintiffs' Injuries are Directly Traceable to § 6085 as Enforced by the Secretary, not to any Independent Action of the MCOs or the State........ 10

            3.     Plaintiffs Are Not Merely Seeking an Advisory Opinion.......................... 13

     C.     The Award of Declaratory or Injunctive Relief Against the Application of § 6085 Would Clearly Redress the Harms of Which Plaintiffs Complain ...................... 17

     D.     Plaintiff Urban Health Care Coalition Has Associational Standing ..................... 19

II.    THE COURT HAS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS' CONSTITUTIONAL CHALLENGES ARE PROPERLY ADVANCED IN AN OFFICIAL CAPACITY SUIT AGAINST THE SECRETARY EITHER DIRECTLY UNDER THE CONSTITUTION, OR THE APA ............................................................ 20

     A.     The Constitutionality of § 6085 is Properly Tested in an Official Capacity Suit Against the Secretary ....................................................................... 20

     B.     Plaintiffs Have Asserted Claims That are Cognizable Under the APA................ 21

III.   THE SECRETARY HAS NOT DEMONSTRATED THAT PLAINTIFFS HAVE FAILED TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6) .................................................................. 23

A.    Legal Standards for Motion to Dismiss for Failure to State a Claim................... 23

B.    Plaintiffs Have Stated A Claim That § 6085 Results in a Taking From Plaintiffs Without Just Compensation in Violation of the Fifth Amendment ..................... 24

    1.    Takings Claim Standards ................................................................. 24

    2.    Plaintiffs Have Pled Facts That State an Unconstitutional Takings Claims Under the Controlling Standards. ........................................... 27

    3.    The Secretary's Motion to Dismiss Plaintiffs' Takings Claims is Based on Incorrect Factual Presumptions and a Moribund Legal Standard............. 31

C.    Plaintiffs' Allegations, and the Logical Inferences They Support, Adequately Advances Substantive Due Process and Equal Protection Claims ...................... 33

D.    Section 6085 Denies Plaintiffs Equal Protection Under the Law ......................... 36

IV.    PLAINTIFFS HAVE STATED A CLAIM FOR RELIEF UNDER THE BICAMERALISM CLAUSE OF ART. I SECTION 7 OF THE UNITED STATES CONSTITUTION ......................................................................................... 40

V.    THE DEFAULT RATE PROVISION SHOULD BE CONSTRUED NOT TO APPLY IN PENNSYLVANIA......................................................................................... 41

CONCLUSION............................................................................................................ 43

# TABLE OF AUTHORITIES

Page

CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)................................................................................. 15-17

*Am. Legal Found v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987)...............................................................................7

*Arkansas Dept. of HHS v. Ahlborn,*
    126 S. Ct. 1752 (2006)...............................................................................10, 12

*Atkins v. Rivera,*
    477 U.S. 154 (1986)..........................................................................................12

*Biton v. Palestinian Interim Self-Gov't Auth.,*
    310 F. Supp. 2d 172 (D.D.C 2004).....................................................................7

*Broad v. Sealsaska Corp.,*
    85 F.3d 422 (9th Cir. 1996), *cert. denied,* 519 U.S. 1092 (1997)...........................26

*Burditt v. U.S. Dep't of Health & Human Servs.,*
    934 F.2d 1362 (5th Cir. 1991) ..........................................................................32

*Calder v. Bell,*
    3 Dall. 386 (1798)............................................................................................26

*Calderon v. Ashmus,*
    523 U.S. 740 (1998)..................................................................................... 13-15

*California Dep't. of Social Servs. v. Leavitt,*
    444 F. Supp. 2d 1088 (E.D. Cal. 2006), *appeal on other grounds pending*, No. 06-
    56136 (9th Cir.)................................................................................................21

*Cheruki, M.D. v. Shalala,*
    175 F.3d 446 (6th Cir. 1999) ..............................................................................5

*Children's Hosp. and Med. Ctr. v. Bonta,*
    97 Cal.App. 4th 740 (2005) ..............................................................................37

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402, 415 (1971)..................................................................................37

*Clinton v. City of New York,*
    524 U.S. 417 (1998)............................................................................40

*Coffman v. Breeze Corps.,*
    323 U.S. 316 (1945)...................................................................... 13-15

*Conley v. Gibson,*
    355 U.S. 41 (1957)............................................................................23

*Cookeville Reg'l Med. Ctr. v. Leavitt,*
    No. 04-1053 (JR) 2006 WL 2787831 (D.D.C. Sept. 26, 2006) .............................21

*Dandridge v. Williams,*
    397 U.S. 471 (1970)............................................................................36

*Diamond v. Charles,*
    476 U.S. 54 (1986)...............................................................................8

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) ...........................................................................30

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,*
    438 U.S. 59 (1978)........................................................................ 20-22

*Edward J. Debartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988)............................................................................42

*Eric County v. Geriatric Ctr.,*
    952 F.2d 71 (3d Cir. 1999) ...................................................................22

*Foggy Botton Ass'n. v. District of Columbia,*
    441 F.2d 84 (D.D.C. 2006) ...................................................................24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,*
    528 U.S. 167 (2000)..............................................................................8

*Garelick v. Sullivan,*
    987 F.2d 913 (2d Cir.), *cert. denied,* 510 U.S. 821 (1993)....................................32

*Grand Council of the Crees v. FERC,*
    198 F.3d 950 (D.C. Cir. 2000) .................................................................7

*Heckler v. Edwards,*
    465 U.S. 870 (1984) ...........................................................................20

*Hooper v. California,*
    155 U.S. 648 (1895)............................................................................41

*Hosp. and Health Sys. Ass'n. of Pa v. Pa. Dep't of Pub. Welfare,*
   888  A.2d 601 (2005) ..................................................................................................*Passim*

*Hunt v. Wash. Apple Adver. Comm'n,*
   432 U.S. 333 (1977)..................................................................................................19

*Jerome Stevens Pharm., Inc., v. FDA,*
   402 F.3d 1249 (D.C. Cir 2005) ...................................................................................7

*Kaiser Aetna v. United States,*
   444 U.S. 169 (1979) ...................................................................................................25

*Kelo v. City of New London,*
   545 U.S. 469 (2005)...................................................................................25-26, 28-29

*Kowal v. MCI Commc'ns Corp.,*
   16 F.3d 1271 (D.C. Cir 1994) .....................................................................................23

*Lingle v. Chevron U.S.A., Inc.,*
   544 U.S. 528 (2005)..............................................................................24-25, 32-33

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982) ......................................................................................24, 25, 30

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ....................................................................................................8

*Medimmune, Inc. v. Greentech, Inc.,*
   127 S. Ct. 764 (2007)........................................................................................ 15-17

*Metropolitan Life Ins. Co. v. Ward,*
   470 U.S. 869 (1985).....................................................................................................37

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,*
   742 F.2d 442 (8th Cir. 1984), *cert. denied,* 469 U.S. 1215 (1985)............................32

*Montgomery v. Carter County, Tenn.,*
   226 F.3d 758 (6th Cir. 2000) ......................................................................................26

*Muskrat v. United States,*
   219 U.S. 346 (1911)....................................................................................................18

*Nat'l. Wrestling Coaches Ass'n. v. Dep't. of Educ.,*
   366 F.3d 930 (D.C. Cir. 2004), *cert. denied,* 545 U.S. 1104 (2005) ........................18

*OneSimpleLoan v. U.S. Sec'y. of Educ.,*
   No. 06 Civ. 2979 (RMB), 2006 WL 1596768 (S.D.N.Y. June 9, 2006), *appeal
   pending,* No. 06-2770-cv (2d Cir)..............................................................................21

*PennCentral Transp. Co. v. New York City,*
    438 U.S. 104 (1978)........................................................................................24

*PhRMA v. Thompson,*
    251 F.3d 219 (D.C. Cir. 2001)........................................................................22

*Porter v. DiBlasio,*
    93 F.3d 301 (7th Cir. 1996) ........................................................................26

*Pub. Citizen v. Clerk, United States District Court,*
    451 F. Supp. 2d 109 (D.D.C. 2006), *appeal pending*, No. 06-5232 (D.C. Cir.) ......... 21, 40-41

*Richardson v. S.W. Miss. Reg'l. Med. Ctr.,*
    794 F. Supp. 198 (S.D. Miss. 1992)................................................................5

*River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.,*
    173 S.W. 3d 43 (Tenn. Ct. App. 2002),
    *appeal denied*, 2003 Tenn. LEXIS 141 (2003) ....................................35

*San Remo Hotel, L.P. v. City and County of San Francisco,*
    545 U.S. 323 (2005)........................................................................................32

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)..........................................................................................7

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976)............................................................................................8

*St. Francis Hosp. Ctr. v. Heckler,*
    714 F.2d 872 (7th Cir. 1983), *cert. denied*, 465 U.S. 1022 (1984)..........................33

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)............................................................................................7

*Temple Univ. Hosp. v. Healthcare Mgmt. Alternatives, Inc.,*
    832 A.2d 501 (Pa. Super. 2003), *appeal denied*, 847 A.2d 1288 (Pa. 2004)...................3, 4, 17

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
    517 U.S. 544 (1996)........................................................................................19

*United States v. Munoz-Flores*
    495 U.S. 385 (1990)........................................................................................40

*Univ. Med. Ctr. of So. Nev. v. Shalala,*
    173 F.3d 438 (D.C. Cir. 1999)........................................................................18

*Wal-Mart Stores, Inc. v. Knickrehm,*
    101 F.Supp.2d 749 (E.D. Ark. 2000)..............................................................37

*Waterview Mgmt. Co. v. FDIC*,
    105 F.3d 696 (D.C. Cir. 1997) ...................................................................................42

*West Virginia Univ. Hosps., Inc. v. Casey*,
    885 F.2d 11 (3d Cir. 1989)..............................................................................37-39

*West Virginia v. HHS*,
    289 F.3d 281 (4th Cir. 2002) ...................................................................................20

*Whitney v. Heckler*,
    780 F.2d 963 (11th Cir.), *cert. denied*, 479 U.S. 813 (1986)....................................32

CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS

Art. I Sec. 7 of the U.S. Constitution...................................................................................40

Art. III of the U.S. Constitution .............................................................................*Passim*

Fifth Amend. to the U.S. Constitution ...................................................................*Passim*

Fourteenth Amend. to the U.S. Constitution.........................................................................36

Balanced Budget Act of 1997, Pub. L. No. 105-33 ...............................................................2

Deficit Reduction Act of 2005................................................................................*Passim*

Pennsylvania Quality Health Care Accountability and Protection Act ("Act 68"),
    40 P.S. 991.2101 *et seq.*..................................................................................*Passim*

42 U.S.C. § 1320a-7b(d) (§ 1128B(d) of the Act) ....................................................................16

42 U.S.C. § 1395dd.................................................................................................................5

42 U.S.C. § 1395u-2(b)(2)(D)..................................................................................................2

42 U.S.C. § 1396 et seq...........................................................................................................2, 21

42 U.S.C. § 1396a(a)(13)(A) (§ 1902(a)(13)(A) of the Act)..........................................2, 38, 41, 42

42 U.S.C. § 1396b(m)(1)(A)(i)..............................................................................................3, 35

42 U.S.C. § 1396b(m)(2)(A)(iii)...........................................................................................10, 22

42 U.S.C. § 1396b(m)(2)(A)(xii)..........................................................................................10, 22

42 U.S.C. §§ 1396b(m) ..........................................................................................................2

42 U.S.C. § 1396u (§ 1903(m) of the Act) ...............................................................................2

42 U.S.C. 1396u-2(b)(2) ................................................................................................3

42 U.S.C. § 1396bu-2(b)(2)(D) (§ 1932(b)(2)(A) of the Act) ...............................*Passim*

42 C.F.R. §§ 438.114 ....................................................................................................3

42 C.F.R. § 438.206 ..................................................................................................3, 35

42 C.F.R. § 447.302 ....................................................................................................12

55 Pa. Code § 1163 ......................................................................................................10

Rule 12(b)(6), Federal Rules of Civil Procedure ..........................................23, 32, 40

**OTHER MATERIALS**

Bureau of Economic Analysis, National Accounts 2006 Q2 Final, Section 3: Government
Current Receipts and Expenditures, Table 3.12 ("Government Social Benefits")..................35

CMS Letter to State Medicaid Directors (SMDL #06-010) (March 31, 2006) ................. 10-11, 16

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR,
IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

Plaintiffs, the Urban Health Care Coalition, et. al., file this Memorandum of Opposition

to the Motion of the Secretary of Health and Human Services to dismiss for lack of subject

matter jurisdiction, or, in the alternative, for failure to state a claim (hereinafter, "Sec'y. Br.").

## STATUTE AT ISSUE

The Social Security Act was amended by the Deficit Reduction Act of 2005, S. 1932 (the

"DRA"), to adopt a Medicaid default rate provision as follows (emphasis added):

> SEC. 6085. EMERGENCY SERVICES FURNISHED BY NON-CONTRACT
> PROVIDERS FOR MEDICAID MANAGED CARE ENROLLEES.
>
> (a)    In General - Section 1932(b)(2)of the Social Security Act (42
> U.S.C. 1396u-2(b)(2)) is amended by adding at the end the following new
> subparagraph:
>
> (D)    EMERGENCY SERVICES FURNISHED BY NON-
> CONTRACT PROVIDERS - *Any provider of emergency services that does not
> have in effect a contract with a Medicaid managed care entity that establishes
> payment* amounts for services furnished to a beneficiary enrolled in the entity's
> Medicaid managed care plan *must accept as payment in full the amounts (less any*
> payments for indirect costs of medical education and direct costs of graduate
> medical education) that it *could collect* if the beneficiary received medical
> assistance *under this title other than through enrollment in such an entity. In a
> state where rates paid to hospitals under the state plan are negotiated by contract*
> and not publicly released, the *payment amount* applicable under this subparagraph
> *shall be the average contract rate that would apply under the state plan* for
> general acute care hospitals or the average contract rate that would apply under
> such plan for tertiary hospitals.
>
> (b)    Effective Date - The amendment made by subsection (a) <u>shall take
> effect on January 1, 2007.</u>

## FACTUAL AND STATUTORY BACKGROUND

This is an action by a group of Medicaid-intensive Philadelphia area hospitals and health

systems, and a trade association that represents their interests as urban providers, challenging

§ 6085 of the Deficit Reduction Act of 2005 ("DRA"), Pub. L. No. 109-171, on several

constitutional grounds. As discussed below, the provision in question (referred to herein as

either "§ 6085" or the "Default Rate Provision") drastically changed the law concerning payments to hospitals for certain Medicaid patients by adding § 1932(b)(2)(D) to the Social Security Act (the "Act"), 42 U.S.C. § 1395u-2(b)(2)(D), effective January 1, 2007.

Medicaid is a joint state and federal program for medical assistance established pursuant to Title XIX of the Act, 42 U.S.C. § 1396 et seq. Medicaid managed care organizations serve as an alternative to the traditional Medicaid fee-for-service ("FFS") system, under which the States directly pay providers for services at published rates that are supposed to be established pursuant to a "public process." See § 1902(a) of the Act, 42 U.S.C. § 1396a(a)(13)(A). Section 1902(a)(13)(A) previously had required States to pay hospitals using FFS rates that are "reasonable and adequate" to cover the costs that must be incurred by efficiently and economically operated hospitals.

That substantive standard, however, was eliminated, at the urging of the National Governor's Association (First Amended Complaint ("FAC") ¶ 29), in favor of the bare procedural requirement that states must set hospital rates through a "public process" under the Balanced Budget Act of 1997 (the "BBA").[1] The BBA amended § 1902(a)(13)(A) of the Act to require a public rate-setting process, but eliminated any "floor" as to what state Medicaid programs must pay for hospital services. Plaintiffs have alleged that, unfettered by the "reasonable and adequate" reimbursement requirement, Pennsylvania has allowed its Medicaid FFS rates to fall well below the levels where they cover plaintiffs' actual costs of furnishing hospital services. First Amended Complaint ("FAC") ¶ 31.

This case involves payments under a Medicaid managed care program. Such programs are authorized and governed by §§1903(m) and 1932 of the Act (42 U.S.C. §§ 1396b(m) and 1396(u)). Under the managed care model, states typically pay fixed per member per month "capitation" fees to managed care organizations ("MCOs") on an "at risk" basis for individuals

---

[1]    Pub. L. No. 105-33, § 4711(a)(1).

2

enrolled in their managed care plans.  FAC ¶ 2.  That is, if the plans can procure all covered

medical services for their enrollees for less money than the aggregate capitated payments they

receive from the state, they can retain those additional sums and derive a profit margin.

Conversely, if the MCOs expend more for administrative and medical expenses than they receive

in capitation fees, they can lose money.  In many areas, including the Philadelphia environs in

which plaintiffs are located, Pennsylvania operates a mandatory Medicaid managed care program

known as "HealthChoices."

Under federal law, MCOs are expected to establish comprehensive networks with the

goal of being able to provide all "covered services" on an in-plan network.[2]  MCOs are not,

however, required to contract with all providers, nor are all providers who participate in

Medicaid required to contract with all MCOs.  FAC ¶ 44.

While enrollees in Medicaid managed care plans ordinarily must obtain covered services

from in-plan providers, there is an exception for emergency services, and Medicaid MCOs are

required to cover *emergency medical services ("EMS")* provided by non-plan hospitals, and

without regard to prior authorization.[3]  Prior to the DRA amendment at issue in this case, no

federal law or regulation governed the amount that MCOs must reimburse providers for EMS.

As alleged by plaintiffs, MCOs historically either contracted with hospitals to participate fully in

their plans' provider networks at agreed upon rates of reimbursement for all covered services

(i.e., both emergency and elective), or negotiated case-specific rates with non-contracted

hospitals that happened to provide EMS to their enrollees.  FAC ¶ 106.

Absent a negotiated agreement for these services, payment rates have been determined

under state law or implied contract principles.  FAC ¶  77-80.  In Pennsylvania, where all

plaintiffs are located, the leading implied contract case is Temple Univ. Hospital v. Health Plan

---

[2]    See 42 U.S.C. § 1396b(m)(1)(A)(i); 42 C.F.R. § 438.206.
[3]    42 U.S.C. § 1396u-2(b); 42 C.F.R. §438.114.

Mgmt. Alternatives, Inc.[4]  In Temple, the court held that Medicaid MCOs must pay Pennsylvania

hospitals for non-contracted EMS based on an equitable "reasonable value" standard, based on

average contract rates for hospital services.  Such contracts, including those with Medicaid

MCOs, invariably include a profit margin.  See FAC ¶ 47.  This standard prevailed until the

enactment of the Pennsylvania Healthcare Accountability and Protection Act ("Act 68"),[5] which

governs EMS rendered on or after January 1, 1999.

Act 68 requires that when an enrollee in any managed care plan seeks EMS from a non-

contracted provider,  the MCO must pay "all reasonably necessary costs" for the emergency

services.  40 P.S. § 991.2116.  The Pennsylvania Supreme Court has held that Act 68 applies

equally to Medicaid and non-Medicaid health plans in Pennsylvania alike.[6]  That Court further

held that Act 68 does not permit the use of Medicaid FFS rates for non-contracted EMS on a

default basis, finding for a variety of reasons that payment of the Pennsylvania Medicaid FFS

rates – which, among other things, failed to cover the actual costs of hospitals – was inconsistent

with the Act 68 requirement to pay "all reasonably necessary costs" of EMS.  HAP v. DPW, 888

A.2d at 614-615.

Until the effective date of § 6085 of the DRA, plaintiffs were entitled to be paid for EMS

provided to enrollees of non-contracted Medicaid MCOs based on the Temple or Act 68

standard.  This changed January 1, 2007 due to the enactment of the Default Rate Provision.

That provision amended Title XIX to require all EMS providers to accept as "payment in full"

for such services the amounts that the state Medicaid agency would pay if the claim had arisen

under the state FFS system.  Under a complementary federal law, the Emergency Medical

---

[4]      832 A.2d 501 (Pa. Super. 2003), appeal denied, 847 A.2d 1288 (Pa. 2004).
[5]      40 P.S. § 991.2101 et seq.
[6]      The Hosp. and Health Sys. Ass'n. of Pa. v. Pa. Dep't of Pub. Welfare, 888  A.2d 601, 613
(2005) ("HAP v. DPW") (striking a Medicaid FFS based rate enacted as part of a General
Appropriations Act as unconstitutional, and in conflict with existing substantive law – i.e., Act
68).

Treatment and Labor Act ("EMTALA"), which includes sanctions for failing to provide EMS to any emergent patient and is administered by the Secretary,[7] hospitals are obligated to provide EMS to all persons who present to their emergency departments irrespective of who will later pay for those services.  FAC ¶ 62.

## NATURE OF THE CASE

Plaintiffs brought this action challenging the adoption of § 6085, which is administered by the Secretary of Health and Human Services ("Secretary"), and its application to them in Pennsylvania.  Plaintiffs asserted five causes of action for declaratory and injunctive relief.  The first four Counts of the FAC allege that § 6085: (1) does not apply in Pennsylvania because the current Medicaid FFS rates in the Commonwealth do not fall within the two scenarios described in § 6085; (2) violates the Takings Clause of the Fifth Amendment by mandating the payment of significantly below-cost rates for EMS that hospitals must accept for the principal or exclusive benefit of privately owned and operated MCOs; (3) violates the Due Process Clause of the Fifth Amendment by failing to rationally and substantially advance the ostensible goal of public cost savings or any other legitimate state interest; and (4) violates the Equal Protection Clause incorporated under the Fifth Amendment by arbitrarily and irrationally incorporating widely disparate Medicaid FFS rates set by the states as the federally-mandated basis for payment for equivalent out-of-network EMS.  Count V alleges that the DRA as a whole is unconstitutional under the Bicameral Clause because the version of the law passed by the House of Representatives differs from the version passed by the Senate and signed by the President.

On February 27, 2007, the Secretary moved to dismiss the FAC, alleging that the Court lacks subject matter jurisdiction and that plaintiffs fail to state a claim upon which relief can be granted.  With respect to jurisdiction, the Secretary contends that: (1) plaintiffs lack standing

---

[7]    42 U.S.C. § 1395dd.  See, e.g., Cheruki, M.D. v. Shalala, 175 F.3d 446 (6th Cir. 1999); Richardson v. S.W. Miss. Reg'l. Med. Ctr., 794 F. Supp. 198, 200 (S.D. Miss. 1992)

because their alleged injury is caused by Pennsylvania's FFS rates, and is neither traceable to an action by the Secretary nor redressable by an order against him; (2) the case is non-justifiable because it seeks an advisory opinion on an issue that will only arise as a defense in future suits by providers against MCOs; (3) the government has not waived its sovereign immunity so as to permit this suit; and (4) the suit is not based on any recognized cause of action.

With respect to the alleged failure to state a claim, the Secretary contends that:  (1) § 6085 does apply in Pennsylvania; (2) § 6085 is valid under all aspects of the Fifth Amendment; and (3) the enactment of the DRA did not violate the Bicameral Clause.  Notably, the Secretary makes little effort to address plaintiffs' separate and distinct causes of action under the Takings, Due Process, and Equal Protection Clauses, but purports to demonstrate the validity of § 6085 under the Fifth Amendment as a whole simply by reiterating its argument that Pennsylvania set the FFS rates that caused plaintiffs' injury, and intoning the unsupported conclusion that "Congress could reasonably conclude that [the Default Rate Provision] would serve the legitimate governmental interests in containing costs and eliminating program incongruities and disincentives for emergency service providers to contract with Medicaid MCOs." Sec'y. Motion at 29.

## ARGUMENT

Plaintiffs are suffering immediate and concrete injury that is directly traceable to § 6085, as enforced by the Secretary, which injury would be fully redressed by declaratory or injunctive relief in this action.  Plaintiffs also have made out a *prima facie* case under each Count of the First Amended Complaint.  The Secretary's motion to dismiss inappropriately and broadly presumes facts that go beyond the four corners of the FAC and are contrary to plaintiffs' well pled allegations and the inferences they reasonably support.

The Secretary's assertions that plaintiffs' injuries would not be redressed by potential relief in this case are contrary not only to the well pled facts, but to the governing laws (under

6

which plaintiffs' payments for non-contracted EMS would be increased automatically were the application of § 6085 to plaintiffs prohibited by order of this Court). The Secretary's arguments that plaintiffs have failed to state a claim on which relief may be granted are flawed because they fail to address the rationality of the specific means Congress chose in § 6085 to achieve the "ends" the Secretary claims Congress sought to achieve through § 6085. The Secretary's motion to dismiss plaintiffs' Takings Claim, in particular, is predicated almost entirely on a legal standard that has been discredited by the Supreme Court. For the reasons that follow, Defendant's motion should be denied.

## I.    PLAINTIFFS' POSSESS STANDING TO SUE UNDER ARTICLE III

### A.    Legal Standards for Motion to Dismiss for Lack of Article III Standing and Subject Matter Jurisdiction

It is the plaintiff's burden to demonstrate that the court has subject matter jurisdiction to hear a case. Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C 2004). However, "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). While the district court may consider materials outside the pleadings when deciding a motion to dismiss for lack of jurisdiction, the court must accept all factual allegations in the complaint as true. Jerome Stevens Pharm. Inc., v. FDA, 402 F.3d 1249, 1253 (D.C. Cir 2005).

A plaintiff's standing under Article III of the United States Constitution ("Art. III") – that is whether there is a "case or controversy" – is necessary to establish the jurisdiction of the Court to hear the case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998); Grand Council of the Crees v. FERC, 198 F.3d 950, 954 (D.C. Cir. 2000). "[T]he decision to seek review must be placed in the hands of those who have a direct stake in the outcome, not in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." Am. Legal Found v. FCC., 808 F.2d 84, 91 (D.C. Cir. 1987) (internal quotation marks

7

omitted; quoting <u>Diamond v. Charles</u>, 476 U.S. 54, 61 (1986)).  To have Art. III standing, a plaintiff must establish: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural of hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  <u>Friends of the Earth, Inc.</u> <u>v. Laidlaw Envtl. Servs.</u>, 528 U.S. 167, 180-81 (2000) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)); <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 28 (1976)).

As we demonstrate below, plaintiffs have adequately alleged injury in fact under the controlling standards.

### B.    Plaintiffs Have Adequately Alleged Specific and Concrete Injuries Flowing Directly From § 6085

Plaintiffs initiated this action to contest the constitutionality of § 6085 of the DRA as applied to them in Pennsylvania.  That provision materially diminished plaintiffs' rights to payment from Medicaid MCOs on a *per se* basis effective January 1, 2007.  The Secretary suggests that § 6085 has no concrete impact on plaintiffs, and asserts that plaintiffs' "real gripe" is with Pennsylvania (which adopted below cost Medicaid FFS rates the Secretary incorporated for paying MCOs under § 6085), or with the MCOs (who pay plaintiffs for non-contracted EMS based on those rates).  These arguments do not withstand scrutiny.

### 1.    Plaintiffs are Injured in Fact by the Default Rates

Plaintiffs have alleged that they presently provide EMS to Medicaid patients enrolled in non-contracted plans and are, therefore, subject to § 6085.  FAC ¶ 2, 100-101.  Plaintiffs further alleged two broad categories of concrete and immediate harm arising directly out of the implementation of § 6085.  The first is that § 6085 mandated a material reduction of plaintiffs' payments for non-contracted EMS as of January 1, 2007, compared with what they had been entitled to be paid for those same services under state law, through and including December 31,

8

2006.[8]  Plaintiffs also alleged that the default rates imposed by § 6085 injure them financially

because they are "confiscatory" and fall far short of covering even the bare costs of providing

EMS services.  Federal law, including EMTALA, supra, also affirmatively obligates plaintiffs to

provide EMS while simultaneously displacing their right and capacity to serve other patients

who are not subject to the Default Rate.[9]

Second, plaintiffs alleged that the implementation of § 6085 injures them less tangibly,

but no less insidiously, by interfering with their contractual relations, and undermining their

negotiating leverage with MCOs.  FAC ¶¶ 101, 105-111.  Plaintiffs allege that the MCOs'

entitlement under § 6085 to pay non-contracted Pennsylvania hospitals at below-cost rates,

coupled with the hospitals' legal obligations to provide EMS payable in full at those rates

undermines their bargaining leverage and diminishes the incentive of MCOs to enter into fair

contractual agreements.  Id.  Plaintiffs allegations that § 6085 undermines their bargaining

leverage with often large, privately owned and operated MCOs, are consistent with a letter sent

to the Chairs of the Senate Budget and House Finance Committees by a delegation of eleven

Pennsylvania congressional representatives (copy attached as Exhibit "A" hereto).  FAC ¶ 111.

The impact of an almost identically worded Pennsylvania default rate statute which was

declared unconstitutional in HAP v. DPW, supra, was found unanimously by the Pennsylvania

Supreme Court to provide standing to hospitals based on the law's impact on reimbursement and

interference with the hospitals ability to negotiate with MCOs for payment.  888 A. 2d at 608

(observing that "Appellant's interest in the subject matter is neither remote nor abstract; rather

the applicable challenged language directly changes the way in which they may receive payment

for emergency services … that they are statutorily obligated to provide").  In short, plaintiffs

---

[8]      These allegations are set forth in paragraphs 74-81 of plaintiffs' FAC.

[9]      These allegations are set forth in paragraphs 54-56,  62, 102, 103, 131-133 of plaintiffs'
FAC, among others.

have alleged with particularity that § 6085 adversely impacted plaintiffs when the clock struck midnight on January 1, 2007.

> **2.    Plaintiffs' Injuries are Directly Traceable to § 6085 as Enforced by the Secretary, not to any Independent Action of the MCOs or the State**

Plaintiffs are harmed directly by § 6085.  Section 6805 amended § 1932 of the Act to state, in the imperative, that EMS "provider[s] ... must accept as payment in full" the amounts that the Pennsylvania Medicaid agency would pay for care under the state fee-for-service program when they provide emergency medical services covered by private, Medicaid MCOs. This law is aimed <u>directly</u> at plaintiffs as a class.  It prohibits <u>plaintiffs</u> from <u>accepting</u> more than the Default Rate for noncontracted EMS.  Pennsylvania regulations, moreover, independently preclude plaintiffs from being paid in excess of the statutorily permitted amounts, and requires them "to return the supplementary payment" upon receipt.  55 Pa. Code § 1163(b).

The "[a]dministration [of the Medicaid program] is entrusted to the Secretary [of HHS], who in turn exercises his authority through the Center's for Medicare and Medicaid services." <u>Arkansas Dept. of HHS v. Ahlborn</u>, 126 S. Ct. 1752, 1758 (2006).  In contrast with the Secretary's disavowal of any role in plaintiffs' plight, § 1903(m) of the Act requires the States to submit their prepaid MCO contracts to the Secretary for prior approval.  42 U.S.C. § 1396b(m)(2)(A)(iii).  It also requires, specifically, that these contracts must "compl[y] with the applicable requirements of section 1932," which now includes the default rate provision.  42 U.S.C. § 1396b(m)(2)(A)(xii).

Contrary to the Secretary's suggestion of passivity as to § 6085 (Sec'y Br. at 12, 18), CMS issued a March 31, 2006 notice to all State Medicaid Directors (SMDL # 06-010) (copy attached as Exhibit "B" hereto), which relevantly states:

> This letter is one of a series that provides guidance on the implementation of the Deficit Reduction Act of 2005, . . . Section 6085 of the DRA created a new section 1932(b)(2)(D) of the Social Security Act (the Act).  This provision

> establishes a limit on the amount to be paid non-contracting providers of
> emergency services at the amount that would have been paid if the service had
> been provided under the State's FFS Medicaid program.
>
> Prior to enactment of this legislation, there was no Federal law or regulation
> governing the amount of payment for emergency services provided to Medicaid
> beneficiaries who receives these services by a provider who did not have a
> contract with the beneficiary's Medicaid managed care entity.  There were often
> disputes over the rate at which the provider of emergency services would be paid.
> This legislation establishes a limit on the amount that emergency services
> providers who do not have a Medicaid managed care contract can be paid by
> Medicaid managed care entities.
>
> Under this provision, any provider of services that does not have in effect a
> contract with a Medicaid managed care organization (MCO), prepaid inpatient
> health plan (PIHP), or prepaid ambulatory health plan (PAHP), and that provides
> emergency services to a beneficiary enrolled in that Medicaid managed care
> entity, must accept as payment in full no more than the amount it would receive if
> the services were provided under the State's fee-for-service (FFS) Medicaid
> program.
>
> \*               \*               \*
>
> States must amend any existing MCO, PIHP, and PAHP contracts that have
> provisions governing payment for emergency services at non-contracting
> providers that are inconsistent with the requirements of new section
> 1932(b)(2)(D) (i.e., which would require payment of an amount in excess of State
> FFS rates) before January 1, 2007.  As of that date, all of these entities which
> cover emergency services outside of their contracting network must limit the
> amount to be paid non-contracting providers for services, which meet the
> definition of emergency in section 1932(b)(2)(B) of the Act, to no more than the
> amount that would have been paid if the service had been provided under the
> State's FFS Medicaid program.  (Emphasis added.)

The Secretary also is directly responsible for enforcing the requirement that hospitals must

provide these services under the Emergency Medical Treatment and Labor Act (EMTALA).  See

fn. 7, supra, and accompanying text.

    The Secretary suggests that Pennsylvania or the MCOs – and not § 6085 as administered

by the Secretary – are the cause of plaintiffs' injuries, and that plaintiffs therefore have sued the

wrong party.  That assertion is based on incorrect suppositions that ignore relevant state and

federal laws.  Pennsylvania did not independently adopt a Medicaid FFS Default Rate for non-

contracted EMS under state law or regulations. Rather, Pennsylvania has a default rate statute that provides for materially higher rates than § 6085. FAC ¶ 77-80.

Until January 1, 2007, plaintiffs were entitled to be paid all of "the reasonably necessary costs" MCO enrollees incurred for non-contracted EMS under the Pennsylvania Health Care Accountability and Protection Act ("Act 68").[10] FAC ¶ 78-80. In HAP v. DPW, supra, the Pennsylvania Supreme Court held both that Act 68 applies equally to Medicaid and non-Medicaid managed care plans licensed by Pennsylvania, and that Act 68 did *not permit* Medicaid MCOs to merely pay for EMS based on Medicaid FFS rates (which the Court observed were set too low to even cover a hospital's costs).[11]

Contrary to the Secretary's suggestion that plaintiffs' "real gripe" is with the MCOs, § 6085 does not even speak to MCOs, but is specifically directed at hospitals, like plaintiffs, by setting rates – in language cast in the imperative – that a contracted "provider . . . must accept." Both the State and the MCOs are entirely passive with respect to § 6085. It is well settled that a state's Medicaid participation is voluntary, but that when states elect to participate, they must adhere to Title XIX, and any conflicting state laws are preempted.[12] The Default Rate Provision currently applies to plaintiffs only because Pennsylvania is required by Title XIX and the Secretary to apply § 6085, and because Title XIX requirements – including those that preempt state law – also are incorporated under the form MCO agreements.

Prior to the Secretary's directive requiring all State Medicaid agencies to modify their MCO contracts to conform to § 6085, the standard contract between Medicaid MCOs and DPW specifically required payment for non-contracted EMS in accordance with Act 68.[13] Id. at 36.

---

[10]    40 P.S. § 991.2116.
[11]    888 A. 2d at 614-615.
[12]    See Atkins v. Rivera, 477 U.S. 154, 157 (1986); Arkansas Dept. of HHS v. Ahlborn, 126 S. Ct. 1752 (2006); 42 C.F.R. § 447.302.
[13]    See CMS Letter to State Medicaid Directors of March 31, 2006 (copy attached Exhibit "B" hereto); Standard HealthChoices Agreement (Effective January 1, 2005) at 36 (relevant excerpts attached as Exhibit "C" hereto).

The same agreement expressly and necessarily incorporated controlling federal law. Id. at 27. The provision in the MCO contracts providing for payment based on Act 68 was preempted by § 6085 effective January 1, 2007, and by the CMS directive discussed further below. The rates of payment for non-contracted emergency services did not change on January 1, 2007 due to action taken by any MCO. The Default Rate Provision – which is binding on the plaintiffs, the States, and MCOs, only because it preempts Act 68 – does not give MCOs (or States) any leeway to pay more for non-contracted EMS.

### 3.    Plaintiffs Are Not Merely Seeking an Advisory Opinion

The Secretary similarly asserts that plaintiffs' case is non-justifiable because "it essentially seeks an advisory opinion as to the validity of a defense to a suit for recovery of unpaid charges for emergency medical services." Sec'y. Br. at 22. To support this argument, the Secretary claims that plaintiffs are merely bringing this action to obtain a favorable ruling regarding the constitutionality of § 6085 that plaintiffs might later use to overcome an MCO's potential invocation of § 6085 as a defense in an inadequate payment suit. The Secretary then asserts that a judgment in this case would not resolve the entire case or controversy between plaintiffs and any MCO, "because a judgment in this case concerning the applicability and/or constitutionality of § 6085 will not bind the MCOs . . .." Id. at 23. These assertions are without merit.

In making his advisory opinion allegations, the Secretary relies on Calderon v. Ashmus, 523 U.S. 740 (1998) and Coffman v. Breeze Corps., 323 U.S. 316 (1945). In Calderon, the plaintiff challenged whether California was qualified to invoke the expedited review provisions of the Antiterrorism and Effective Death Penalty Act of 1996, which provided certain procedural advantages to qualifying states in federal habeas proceedings. That determination, even if made in plaintiff's favor, "would not resolve the entire case or controversy … but would merely determine a collateral legal issue governing certain aspects of their pending or future suits." Id.

at 747.[14]  In <u>Coffman</u>, a patent owner brought suit against his licensee to enjoin the licensee from

paying accrued royalties to the government under the Royalty Adjustment Act.  <u>Coffman</u>, 232

U.S. at 319-320.  The patent owner did not seek any judgment for the recovery of the royalties

alleged to be due, but instead sought an advisory adjudication that the statute was

unconstitutional.  <u>Id</u>. at  321-322.  The Court held that plaintiffs' real dispute was with the

licensee, therefore there was no "justifiable question unless and until [the patent holder] seeks

recovery of the royalties, and then only if [the licensee] relies on the Act as a defense."

<u>Coffman</u>,  323 U.S. at 324.[15]

Unlike the matters at issue in <u>Calderon</u> and <u>Coffman</u>, plaintiffs' obligation to accept

below-cost rates flows directly, exclusively and ineluctably from § 6085, and a judgment for

plaintiffs in this action would therefore resolve the entire case or controversy.   As noted,

plaintiffs, Medicaid MCOs, and Pennsylvania DPW all are strictly bound by § 6085 – plaintiffs

by the very terms of § 6085, and the criminal "anti-supplementation law" (discussed at pages 16-

17 below); Pennsylvania by Title XIX; and the MCOs by their agreements with DPW which

incorporates by reference and requires compliance with Title XIX, which now "trumps" Act 68.

The Pennsylvania Supreme Court held in <u>HAP v. DPW</u>, <u>supra</u>, that <u>existing</u> Pennsylvania law

<u>precludes</u> establishing a Medicaid FFS rate as the default rate for non-contracted EMS.

Accordingly, the <u>only</u> thing that enables the MCOs to pay less than "all reasonably necessary

costs" of EMS <u>is</u> § 6085 which "preempts" Act 68.

Significantly, plaintiffs also are expressly precluded by federal law from billing the

MCOs in the very manner the Secretary suggests they do as the vehicle for testing § 6085.

---

[14]     The reason is that the underlying "case or controversy" at stake was the class members'
claims in their individual habeus proceedings and the relief requested would merely determine a
collateral legal issue governing certain aspects of those pending or future suits.  <u>Calderon</u>, 523
U.S. at 747.
[15]     The reason is that the patent owner asserted no right to recover the royalties due under the
licensing agreement and it was not certain that the licensee would raise the Act as a defense.
<u>Coffman</u>, 323 U.S. at 323-324.

Consequently, Abbott Labs. v. Gardner, 387 U.S. 136 (1967), and Medimmune, Inc. v.

Greentech, Inc., 127 S. Ct. 764 (2007) are much more closely on point than Calderon and

Coffman. In Abbott, drug companies and their trade association brought a pre-enforcement

action against the Secretary and the Commissioner of the FDA to challenge regulations that

required labels and other printed manufacturers of prescription drugs to designate the established

name of the drug involved whenever its trade name was used, seeking a declaratory judgment

that the regulations were unlawful and an injunction retraining the Secretary from enforcing

them. Denying the Secretary's motion to dismiss, the Abbott Court readily found Art. III

standing, observing that plaintiffs' failure to comply with the "self-operative" labeling

requirements would result in the drugs being declared "misbranded" *per se*, subjecting them to

injunction, criminal penalties and seizure of unlawfully distributed, misbranded drugs. Id. at

147, 152, 153, n. 19. The drug companies either had to comply with the regulations'

requirements, incurring the costs of changing their label and promotional material, or defy them

risking serious potential criminal and civil penalties. The Court observed that "it was the very

purpose of the Declaratory Judgment Act to ameliorate," and avoid such "dilemma[s]" and that

> [w]here the legal issue presented is fit for judicial resolution and
> where a regulation requires an immediate and significant change in
> the plaintiff's conduct of their affairs with serious penalties
> attached to noncompliance, access to the courts under the
> Administrative Procedures Act and the Declaratory Judgment Act
> must be permitted … .

Id. at 152, 153. See also Medimmune, 127 S. Ct. at 772 (holding that, "where threatened action

by government is concerned, we do not require a plaintiff to expose himself to liability before

bringing suit to challenge the basis for the threat").

As pled in the FAC (¶ 104), plaintiffs would be committing a felony *per se* if they

charged MCOs more than the rates prescribed under § 6085 for services to an individual enrolled

in a Medicaid MCO. Section 1128B of the Act,[16] entitled Criminal Penalties for Acts Involving

Federal Health Care Programs, relevantly states (emphasis added):

> (d)    Whoever <u>knowingly and willfully</u> –
>
> (1)    <u>charges, for any service provided to a patient under a State plan</u> approved
> under subchapter XIX of this chapter . . . <u>at a rate in excess of the rates
> established by the State</u> (or, in the case of services provided to any individual
> enrolled in a Medicaid managed care organization under subchapter XIX of this
> chapter under a contract under section 1903(m) <u>or under a contract, referral, or
> other arrangement</u> under such contract, <u>at a rate permitted under such contract</u>) . .
> .
>
> \*                    \*                    \*
>
> <u>shall be guilty of a felony</u> and upon conviction, thereof shall be fined not more
> than $25,000 or imprisonment for not more than five years, or both.

The below cost rates mandated for EMS by § 6085 are "established by the State," <u>and</u> required

by the Secretary to be included "under the contract" entered between the MCOs and DPW

"under section § 1903(m)." <u>See</u> CMS SMDL # 06-010. Further, the § 6085 rates are payable

under an "arrangement" for non-contracted EMS. <u>Id</u>.

The Act thus makes knowingly and willfully billing in excess of the Default Rate a

felony. It contains no exception for EMS providers that would like to defy the criminal law in

order to generate a "test case" against an MCO in which the MCO would raise § 6085 as a

"defense" to the "excessive" bill. Like the rules challenged in <u>Abbott</u>, § 6085 is self-operative,

has an immediate negative impact on plaintiffs' businesses, and plaintiffs would have to defy the

clear mandate of § 1932 and violate a federal criminal law *per se* to avail themselves of the

"alternative remedy" proposed by the Secretary. The issues presented here also are purely legal,

as they were in <u>Abbott</u>. Consistent with <u>Abbott</u> and <u>Medimmune</u>, plaintiffs should not have to

expose themselves to criminal liability to challenge the constitutionality of § 6085.[17]

---

[16]    42 U.S.C. § 1320a-7b(d).

[17]    The Secretary asserts that plaintiffs' concern that they have no practical way of testing §
6085 by suing the MCOs is defeated by <u>Seegars v. Gonzales</u>, 396.F.3d 1248 (D.C. Cir. 2005).
Sec'y. Br. at 20, n.13. The Secretary's reliance on <u>Seegars</u> is misplaced. <u>Seegars</u> directly dealt
with a "non-First Amendment preenforcement <u>challenge to a criminal statute</u> (emphasis

### C.    The Award of Declaratory or Injunctive Relief Against the Application of § 6085 Would Clearly Redress the Harms of Which Plaintiffs Complain

Equally unconvincing is the Secretary's representation that the relief plaintiffs seek (i.e., a declaration and injunction against the application of § 6085 to plaintiff hospitals) would not redress their injuries, or cause them to be paid more than the Default Rates. The Secretary asserts that a "judgment in this case concerning the applicability and/or constitutionality of § 6085 will not bind the MCOs." Sec'y. Br. at 23. The Secretary also asserts that:

> Nor would the court's decision bind Pennsylvania, which would be free to maintain the fee-for-service rates that plaintiffs claim are inadequate.

Sec'y. Br. at 16. These conclusory assertions are contrary to the facts pled by plaintiffs and to the plain terms of governing laws, as discussed in detail above.

Unlike defendant's self-serving supposition that Pennsylvania "might" still require the use of the Medicaid FFS rates if § 6085 were held invalid, plaintiffs' contrary allegations are predicated on actual Pennsylvania law that actually governs plaintiffs' payments for non-contracted EMS, which they would automatically obtain "but for" § 6085. Plaintiffs thus automatically would be entitled upon the entry of a favorable judgment in this case to reimbursement for EMS from non-contracted Medicaid MCOs at the much higher rates prescribed by Pennsylvania Act 68, as interpreted by HAP v. DPW, supra, or under the *quantum meruit* standards adopted by the Pennsylvania Supreme Court in Temple, supra. The only reason those higher rates are not applicable to plaintiffs today is because § 6085 preempts the inconsistent (*i.e.*, more generous) state law and because the Secretary has ordered the states to replace such reimbursement standards with that prescribed by § 6085. The Secretary simply ignores these controlling state laws.

---

added)." Id. at 1254. Plaintiffs are not challenging the constitutionally of or seeking to enjoin enforcement of Section 1128B of the Act. Rather, as explained directly above, Section 1128B prevents plaintiffs from charging the MCOs rates above the limits mandated by § 6085 or bringing private party suits against the MCOs for higher rates (as the Secretary suggests) without the untenable dilemma of exposing themselves to criminal liability. Thus, the situation is controlled by Abbott and Medimmune.

Consequently, defendant's reliance on cases such as <u>National Wrestling Coaches</u> <u>Association v. Department of Education</u>, 366 F.3d 930 (D.C. Cir. 2004), <u>cert</u>. <u>denied</u>, 545 U.S. 1104 (2005), and <u>Univ. Med. Ctr. of So. Nev. v. Shalala</u>, 173 F.3d 438 (D.C. Cir. 1999), for the proposition that it is purely speculative that the relief sought would redress plaintiffs' harms is ill founded. In both of those cases, third parties remained free as a legal matter to take independent action that would perpetuate plaintiffs' injuries, so that it was not reasonably likely that the relief plaintiffs sought in federal court would ameliorate the injuries of which they complained. The opposite is true here.

The Secretary also incorrectly relies on <u>Muskrat v. United States</u>, 219 U.S. 346 (1911), stating:

> Plaintiffs may perceive a suit against a public official for declaratory and injunctive relief to be a familiar and convenient way of obtaining a judicial declaration on the applicability and constitutionality of a statute. However courts have long rejected such suits as vehicles for testing the constitutionality of statutes testing rights and duties <u>as between private parties</u>.

Sec'y. Br. at 16 (emphasis added). That reliance is misplaced. <u>Muskrat</u> involved an act of Congress that established direct jurisdiction in the federal courts to determine the constitutional validity of an act of Congress without the necessity of a case or controversy. <u>Muskrat</u>, 219 U.S. at 361. Here, a controversy exists, and the "private party" is merely conduit for the challenged provision of <u>Title XIX,</u> which independently <u>obligates</u> the MCOs to pay, and forces plaintiffs to accept, the Default Rates.

Given the facts that must be taken by the Court as true, and the actual import of the governing federal and state laws, it is clear that the harms of which plaintiffs complain would immediately and conclusively be redressed by the award of declaratory and injunctive relief.

### D.     Plaintiff Urban Health Care Coalition Has Associational Standing

The Secretary asserts, in a footnote, that plaintiff Urban Health Care Coalition (the "Urban Coalition") does not have associational standing in this action.  Sec'y. Br. at 15, n.11. "[A]n association has standing to sue on behalf of its members 'when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996) (quoting Hunt v. Wash. Apple Adver. Comm'n, 432 US. 333, 343 (1977)).  Associational standing is most easily satisfied when the Complaint seeks declaratory and injunctive relief and not monetary damages requiring the individualized proof on behalf each plaintiff.  Id.

Plaintiff Urban Coalition meets these standards.  The Secretary's motion rests on the incorrect premise that the individual hospital and system members of the Urban Coalition lack standing to sue in their own right.  Further, the Urban Coalition's mission and services revolve around helping member hospitals seek and obtain fair and adequate payments under Medicaid and Other Government programs.  FAC ¶11.  Under Hunt, the Urban Coalition may properly rely on its members' standing where, as here, the interests it seeks to protect in this case are "germane to its purpose."  As only declaratory and injunctive relief is sought in this case, not specific damages requiring individualized poof, all requirements for associational standing are met.

## II.    THE COURT HAS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS' CONSTITUTIONAL CHALLENGES ARE PROPERLY ADVANCED IN AN OFFICIAL CAPACITY SUIT AGAINST THE SECRETARY EITHER DIRECTLY UNDER THE CONSTITUTION, OR THE APA

### A.    The Constitutionality of § 6085 is Properly Tested in an Official Capacity Suit Against the Secretary

The Secretary erroneously contends that plaintiffs have no cause of action against the Secretary to seek redress against the application of § 6085. The government acknowledges, as it must, that "a suit against a public official for declaratory relief [is] … a familiar and convenient way of obtaining a judicial declaration of the applicability and constitutionality of a statute." Sec'y. Br. at 16. Moreover, the Supreme Court has made clear that the constitutionality of a federal statute is properly tested in an official capacity suit against the head of the agency charged with enforcing the statute at issue. Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59 (1978). See, e.g., Heckler v. Edwards, 465 U.S. 870 (1984) (lawsuit challenging, on Equal Protection grounds, gender-based presumption incorporated into the Act, was brought as a suit by those claiming discrimination against the Secretary); West Virginia v. HHS, 289 F.3d 281 (4th Cir. 2002) (suit against the Secretary to challenge amendment to Title XIX as infringing on the State's Tenth Amendment rights).

In Duke Power Co., the Supreme Court held that a suit in which citizens sought a declaration that the Price-Anderson Act denied them Equal Protection *and* constituted a Taking in violation of the Fifth Amendment was properly advanced as a suit against the Secretary of the NRC. The Court further observed that the claim raised a federal question under § 1331 as to which a cause of action arose directly "under the Constitution to vindicate [plaintiffs'] federal rights." Duke Power Co., 438 U.S. at 69-70. Indeed, in three of the cases cited by the Secretary that challenged the constitutionality of the DRA based on bicameralism grounds, the defendant

20

was the Secretary of the executive agency charged with implementation of the DRA provision at issue.[18] None was dismissed for want of Article III standing or a federal cause of action.[19]

Just as the NRC was the proper party defendant as the head of "the executive agency charged with administration and enforcement of the allegedly unconstitutional statute" (Duke Power, id.), under 42 U.S.C. § 1396 et seq, the Secretary is specifically empowered and obligated to oversee and administer the operation of Medicaid and the States' adherence to § 6085. See pages 10-11 above. He is therefore the proper party to a suit challenging the constitutionality of that provision.

### B.  Plaintiffs Have Asserted Claims That are Cognizable Under the APA

Defendant recognizes, as he must, that the Administrative Procedures Act ("APA") waives federal immunity to suit by providing:  "An action in a [federal] court . . . seeking relief other than money damages and stating a claim that an agency or an officer . . . thereof acted . . .

---

[18]    See Cookeville Reg'l Med. Ctr. v. Leavitt, No. 04-1053 (JR) 2006 WL 2787831 (D.D.C. Sept. 26, 2006) (Robertson, J.);  California Dep't. of Social Servs. v. Leavitt, 444 F. Supp. 2d 1088 (E.D. Cal. 2006), appeal on other grounds pending, No. 06-56136 (9th Cir.); OneSimpleLoan v. U.S. Sec'y of Educ., No. 06 Civ. 2979 (RMB), 2006 WL No. 1596768 (S.D.N.Y. June 9, 2006), appeal pending, No. 06-2770-cv (2d Cir.);

[19]    Similarly, in Pub. Citizen v. Clerk, United States District Court, a non-profit consumer advocacy organization brought an action against the Clerk of the United States District Court for the District of Columbia (the "Clerk of Court") challenging the constitutionality of the DRA on grounds that it was passed in different forms by the House and Senate (i.e., the bicameralism claim). 451 F. Supp. 2d 109 (D.D.C. 2006) (Bates, J.), appeal pending, No. 06-5232 (D.C. Cir.). While the plaintiff brought its action against the Clerk of Court because it sought an order enjoining the Clerk of Court from imposing the increased filing fee provided for in § 10001(a) of the DRA, Judge Bates properly noted in his opinion that the defendant should instead have been an agency in the executive branch, stating:

> Defendant in this case is nominally the Clerk of the Court ....
> However, the executive branch, rather than the judiciary, is the real party in interest.  As discussed in more detail above, the DRA is an act to provide for reconciliation of the budget for fiscal year 2006 and has a sweeping impact on programs managed by agencies within the executive branch.

Id. at 111 n.4 (emphasis added).

21

in an official capacity or under color of legal authority shall not be dismissed on the ground that it is against the United States … ." Sec'y.Br. at 24.  As noted above, under Duke Power, plaintiffs have a direct cause of action under the constitution, as to which jurisdiction is properly based on § 1331.  Accordingly defendant's APA defense is irrelevant.  In any case, the Secretary also is subject to the APA and § 1331 for his official role in administering Title XIX and enforcing § 6085.

Defendant suggests that there is no waiver of immunity to authorize an official capacity suit under the APA because he personally has taken no action adverse to the plaintiffs.  On the contrary, the Act specifically requires the Secretary to oversee and approve MCO contracts under the Medical managed care program and to ensure compliance with § 1932.  42 U.S.C. § 1396b(m)(2)(A)(iii) & (xii).  Even though third parties – such as States or MCOs – commonly pay providers for their services under Title XIX, suits challenging payments commonly are brought against the Secretary based on his oversight and approval of contested payment rates or payment rules.[20]  Moreover, in this case, as discussed above (pages 10-11), the Secretary, through CMS, has taken specific action to enforce § 1932 by issuing a directive ordering all State Medicaid Directors to amend MCO contracts to incorporate the Default Rate Provision.

The Secretary further claims that there is no waiver of sovereign immunity capable of supporting a cause of action under the APA because plaintiffs supposedly have available some "other adequate remedy in a court."  Sec'y. Br. at 24.  This assertion fails because plaintiffs have no necessary or practical alternative to suing the Secretary to challenge § 6085 and would have to engage in facially criminal conduct in order to generate the private controversy through which

---

[20]    See, e.g., Eric County v. Geriatric Ctr., 952 F.2d 71 (3d Cir. 1999) (suit under the APA and § 1331 challenging, as arbitrary, and contrary to law, Secretary's approval of a State Plan Amendment under which Pennsylvania adopted a "suspect" rate methodology); PhRMA v. Thompson 251 F.3d 219 (D.C. Cir. 2001) (adjudicating suit under § 1331 and the APA to challenge the Secretary's approval of a state demonstration waiver program under § 1115 of the Act).

22

the Secretary invites them to test the constitutionality of § 6085. As shown above, plaintiffs are affirmatively barred from knowingly charging the MCOs more than the Default Rates by both the mandate of § 6085 and the criminal anti-supplementation law (§ 1128B(d)). Furthermore, the MCOs and DPW have no choice but to require payment of the Default Rate because the Secretary requires them to do so pursuant to 42 U.S.C. § 1396b(m)(2)(A)(xii). Thus, the Secretary's attempt to rebut an APA claim based on alternative remedies fails.

## III.    THE SECRETARY HAS NOT DEMONSTRATED THAT PLAINTIFFS HAVE FAILED TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6)

After contending that plaintiffs lack Article III standing and a viable cause of action, the Secretary asserts that plaintiffs have failed to state any constitutional claim on which relief may be granted, warranting dismissal under Fed. Rule Civ. Proc. 12(b)(6). This aspect of the Secretary's motion is flawed because it (once again) ignores plaintiffs' well pled allegations of fact, and because it is, in large part, predicated on an obsolete legal standard that has been rejected by the Supreme Court.

### A.    Legal Standards for Motion to Dismiss for Failure to State a Claim

A complaint should not be dismissed for failure to state a claim under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Moreover, "the complaint is construed liberally in the plaintiff's favor, and ... plaintiff [receives] the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir 1994). As we demonstrate the Secretary's motion to dismiss under Rule 12(b)(6) fails under these standards given plaintiffs' allegations and the factual inferences that they reasonably support.

23

**B.    Plaintiffs Have Stated A Claim That § 6085 Results in a Taking From Plaintiffs Without Just Compensation in Violation of the Fifth Amendment**

**1.    Takings Claim Standards**

The Takings Clause of the Fifth Amendment relevantly provides:

> ... nor shall private property be taken for public use, without just compensation.

**a.    Regulatory Takings in General**

In general, takings claims are divided into two broad categories, condemnations of property and regulatory takings.  See generally Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005).  The latter occurs where a regulation deprives someone's property entirely of its value (which plaintiffs do not assert here), or "goes too far" by interfering with a person's property interests through an economic impact inconsistent with investment based interests.  See generally PennCentral Transp. Co. v. New York City, 438 U.S. 104, 124 (1978); Lingle, 544 U.S. at 537, 539-540.  The second test looks to the character of the interference and the severity of the economic impact.  Lingle, id.  See also Foggy Botton Ass'n. v. District of Columbia, 441 F.2d 84, 89 (D.D.C. 2006).  This area of law was comprehensively surveyed and evaluated in Lingle, which instructs that review of whether governmental action effects an unconstitutional regulatory taking is highly fact specific, and considers certain key benchmarks, including: whether the regulation seems to be "equivalent to the classic taking in which the government directly appropriates private property," and whether the regulation "forc[es] some people alone to bear public burdens which, in fairness, should be more broadly borne by the public as a whole."  Lingle, 544 U.S. at 537, 539; Foggy Bottom Ass'n, id.

**b.    Physical Invasion Takings**

The issue in a Takings case generally is not whether the government may interfere with property, but whether the interference amounts to a Taking that requires "just compensation" as an incident of the exercise of the government's police power.  Lingle, 544 U.S. at 536-537.  In certain instances, known as Loretto Takings, a regulation may constitute a Taking *per se* so that

24

payment of "just compensation" is mandatory. Id. at 538 (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)). This occurs when governmental interference with private property "requires an owner to suffer a permanent physical invasion of her property – however minor," in which case there is "a government . . . taking without regard to the public interest it serves" so that "it must provide just compensation." Lingle, 544 U.S. at 538; Loretto, 485 U.S. at 425. In Loretto, the physical invasions involved an easement to run a small television cable across plaintiffs' roofs. The Loretto Taking standard applies whenever there is physical interference with "the [owners] absolute and undisturbed possession of every party of his premises." Loretto, 458 U.S. at 437. See Kaiser Aetna v. United States, 444 U.S. 169 (1979) (per se Taking results from Coast Guard's dredging operation that subjected part of private marina to mandatory public access).

c.    **Takings For Private Benefit**

To satisfy the Fifth Amendment, any Taking, whether it involves a condemnation or a regulatory Taking, must be "for public use." A Taking for private use is prohibited "even [if] just compensation is paid." Kelo v. City of New London, 545 U.S. 469 at 478-478 (2005); and at 497 (and cases discussed therein). (O'Connor J. dissenting). The scope of a "public use" was hotly debated in Kelo, which closely examined the relation of a private benefit resulting from a Taking to the "public use" requirement.

In Kelo, the City of New London had condemned private properties pursuant to an economic revitalization plan under which a private nonprofit redevelopment agency would establish a new, mixed use zone in place of the condemned properties, which then would be leased to private developers. The plan was fashioned to encourage jobs, commerce and new tax sources. In a 5 to 4, multi-opinion split, the Supreme Court narrowly sustained the condemnation. A four member plurality that upheld the Taking concluded that a Taking is not required to be for a "purely public" purpose, but merely must be rationally related to a purely

25

public purpose. Justices Rehnquest, Scalia, Thomas, and O'Connor dissented. They expressed consternation that the City had condemned private property for the benefit of a private entity under the auspices of urban redevelopment, contending that only "*purely public*" Takings are constitutional. The dissenting opinions were highly critical of governmental action that involves "robbing Peter to pay Paul" for the benefit of a politically powerful private party (as opposed to for a "purely public" benefit), a limitation on takings first espoused in <u>Calder v. Bell</u>, 3 Dall. 386, 388 (1798).[21] <u>See also</u> <u>Broad v. Sealsaska Corp.</u>, 85 F.3d 422 (9th Cir. 1996), <u>cert.</u> denied, 519 U.S. 1092; <u>Montgomery v. Carter County, Tenn.</u>, 226 F.3d 758 (6th Cir. 2000); <u>Porter v. DiBlasio</u>, 93 F.3d 301 (7th Cir. 1996) (holding that takings for the benefit of a private party are unlawful *per se*).

In concurring with the four other Justices to uphold the redevelopment initiative, in his swing vote, Justice Kennedy underscored that he would defer to the legislative finding of a public use based on the extensive public process that preceded a condemnation that significantly benefited a "private" party (the private developer and Pfizer, Inc., which owned the adjoining site), and because it was designed to combat local unemployment and improve the City's eroding tax base. Justice Kennedy nonetheless emphasized in his concurrence that the Court "should strike down a taking that, by a clear showing, is intended to benefit a particular private party, with only incidental or pretextual public benefits." 545 U.S. at 491. He also stressed that "there may be private transfers in which the risks of undetected favoritism of private parties is so acute that a presumption (rebuttable or otherwise) of invalidity is warranted under the Public Use Clause." <u>Id.</u> at 493.

---

[21]    <u>See</u> 545 U.S. at 505 (Thomas, dissenting); at 494 ("O'Connor dissenting, joined by the Chief Justice and Justices Scalia and Thomas) (permitting a merely incidental public benefit serves to "wash out any distinction between private and public use of property").

26

### 2.    Plaintiffs Have Pled Facts That State an Unconstitutional Takings Claims Under the Controlling Standards

Plaintiffs' allegations make out a cognizable claim under the Takings Clause under the foregoing standards. Plaintiffs contend that § 6085 effects an unconstitutional regulatory Taking as applied to them because it independently adopts and mandates the use of an inherently "confiscatory" rates to obtain valuable EMS for the direct and predominant benefit of a private MCOs, and forces EMS hospitals located in Pennsylvania, in particular, to "subsidize" the costs of EMS for Medicaid recipients. See, e.g., FAC ¶¶ 5, 7, 16-17, 128-137.

Under rules of notice pleading, plaintiffs' allegation of an unlawful regulatory Taking subsumes the underlying legal standards, namely that the use of the Default Rate imposes upon plaintiffs an economic burden that more fairly should be borne by society (or the Medicaid program) as a whole, and that the payment of "confiscatory" rates that may shift a hospital from a positive to a negative margin, undermines investment-based expectations. While only notice pleading is required by the Rules, plaintiffs factual allegations also include the following:

- Plaintiffs each provide EMS to enrollees in non-contracted Medicaid HMOs for which § 6085 requires them to accept, as payment in full, Medicaid FFS. FAC ¶¶ 2, 4, 16-17.

- Plaintiffs treat substantial volumes of Medicaid patients, and 50% or so of hospital admissions occur through the emergency department. FAC ¶¶ 12.E, 13, 14, 15.D, 98.

- Beginning January 1, 2007, the Default Rate Provision has forced plaintiffs to accept "confiscatory" rates that do not cover the underlying costs of providing inpatient EMS, and cover only a fraction of the actual costs of outpatient EMS. FAC ¶¶ 55, 56, 102.

- These rates also deny plaintiffs "payments that are consonant with a fair return on equity." FAC ¶ 132.

- Hospitals in Pennsylvania operate on low margins and small swings in their reimbursements can mean the difference between making or losing money overall. FAC ¶¶ 93-98.

- "The takings effected by § 6085 are not for a public purpose." FAC ¶ 135.

- § 6085 transfers the benefits of providers' subsidies of EMS resulting from the mandate to accept below-cost FFS "entirely to privately owned and operated HMOs."

FAC ¶¶ 3, 5.  Because the States' pay fixed, capitated fees to Medicaid MCOs, which operate "at risk," the "savings" achieved by the MCOs at plaintiffs' expense are not passed along to the State, but "inure directly" to the MCOs' benefit (in a manner that "robs Peter to pay Paul").  FAC ¶¶ 42-43, 86-89, 135-137.

- On information and belief, § 6085 was inserted into the conference committee version of the budget bill without public debate or congressional oversight hearings concerning the adequacy of the default rates, at the instance of and for the private pecuniary benefit of the managed care industry.  FAC ¶¶ 5, 116, 135.D.

- HMO industry lobbying efforts were intended specifically to preempt prevailing state statutes, such as Act 68 in Pennsylvania, under which hospitals were entitled to be paid greater amounts than Medicaid FFS levels for non-contracted EMS.  FAC ¶ 84-86.

- Hospitals are required under compulsion of law to provide these EMS services for the benefit of non-contracted Medicaid HMOs.  FAC ¶¶ 62-73, 99.

- Hospitals may not even theoretically avoid these Takings by declining to participate in Medicaid since, as enacted, § 6085 was made applicable to <u>all</u> providers of EMS, not just those who chose to participate in Medicaid.  FAC ¶ 83.

- The federal regulatory taking effected by § 6085 is attended by a "physical invasion" through complementary federal laws (i.e., EMTALA), which require the use of plaintiffs physical property (i.e., the ED and inpatient units) and valuable services to provide the below cost EMS which renders it a Taking *per se*.  FAC ¶¶ 136, 137.

### a.    Private Benefit

Plaintiffs have alleged, first, that § 6085 directly, substantially, and overwhelmingly, if not exclusively, benefits private parties – including large publicly traded HMO companies – at plaintiffs' expense.  Under the approach endorsed by a majority of the Justices in <u>Kelo</u>, § 6085 fails as a Taking for a private use if it robs "Peter" (i.e., plaintiffs) at least principally for the private benefit of "Paul" (i.e., MCOs).  Although Justice Kennedy joined four other Justices in upholding the condemnation benefiting the private developer in <u>Kelo</u>, he rested that decision on the fact that the resulting redevelopment was motivated by acute underemployment and tax-driven economic needs in New London, and because it arose out of a detailed legislative history and public proceeding that made clear that the private land developer was merely a secondary and incidental beneficiary of the Taking.

28

Plaintiffs have alleged, in contrast, that in view of confiscatory payments by Pennsylvania and the direct pocketing of their subsidy of EMS by the private MCOs under the capitated managed care funding assignment, § 6085 effects a primarily, if not exclusively, private benefit, unattended by any legislative findings that could support a contrary conclusion. The government's "savings," if any, are attenuated, remote and indirect. This law is so obviously "intended to favor a particular private party" that it is a "presumption of invalidity (rebuttable or otherwise) is warranted under the Public Use Clause." Id. at 493 (Kennedy, J. concurring). When the decisions of the four dissenters (which would treat a law taking property for a private party's benefit as unlawful *per se*) are combined with Justice Kennedy's concurrence, it is clear that the Secretary bears the burden of proving that the § 6085 is not an instance of "undetected impermissible favoritism of private parties." Id.[22]

Moreover, the public benefits the Secretary would presumptively attribute to § 6085 notably do not and (cannot) include enhancing the actual provision of EMS to Medicaid recipients. Hospitals already were independently bound by EMTALA, their obligations under the IRS code, and parallel state laws to provide those very services to the same patients. FAC ¶¶ 62-73. All that § 6085 did was to permit MCOs to pay plaintiffs less than those services cost plaintiffs to provide them, let alone less than what EMS services are "justly" worth, effective January 1, 2007. Indeed, and as plaintiffs have alleged, if anything, § 6085 is most likely to diminish the availability of EMS services to society as a whole. See FAC ¶¶ 112-115. The simple reason is that § 6085 forces hospitals to absorb, or to shift the unpaid costs of EMS, to other third parties when a host of economic conditions already are pressuring hospitals to close or curtail EMS to avoid financial losses associated with offering EMS. Id.

---

[22]    As the government implicitly concedes (Sec'y. Br. at 29), the standard under which the Court may *sua sponte* attribute acceptable rationales and motives to lawmakers applies only to "equal protection" and due process review," *not* to an assessment of whether there is an impermissible private benefit where a public law appears on a *prima facie* impermissibly benefit a particular class of private parties.

### b.    Unfair Burden

Section 6085 also effects a prohibited regulatory Taking, apart from the fact that it primarily creates a private benefit that renders it unconstitutional *per se*. As noted, underpayments for EMS generally are prompting closures of emergency departments ("EDs") and exacerbating a burgeoning emergency care crisis. This allegation underscores that the "savings" that the government allegedly seeks to achieve though § 6085 should be more fairly and appropriately borne by the public as a whole—or at least by the Medicaid program as a whole – rather than just by those hospitals that have the laudable role of delivering EMS to sick and injured patients. See generally Dolan v. City of Tigard, 512 U.S. 374 (1994) (impact of Takings should be "proportional" on those subject to regulations).

Plaintiffs also have adequately alleged that the FFS payments constitute a regulatory Taking because they are inherently confiscatory, fail by a material margin to cover plaintiffs' own costs, and pay less than a fair rate of return that might be expected by an investor (such as a bond financier). Further, because hospitals often operate on the slimmest of margins (or less), the new requirement to provide a class of expensive services at below cost could be proven sufficient to be the "straw" that breaks the solvency of any given hospital. FAC ¶¶ 93, 94.

### c.    Physical Invasion

Finally, plaintiffs have made out a *per se* Taking claim under Loretto, having alleged that the requirement to accept confiscatory rates is attended by a permanent physical invasion under mandate of EMTALA. FAC ¶ 136. Section 6085 applies to services that are defined as EMS under EMTALA, which, in turn requires a hospital to provide emergency services to any patient who presents to its ED with a perceived medical emergency or the apparent onset of labor (as determined under a liberal, "prudent layperson" standard). Patients so presenting must be screened, and must be diagnosed and treated at least until the emergency medical condition has been stabilized. Both the mandated screening and treatment require the dedicated use of hospital space (real property) and professional services (staff) and supplies (personal property). Because

30

the requirement to provide EMS deprives plaintiffs of the absolute and undisturbed use of their property and services, it comprises a physical invasion which, under <u>Loretto</u> and its progeny mandates just compensation. Paying 75% or less of actual costs is, inherently <u>not</u> just compensation.

### 3.    The Secretary's Motion to Dismiss Plaintiffs' Takings Claims is Based on Incorrect Factual Presumptions and a Moribund Legal Standard

For each of the above independent reasons, plaintiffs have adequately pled that § 6085 effects a Taking in violation of the Fifth Amendment. The Secretary first argues that plaintiffs' Takings claim fails because § 6085 "does not set any rates." Sec'y. Br. at 28. As demonstrated above, that assertion is erroneous. Prior to January 1, 2007, hospitals were entitled to payment for non-contracted EMS at "materially higher" rates (FAC ¶ 46) under prevailing state law. In Pennsylvania, plaintiffs would be entitled under Act 68 to be paid "all reasonably necessary costs associated with ... emergency services." That entitlement was expressly and singularly displaced by § 6085, which, for the first time, forced plaintiffs to accept below cost Medicaid fee-for-service rates for these services from Medicaid HMOs as the federally mandated rates.[23] The fact that § 6085 sets mandated rates by borrowing them from the State's FFS program does not change the fact that the new rates for non-contracted are set by and applicable solely under compulsion of § 6085.

The Secretary seeks to sweep away <u>all</u> of plaintiffs' constitutional claims by asserting that § 6085 is subject to only "exceedingly deferential" review and must be sustained as long as it bears a "rational relationship to a legitimate governmental purpose." Sec'y. Br. at 29. He then states that, "[t]o the extent § 6085 is subject to such review, Congress could reasonably conclude

---

[23]    As noted (<u>supra</u>, at page 4), one Pennsylvania law applicable to fiscal year 2003 would have incorporated the Pennsylvania Medicaid rates from Medicaid HMOs as the default rates for non-contracted emergency services. That law was declared unconstitutional, in part because it was enacted as a budgeting rider that conflicted with entitlement of hospitals to receive far higher rates of payment under existing substantive law, namely, Act 68.

that it would serve legitimate governmental interests in containing costs and eliminating program

incongruities and disincentives for emergency services providers to contract with Medicaid

MCOs." Id. Significantly, the Secretary applies this single test to challenge plaintiffs Taking,

Due Process and Equal Protection claims. However, in Lingle, the Supreme Court *unequivocally*

*rejected* use of the "substantially advances" formula, which derives from substantive due process

cases, for analysis of Takings Clause claims, and discredited prior decisions that had suggested

using that standard.

While Lingle affirmed the continuing propriety of that standard for adjudicating

substantive due process claims, it held clearly that the "substantially advances" test is "not a

valid takings test and indeed . . . has no proper place in our takings jurisprudence." Lingle, 544

U.S. at 548; accord San Remo Hotel, L.P. v. City and County of San Francisco, 545 U.S. 323,

346 n.25 (2005). Instead, the Court underscored that the correct focus for a Takings claim are

the standards discussed by plaintiffs (at pages 24-31 above), that is, whether the burden is one

that more fairly "should be borne by the public as a whole," whether a regulatory taking is

"functionally equivalent to ... [a direct] appropriate[ion] [of] private property," and whether the

"government takes private property '*for public use*'." Lingle, 544 U.S. at 537, 539, 543

(emphasis in original). As demonstrated above, plaintiffs adequately alleged that § 6085, as

applied, effects a taking under the *applicable* standards. The Secretary's motion rests on the

*wrong* test, addresses not one of these relevant standards, and must, therefore, be denied.

Indeed, the only argument the Secretary makes in support of his Rule 12(b)(6) Motion

that actually relates to Taking Clause jurisprudence is his statement in footnote 19, page 29, that:

> Plaintiffs' Takings Clause claims also fails because courts have
> long recognized that health care providers' participation in the
> Medicaid and Medicare programs is voluntary, precluding

challenges to the level of their compensation for services provided under those programs.[24]

This argument is inapposite here.

While the Conference Report suggested an intent by the House to limit this rate to "Medicaid" providers, § 6085, as enacted in the DRA, applies by its plain terms to "[a]ny provider of emergency services." Thus, plaintiffs could cease to participate in Medicaid and Medicare – assuming *arguendo* and against any practical factual possibility that a hospital could do so and still function as a hospital or a non-profit entity – and still would be forced by § 6085 to accept the same below cost FFS rates as payment in full from non-contracted Medicaid MCOs. Moreover, should plaintiffs charge an MCO more than permitted by § 6085, they would be subject *per se* to criminal prosecution under § 1128B(d) of the Act, which, through the use of the subject "whoever … charges," also is not limited to hospitals that "participate" in Medicaid or Medicare.

### C.    Plaintiffs' Allegations, and the Logical Inferences They Support, Adequately Advances Substantive Due Process and Equal Protection Claims

In Count III of the FAC, plaintiffs have alleged, independent of their Takings Clause claims, that § 6085 offends notions of substantive due process because it fails to substantially advance the public purpose it was enacted to advance (according to the Secretary). Substantive due process requirements also are violated where a law is sufficiently "arbitrary or irrational" as to offend notions of fairness. Lingle, 544 U.S. at 548-549 (Kennedy, J., concurring).

First, the connection between the goals of § 6085 (as articulated by the Secretary), and its actual operation are too attenuated to substantially advance those goals. The Secretary has

---

[24]    In support of this argument, the Secretary cites to Garelick v. Sullivan, 987 F.2d 913, 916-17 (2d Cir. 1993), cert. denied, 510 U.S. 821 (1993); Burditt v. U.S. Dep't of Health & Human Servs., 934 F.2d 1362, 1376 (5th Cir. 1991); Whitney v. Heckler, 780 F.2d 963, 972 (11th Cir.), cert. denied, 479 U.S. 813 (1986); Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare, 742 F.2d 442, 446 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985); and St. Francis Hosp. Ctr. v. Heckler, 714 F.2d 872, 875-76 (7th Cir. 1983), cert. denied, 465 U.S. 1022 (1984).

asserted elsewhere in his brief – where it suits his Article III standing argument – that § 6085 has no impact whatsoever, because the underlying rates mandated by § 6085 are set by the States. On that basis, this Court should conclude that § 6085 does <u>nothing</u> to substantially advance the cost containment goal cited by the Secretary, since it is unclear whether the incorporation of the FFS laws of any given State by § 6085 does or does not "save costs."

Even if, however, one assumed that § 6085 does reduce what hospitals are paid – as plaintiffs contend occurs in Pennsylvania – it does not "substantially" achieve such savings. Given the absence of oversight hearings and the eleventh hour insertion of the Default Rate Provision into the DRA, one can only speculate – in the face of the direct and substantial benefit to the privately owned HMOs – that its goal was Medicaid cost savings. However, no substantial or even discernible savings will result from § 6085. Thus, plaintiffs have alleged (based on provable facts) that Pennsylvania (and other States) ordinarily pay Medicaid MCOs based on fixed capitated fees under which the MCOs individually assume the risk of loss, "pocket" the difference, and hold the States harmless for their actual profits or losses. FAC ¶¶ 38, 42, 134, 135.

For purposes of the instant motion this fact must be taken as true. Consequently, none of the theoretical "savings" realized by permitting Medicaid MCOs – including, for example, the national Medicaid MCO company owned and operated by UnitedHealthcare – to under-reimburse EMS providers is passed through to the States, let alone to the United States (which indirectly shares in Medicaid funding through federal financial participation). FAC ¶¶42, 43. In sum, there is no concrete basis to assume that these selective profit enhancements to Medicaid MCOs will ever suppress federal expenditures, as opposed to benefiting HMO shareholders, and plaintiffs have alleged the contrary.

While the impact of under-reimbursing costly EMS may be devastating to an individual EMS provider and go so far as to shift it from a positive to a negative P&L margin, plaintiffs

allege and intend to prove that any "savings" from the standpoint of the federal program is non-existent to, at most, <u>insubstantial</u>.  Medicaid is an enormous, $300 billion a year program, and any savings that might even theoretically be realized by the Secretary due to § 6085 would at best be a drop in the bucket.[25]  Moreover, federal law and regulations require MCOs to establish broad provider networks that will enable them to offer access to covered services "to the same extent as such services are made accessible" to persons served under the regular FFS Medicaid programs.[26]  If the Court presumes "regularity" in the administration of the program by the Secretary and the States, there should be relatively few situations controlled by § 6085, further minimizing any alleged federal "savings" opportunities.

There also is no principled basis for the Court to presume that underpaying non-contracted hospitals for EMS will increase contracting between providers and MCOs as the Secretary asserts (and certainly no congressional hearings or legislative findings to which the Secretary can point to support this naked assumption).  The more reasonable assumption is that a hospital or system that has elected not to contract with a given MCO – because, for example, the MCO has a practice and reputation of denying, rejecting and underpaying claims[27] – will continue to avoid entering into a more comprehensive contractual relation while being forced to subsidize the MCO for non-contracted EMS.  FAC ¶ 7 ("plaintiffs ordinarily do not enter into or renew [MCO] contracts . . . under which they lose money").

Indeed, § 6085 is more reasonably likely to <u>discourage</u> than encourage contracting by MCOs: armed with § 6085, MCOs can enhance their profitability by avoiding comprehensive contracts with more expensive, tertiary care level providers, while "eating their cake" by paying

---

[25]     Bureau of Economic Analysis, National Accounts 2006 Q2 Final, Section 3: Government Current Receipts and Expenditures, Table 3.12 ("Government Social Benefits").

[26]     <u>See</u> 42 U.S.C. § 1396b(m)(1)(A)(i); 42 C.F.R. § 438.206 (network requirements).

[27]     <u>See, e.g.</u> <u>River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.</u>, 173 S.W. 3d 43 (Tenn. Ct. App. 2002), <u>appeal denied</u>, 2003 Tenn. LEXIS 141 (2003) (commenting on the administrative nightmares and extra costs inherent in dealing with noncontracted HMOs).

those same providers at below-market, and below-cost rates when their members access their

services by presenting at the ED.  The only substantive remark by any member of Congress

about the likely impact of § 6085 is the observation of the Pennsylvania congressional delegation

(Exhibit "A" hereto) that § 6085 will undermine the bargaining leverage of hospitals (which is

likely to discourage hospitals from willingly entering into full contracts with these MCOs).

Further, because they can now get away with paying hospitals less due to § 6085, MCOs will be

far less likely to negotiate case-specific rates with non-contracted hospitals that cover both the

emergent and post-stabilization portions of  inpatient admissions of emergency patients.  Prior to

§ 6085, entering into such agreements was the norm.  FAC ¶ 75, 106.  Under § 6085, however,

MCOs will be heavily incented to pay the federally mandated "low-ball" rates for EMS, and then

arrange for transfer of "stable" patients in-network hospitals, leaving Medicaid patients to suffer

the consequences.

In sum, plaintiffs have pled a valid claim that § 6085 does not substantially advance the

goals the Secretary would attribute to it, and operates in an arbitrary and irrational manner.

**D.**      **Section 6085 Denies Plaintiffs Equal Protection Under the Law**

In Count IV plaintiffs have alleged that § 6085 denies them Equal Protection because it

irrationally discriminates against plaintiffs in mandating that they provide EMS to HMOs for

below their costs based on their place of domicile.  Plaintiffs have adequately pled a *prima facie*

case under the Equal Protection Clause of the Fourteenth Amendment as incorporated by the

Fifth Amendment.

Equal Protection challenges to provisions of social welfare and economic legislature are

reviewable under a deferential "rational basis" test.  See e.g., Dandridge v. Williams, 397 U.S.

471 (1970).  Section 6085 however, is not rational, but, rather, arbitrary and capricious on its

face because the Default Rate Provision discriminates against EMS providers based solely on

their geographic location, and in complete disregard of how disparate the "borrowed" FFS rates

might be, or the degree to which they may cover the hospital costs of similarly situated hospitals for equivalent services.

While it encompasses a deferential standard of review, the rational basis test still requires that a law not just have a rational objective, but a "rational connection between the facts found and the choice made" to achieve that objective. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971). Laws that discriminate economically against similarly situated businesses providing comparable services repeatedly have been found to cross the line. In Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869 (1985), the Supreme court recognized that the promotion by a State of domestic commerce was a legitimate goal, but that taxing domestic and foreign corporates at substantially disparate levels, without regard to costs, offended the Equal Protection Clause. 470 U.S. at 877. In Wal-Mart Stores, Inc. v. Knickrehm, 101 F.Supp.2d 749 (E.D. Ark. 2000), the court struck, on Equal Protection grounds, a two-tiered Medicaid reimbursement payment system under which the state program paid chain pharmacies less than local independent pharmacies for the same prescription drugs, holding that discriminatory payments for equivalent services would not "legitimately" and "rationally" advance the State's cost savings objective absent clear evidence that independents would "fail" without the price advantage or that chains actually received discounts sufficient to realize similar profit margins under the discriminatory fees. 101 F.Supp.2d at 763-764.

Similarly, the California Court of Appeals held that the State Medicaid program violated Equal Protection by paying out-of-state hospitals less than in-state hospitals for emergency medical services provided to California residents, regardless of whether such hospitals incurred equal or greater expenses in furnishing the same services. Children's Hosp. and Med. Ctr. v. Bonta, 97 Cal.App. 4th 740, 768-771 (2005) (noting that rate discrimination against hospitals with equivalent costs is not validly based on "distinguishing characteristics relevant to the [State's] interests"). Likewise, in West Virginia Univ. Hosps., Inc. v. Casey, 885 F.2d 11 (3d

37

Cir. 1989) ("WVUH"), the Third Circuit invalidated, as "arbitrary and capricious," a Pennsylvania Medicaid payment rule under which the State paid out-of-state hospitals at lower rates than hospitals located in Pennsylvania for equivalent services without regard to the costs incurred by the out-of-state hospitals to provide the services.[28]  Given the wide disparity between what Pennsylvania might pay local or foreign hospitals, the Third Circuit criticized the use of "state boundary lines as points of demarcation in reimbursement [of widely varying percentages of actual costs] for the delivery of health care" under Medicaid as "arbitrary and capricious." WVUH, 885 F.2d at 28-29.

Plaintiffs do not contend that it would be irrational to establish some federally mandated default rate for the non-contracted EMS (e.g., based on the providers' Medicare rates), or that a presumed goal of cost containment in itself is illegitimate, but, rather, that the means adopted in § 6085 do not legitimately advance that end.  As alleged by plaintiffs, the payments required for the EMS services of hospitals in the Philadelphia area are well below cost, whereas comparable hospitals located "just across the bridge" in New Jersey might be paid healthy margins above their costs pursuant to the same federal law.  FAC ¶ 151.  This rate "borrowing" from State FFS rates for EMS might have been rational until 1997, when the federal law that governed FFS rates required all states to set rates for "hospital services" at levels "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" to provide quality care.  42 U.S.C. § 1396a(a)(13)(A).  That provision, however, was repealed by § 4711(a)(1) of the BBA of 1997, and replaced by a requirement that states must use "a public process for determination of rates" which was devoid of any floor, and stripped of any

---

[28]    The district court found the discriminatory rate system to violate both the Act and the Equal Protection Clause.  The Third Circuit, having agreed with the statutory determination, did not reach the Equal Protection claim, but equivalently found that the State's discrimination without regard to the hospitals' actual costs was "arbitrary and capricious."

substantive requirement to set the rates at a level that is reasonable and adequate to cover the costs of any hospitals. 42 U.S.C. § 1396a (a)(13)(A) (1998).

By eliminating the "reasonable and adequate" payment standard through the 1997 BBA amendment, Congress cut all ties between what costs a hospital must incur and rates they may be paid under Medicaid FFS. Putting aside the rationality of this standard for setting FFS rates for hospitals that "voluntarily" participate in Medicaid, it is arbitrary and irrational to federally mandate payment at widely varying levels for services provided to private MCOs based solely on a hospital's location. Given the widely disparate rates that flowed from the BBA amendment, it was irrational to adopt as the default payment for MCOs the FFS rates of the 50 states and territories in 2007 through incorporation by reference, without any apparent analysis or evaluation of the relation those rates bear to the costs of EMS services. The only conceivable reason for uncritically incorporating these widely varying rates for non-contracted EMS payments is administrative convenience. Mere administrative convenience is not, however, a "rational basis" for adopting grossly disparate rates for the same medical services. WVUH, 885 F.2d at 29.

Plaintiffs also submit that it is not constitutionally rational to mandate payments that can be confiscatory for the benefit of private for-profit HMOs at the expense of not-for-profit caregivers. Even if the objective of saving money for the principal benefit of privately owned HMOs were reasonable, doing so in a manner in which hospitals in some locations can cover or exceed their costs, while others must heavily subsidize the costs of EMS, does not "rationally" advance the cost savings goal.

In sum, plaintiffs have made out a *prima facie* case that § 6085's wooden incorporation of the various state FFS rates as the measure of payment for non-contracted EMS is arbitrary and capricious, and irrational. Plaintiffs should be afforded their day in court to prove the

inadequacy of these rates and the extreme disparities of what must be paid to providers based solely on their location.

## IV.    PLAINTIFFS HAVE STATED A CLAIM FOR RELIEF UNDER THE BICAMERALISM CLAUSE OF ART. I SECTION 7 OF THE UNITED STATES CONSTITUTION

In Count V, plaintiffs allege that the DRA is invalid because the version of the Act passed by the House was not identical to the version passed by the Senate and signed by the President. FAC ¶ 156.   The question of whether the DRA was enacted in a manner that violates the Bicameralism Clause is the subject of several suits, including Pub. Citizen v. Clerk, United States District Court, 451 F. Supp. 2d 109 (D.D.C. 2006) (Bates, J.), appeal pending, No. 06-5232 (D.C. Cir.)., which is presently on appeal to the D.C. Circuit.

In a nutshell, the House passed the conference report of the DRA on December 19, 2005, and on December 21, 2005, the Senate passed an amended version of the bill. FAC ¶¶ 159-161. When the Senate clerk transmitted the bill, as amended, to the House, the clerk made a substantive change to section 5101 of the bill.   On February 1, 2007, the House voted on the version of the bill that contained the clerk's error and that, therefore, was not identical to the version passed by the Senate and ultimately signed by the President. FAC ¶ 162-165. Thus, the bill signed by the Senate and the President was never passed by the House, violating Art. 1, Sec. 7 of the Constitution. This flaw is fatal under Clinton v. City of New York, 524 U.S. 417, 448 (1998).[29]

In Pub. Citizen, the defendant's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) was granted by the district court and will be resolved in a pending appeal that will be binding on this court. For the sake of efficiency for the court and counsel alike, plaintiffs incorporate appellant Public Citizen's arguments herein by reference, and agree with defendant's

---

[29] See also United States v. Munoz-Flores, 495 U.S. 385 (1990) ("[T]he principle that the courts will strike down a law when Congress has passed it in violation of [a constitutional] command has been well settled for almost two centuries").

40

suggestion (Sec'y. Br. at 31) that this court defer actions on this particular issue pending decision in Pub. Citizen.

## V.    THE DEFAULT RATE PROVISION SHOULD BE CONSTRUED NOT TO APPLY IN PENNSYLVANIA

In Count I of the Complaint, plaintiffs seek a declaration that § 6085 does not apply in Pennsylvania due to the unique and unconventional manner in which Pennsylvania adopted the underlying FFS rates that became the Default Rates under § 6085.  It is well settled that federal courts must, if possible, decide cases in a manner that avoids unnecessarily deciding constitutional issues.[30]  If the Court were to find that § 6085 was not meant to apply in Pennsylvania, the need to adjudicate plaintiffs' Takings, Due Process, Bicameralism, and Equal protection claims would, commendably, be avoided.

In essence, the drafters of § 6085 envisioned one of two alternative circumstances for its application.  These include one in States where published FFS rates are adopted for service rendered to beneficiaries "under this title" outside of the managed care program, and another in States "where rates paid to hospitals under the state plan are negotiated by contract and not publicly released."  Pennsylvania's unconventional approach to FFS rate setting falls under neither of these umbrellas.

Congress amended 42 U.S.C. § 1396a (a)(13)(A) to require that states must formulate FFS rates through a statutorily defined "public process."  FAC ¶121.  Pennsylvania, however, did not utilize the public process envisioned by Title XIX.  Instead, Pennsylvania has set "base rates" for hospitals for almost 20 years, based on stale, 1987 cost data, through an ostensibly "negotiated" Rate Agreement in which it has periodically updated those rates based on budgetary

---

[30]    See Edward J. Debartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) ("[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (quoting Hooper v. California, 155 U.S. 648, 657 (1895); See also Waterview Mgmt. Co. v. FDIC, 105 F.3d 696, 701 (D.C. Cir. 1997) (statutes should be construed to avoid a possible unconstitutional result).

considerations, through closed door negotiations. FAC ¶ 49.[31]  As part of the Rate Agreement, the State requires hospitals to sign a "waiver" of their rights to sue DPW to challenge the rates, including through law suits alleging that the rates violate the public process requirement, as a condition of receiving certain supplemental payments.  While these rates are nominally "negotiated," they are adopted as FFS, and the rates are publicly available.  FAC ¶ 125.

As a consequence of the unique manner in which DPW has adopted Pennsylvania's Medicaid FFS rates, they do not fit within the second category under § 6085 because they are "negotiated" yet publicly available.  Further, the FFS rates were not adopted in the manner anticipated by Congress for payments for persons receiving Medicaid benefits under the FFS program, since DPW used closed negotiations in lieu of the statutorily prescribed public process required under § 1902(a)(13)(A) of the Act, and girded its  unauthorized method for setting FFS rates against legal challenge by exacting waivers from hospitals of their right to sue to enforce § 1902(a)(13)(A).[32]  Under the circumstances, the Court could reasonably conclude that Pennsylvania providers are not subject to § 6085 and avoid reaching plaintiffs' alternative constitutional challenges to the DRA.

---

[31]    A copy of relevant excerpts from the most recent Rate Agreement are supplied as Exhibit "C."

[32]    The Rate Agreements, including the waivers, expressly do not apply to payments made under the managed care program which except for non-contracted EMS services the as a result of the DRA, does not utilize the FFS rates.

## CONCLUSION

For the reasons stated, defendant's motion to dismiss Counts I through IV of the FAC should be denied. A ruling on Count V should be deferred pending decision in Pub. Citizen v. Clerk, United States District Court, which will be controlling precedent as to plaintiffs' challenge to the DRA under the Bicameralism requirement.

Dated: April 11, 2007                          Respectfully submitted,


                                                          /s/
Of Counsel:                                    L. Barrett Boss (D.C. Bar No. 398100)
Mark H. Gallant (D.C. Bar No. 913111)          COZEN O'CONNOR
Salvatore G. Rotella, Jr. (D.C. Bar No. 442795)  1627 I Street, NW, Suite 1100
Gregory M. Fliszar                             Washington, D.C., 20006
COZEN O'CONNOR                                 Telephone (202) 912-4800
1900 Market Street                             Facsimile  (866) 413-0172
Philadelphia, PA  19103
Telephone: (215) 665-2000
Facsimile:  (215) 665-2013

                                               Attorneys for Plaintiffs


PHILADELPHIA\3045246\9  193485.000

**Attachment 2**

Civ. A. No. 06-2220 (RWR)

**EXHIBIT A**

Civ. A. No. 06-2220 (RWR)

# Congress of the United States
## House of Representatives
### Washington, DC 20515

December 9, 2005

The Honorable Jim Nussle
Chairman
U.S. House Committee on the Budget
309 Cannon HOB
Washington, DC 20515

The Honorable Charles Grassley
Chairman
U.S. Senate Committee on Finance
219 Dirksen SOB
Washington, DC 20515

Dear Chairmen Nussle and Grassley:

We are writing to express our deep concern over a provision currently included in H.R. 4241, the Deficit Reduction Act of 2005, which establishes a Medicaid managed care default rate for emergency out-of-network services.

The Pennsylvania Medicaid managed care process to negotiate rates with hospitals has operated without government intervention for two decades—while showing improved outcomes and access to care for Medicaid patients.

In Pennsylvania, managed care plans and out-of-network hospitals negotiate payment rates for emergency services. The establishment of a Medicaid managed care default rate would remove incentives for Medicaid managed care plans to negotiate fairly with health care providers, including both hospitals and physicians. As you know, all health care providers, including hospitals, are currently required under the Emergency and Medical Treatment and Labor Act of 1996 (EMTALA) to provide care regardless of compensation. The imposition of a federally mandated national default rate would inevitably increase uncompensated care payments on the American taxpayer to offset the over $160 million in increased costs to Pennsylvania hospitals if this provision becomes law.

The Medicaid fee-for-service (FFS) rate in Pennsylvania is currently 74.9 percent of costs. Under Medicaid managed care, Pennsylvania hospitals receive slightly better payments, on average 2-5 percent over the FFS rate, which decreases uncompensated care costs. By moving Pennsylvania to a default payment rate, this federal mandate will only destabilize a very successful program and reduce payments to hospitals.

1

An essential concept of the current process is that it results in reduced utilization of emergency rooms and hospitalizations as compared to the Medicaid FFS program. Medicaid managed care plans establish provider networks and employ other education and review strategies to reduce health care use. Medicaid managed care was also established on the basic premise that both hospitals and physicians can negotiate rates to reimburse per case/visits to improve on the rates offered under the traditional program, without increasing overall Medical Assistance costs to the states. In addition, this policy change runs counter to our free market-based health care system by mandating reimbursement between providers and health plans.

Accordingly, we recommend two immediate actions:

1. Remove the language providing a Medicaid managed care default rate for emergency out-of-network services from H.R. 4241, the Deficit Reduction Act of 2005; or
2. Include the following final committee report language to exempt Pennsylvania's current Medicaid managed care negotiated payment rate process:

*It is the intent of the committee that, for purposes of [this provision]/[section 1932(b)(2)(D) of the Social Security Act], in any State where payment rates are determined between a managed care plan and a health care provider constitutes a contract described in that [provision]/[section].*

Thank you for your prompt attention to this matter and your continued efforts to support free market-based solutions—not federally imposed government mandates—to improve the quality of our nation's Medicaid program.

Sincerely,

Tim Murphy
Member of Congress

Jim Gerlach
Member of Congress

Charles Dent
Member of Congress

Melissa Hart
Member of Congress

Phil English
Member of Congress

Don Sherwood
Member of Congress

2

John Peterson
Member of Congress

Todd Platts
Member of Congress

Michael Fitzpatrick
Member of Congress

Bill Shuster
Member of Congress

Curt Weldon
Member of Congress

cc:

The Honorable Dennis Hastert, Speaker, U.S. House of Representatives
The Honorable Roy Blunt, Majority Leader, U.S. House of Representatives
The Honorable Joe Barton, Chairman, Committee on Energy and Commerce, U.S. House
of Representatives

3

**Attachment 3**

Civ. A. No. 06-2220 (RWR)

**EXHIBIT B**

Civ. A. No. 06-2220 (RWR)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland  21244-1850



## Center for Medicaid and State Operations

March 31, 2006                                                          **SMDL #06-010**

Dear State Medicaid Director:

This letter is one of a series that provides guidance on the implementation of the Deficit Reduction Act of 2005.  On February 8, 2006, President Bush signed into law the Deficit Reduction Act (DRA) of 2005 ( Pub. L. No. 109-171).  Section 6085 of the DRA created a new section 1932(b)(2)(D) of the Social Security Act (the Act).  This provision establishes a limit on the amount to be paid non-contracting providers of emergency services at the amount that would have been paid if the service had been provided under the State's FFS Medicaid program.

Prior to enactment of this legislation, there was no Federal law or regulation governing the amount of payment for emergency services provided to Medicaid beneficiaries who received these services by a provider who did not have a contract with the beneficiary's Medicaid managed care entity.  There were often disputes over the rate at which the provider of emergency services would be paid.  This legislation establishes a limit on the amount that emergency service providers who do not have a Medicaid managed care contract can be paid by Medicaid managed care entities.

Under this provision, any provider of services that does not have in effect a contract with a Medicaid managed care organization (MCO), prepaid inpatient health plan (PIHP), or prepaid ambulatory health plan (PAHP), and that provides emergency services to a beneficiary enrolled in that Medicaid managed care entity, must accept as payment in full no more than the amount it would receive if the services were provided under the State's fee-for-service (FFS) Medicaid program.

This rule applies whether the non-contracting provider is within the State or outside of the State in which the managed care entity has a contract.  This rule does not apply to payments made by the State on behalf of enrollees in a State's primary care case management system.  This letter contains initial guidance on this new legislative authority, which is effective on January 1, 2007.

States must amend any existing MCO, PIHP, and PAHP contracts that have provisions governing payment for emergency services at non-contracting providers that are inconsistent with the requirements of new section 1932(b)(2)(D) (i.e. which would require payment of an amount in excess of State FFS rates) before January 1, 2007. As of that date, all of these entities which cover emergency services outside of their contracting network must limit the amount to be paid non-contracting providers for services, which meet the definition of emergency in section 1932(b)(2)(B) of the Act, to no more than the amount that would have been paid if the service had been provided under the State's FFS Medicaid program.  For services provided by non-contracting hospitals, this amount

2 – State Medicaid Director

must be less any payments for indirect costs of medical education and direct costs of graduate medical education that would have been included in FFS payments.  In any State where Medicaid rates paid to hospitals are negotiated and not publicly released, the applicable payment amount would be the average contract rate that would apply for tertiary hospitals.

Should you have any questions regarding this new legislation, or submission of a contract in order to reflect the establishment of this provision, please contact the CMS Regional Office serving your State.

Sincerely,

/s/

Dennis G. Smith
Director

Enclosure

cc:

CMS Regional Administrators

CMS Associate Regional Administrators
   for Medicaid and State Operations

Martha Roherty
Director, Health Policy Unit
American Public Human Services Association

Joy Wilson
Director, Health Committee
National Conference of State Legislatures

Matt Salo
Director of Health Legislation
National Governors Association

Jacalyn Bryan Carden
Director of Policy and Programs
Association of State and Territorial Health Officials
Page 3 – State Medicaid Director

Christie Raniszewski Herrera
Director, Health and Human Services Task Force
American Legislative Exchange Council

Lynne Flynn
Director for Health Policy
Council of State Governments

**Attachment 4**

Civ. A. No. 06-2220 (RWR)

**<u>EXHIBIT C</u>**

Civ. A. No. 06-2220 (RWR)

# STANDARD HEALTHCHOICES AGREEMENT
## Effective January 1, 2005

## Table of Contents

SECTION I:  INCORPORATION OF DOCUMENTS ................................................................... 1

    A.          Operative Documents .......................................................................... 1

SECTION II:  DEFINITIONS ..................................................................................................... 1

AGREEMENT and RFP ACRONYMS ......................................................................... 23

SECTION III:  RELATIONSHIP OF PARTIES ............................................................... 26

    A.          Basic Relationship ............................................................................ 26
    B.          Nature of Contract ............................................................................ 26

SECTION IV:  APPLICABLE LAWS AND REGULATIONS .......................................... 27

    A.          Certification and Licensing .............................................................. 27
    B.          Specific to MA Program ................................................................... 27
    C.          General Laws and Regulations ....................................................... 27
    D.          Limitation on the Department's Obligations ..................................... 29

SECTION V:  PROGRAM REQUIREMENTS ................................................................. 29

    A.          In-Plan Services ............................................................................... 29
          1.     Amount, Duration and Scope ................................................... 29
          2.     Program Exceptions ................................................................. 30
          3.     Expanded Benefits .................................................................. 30
          4.     Referrals .................................................................................. 31
          5.     Self Referral/Direct Access ..................................................... 31
          6.     Behavioral Health Services ..................................................... 32
          7.     Pharmacy Services .................................................................. 32
          8.     EPSDT Services ...................................................................... 36
          9.     Emergency Services................................................................. 36
          10.   Post-Stabilization Services ....................................................... 37
          11.   Examinations to Determine Abuse or Neglect ......................... 38
          12.   Hospice Services ..................................................................... 39
          13.   Organ Transplants................................................................... 39
          14.   Transportation ......................................................................... 39
          15.   Waiver Services/State Plan Amendments ............................... 40
          16.   Nursing Facility Services ......................................................... 41
    B.          Prior Authorization of Services ........................................................ 42

## SECTION IV:  APPLICABLE LAWS AND REGULATIONS

### A.    Certification and Licensing

During the term of this Agreement, the Contractor shall require that each of its Network Providers complies with all certification and licensing laws and regulations applicable to the profession. The Contractor agrees not to employ or enter into a contractual relationship with a Health Care Provider who is precluded from participation in the MA Program.

### B.    Specific to MA Program

The Contractor agrees to participate in the MA Program and to arrange for the provision of those medical and related services essential to the medical care of those individuals being served, and to comply with all federal and Pennsylvania laws generally and specifically governing participation in the MA Program. The Contractor agrees that all services provided hereunder shall be provided in the manner prescribed by 42 U.S.C.A. 300e(b), and warrants that the organization and operation of the Contractor is in compliance with 42 U.S.C.A. 300e(c). The Contractor agrees to comply with all applicable rules, regulations, and Bulletins promulgated under such laws including, but not limited to, 42 U.S.C.A. 300e; 42 U.S.C. 1396 et seq.; 62 P.S. 101 et. seq.; 42 C.F.R. Parts 431 through 481 and 45 C.F.R. Parts 74, 80, and 84, and the Department of Public Welfare regulations as specified in Exhibit A of this Agreement, Managed Care Regulatory Compliance Guidelines.  See Exhibit C of this Agreement, HealthChoices Physical Health Proposers' Library, for a list of applicable regulations.

### C.    General Laws and Regulations

1.    The Contractor must comply with Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C.A. Section 2000d et seq. and 2000e et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. Section 701 et seq.; the Age Discrimination Act of 1975, 42 U.S.C.A. 6101 et seq.; the Americans with Disabilities Act, 42 U.S.C.A. 12101 et seq.; 45 CFR Parts 160 and 164 (Standards for Privacy of Individually Identifiable Health Information); the Pennsylvania Human Relations Act of 1955, 71 P.S. 941 et seq.; and Article XXI of the Insurance Company Law of 1921, as amended, 40 P.S. 991.2102 et seq.

2.    The Contractor must comply with the Commonwealth's Contract Compliance Regulations that are set forth at 16 Pa. Code 49.101 and on file with the Contractor.

information.  These assurances and procedures must be submitted and receive advance written approval by the Department prior to initiating the PBM Subcontract.  The Department will allow the continued operation of existing PBM Subcontracts while the Department is reviewing new contracts.

8.    **EPSDT Services**

The Contractor must comply with the requirements regarding EPSDT services as set forth in Exhibit J of this Agreement, EPSDT Guidelines.

The Contractor must also adhere to specific Department regulations at 55 Pa. Code Chapters 3700 and 3800 as they relate to EPSDT examination for individuals under the age of 21 and entering substitute care or a child residential facility placement.

9.    **Emergency Services**

The Contractor agrees to comply with the program standards regarding Emergency Services that are set forth in Exhibit K of this Agreement, Emergency Services.

The Contractor must comply with the provisions of 42 U.S.C. 1396u-2, 28 PA Code Ch. 9, and Sections 2102 and 2116 of the Insurance Company Law of 1921 as amended, 40 P.S. 991.2102 and 991.2116, pertaining to coverage and payment of Medically Necessary Emergency Services.

Consistent with the provisions of 42 U.S.C. 1320a-7b(d), in the event that the Contractor and a non-participating provider cannot agree on a payment amount for Emergency Services provided to the Contractor's Member(s), the Contractor shall pay the non-participating provider an amount determined by the Department. The Contractor and the Department agree that the payment amount shall be deemed binding on the Contractor and not subject to any further review in any administrative or judicial forum.

The Department will determine the amount of payment after consideration of the payment proposed by the Contractor, the amount sought by the provider, the payment rates established by the Department for equivalent services under the Department's Fee-for-Service program, and the assumptions used to develop the Department's Actuarially Sound payment Rate to the Contractor,