IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE URBAN HEALTH CARE COALITION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civ. A. No. 06-2220 (RWR) |
| MICHAEL O. LEAVITT, Secretary, Department of Health and Human Services, | ) ) ) ) |
| Defendant. | ) ) |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
OR, IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associated General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
  for Litigation

SUSAN MAXSON LYONS
ROBERT W. BALDERSTON
Attorneys
Department of Health and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

ROBERT J. KATERBERG
  (D.C. Bar No. 466325)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Rm. 6112
Washington, D.C. 20001
Telephone:    (202) 616-8298
Facsimile:    (202) 616-8460
Robert.Katerberg@usdoj.gov

Attorneys for Defendant

## TABLE OF CONTENTS

Page

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION
      OVER PLAINTIFFS' CLAIMS ........................................................ 1

      A.    Plaintiffs Lack Standing to Sue the Secretary ......................................... 1

      B.    Plaintiffs Have Identified Neither an Applicable Waiver
            of Sovereign Immunity Nor an Available Cause of Action .................................. 7

II.   THE COMPLAINT FAILS TO STATE A CLAIM UPON
      WHICH RELIEF CAN BE GRANTED ........................................................ 9

      A.    Plaintiffs' Statement of the Standard of Review is Materially Incomplete ........... 9

      B.    Section 6085 Does Not Violate the Takings Clause ............................................ 11

            1.    Any Taking Here Is Not the Result of Section 6085 ............................... 12

            2.    Section 6085 Cannot Be a Taking Because Plaintiffs Are Not
                  Legally Compelled to Participate in Medicare or Medicaid ................... 13

            3.    Plaintiffs' Various Takings Theories Are Without Merit ....................... 15

      C.    Section 6085 Does Not Violate Substantive Due Process .................................... 20

      D.    Section 6085 Does Not Violate Equal Protection ............................................... 21

      E.    Plaintiffs' Statutory Interpretation Claim is Wholly Without Merit ................... 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                    Page(s)

Abbott Labs. v. Gardner,
    387 U.S. 136 (1967) ................................................................ 7

Arkansas Dep't of HHS v. Ahlborn,
    126 S. Ct. 1752 (2006) ........................................................... 6

ASARCO Inc. v. Kadish,
    490 U.S. 605 (1989) ............................................................... 1

Berman v. Parker,
    348 U.S. 26 (1954) ............................................................... 15

Broad v. Sealsaska Corp.,
    85 F.3d 422 (9th Cir. 1996), cert. denied, 519 U.S. 1092 (1997) .................................. 13

Buaiz v. United States,
    471 F. Supp. 2d 129 (D.D.C. 2007) ................................................ 7

Burditt v. U.S. Dep't of Health & Human Servs.,
    934 F.2d 1362 (5th Cir. 1991) ................................................ 14, 19

Calder v. Bull,
    3 Dall. 386 (1798) ............................................................. 13

Calderon v. Ashmus,
    523 U.S. 740 (1998) ........................................................... 1, 5

Children's Healthcare is a Legal Duty, Inc. v. Deters,
    92 F.3d 1412 (6th Cir. 1996), cert. denied, 519 U.S. 1149 (1997) ................................... 6

Children's Hospital and Medical Center v. Bonta,
    97 Cal. App. 4th 740 (Cal. Ct. App. 2002) ..................................... 23

City of New Orleans v. Dukes,
    427 U.S. 297 (1976) ........................................................... 23

Coffman v. Breeze Corps.,
    323 U.S. 316 (1945) ........................................................... 1, 5

Conley v. Gibson,
    355 U.S. 41 (1957) ............................................................................ 9

Connolly v. Pension Ben. Guar. Corp.,
    475 U.S. 211 (1986) ........................................................................ 18

Dolan v. City of Tigard,
    512 U.S. 374 (1994) ................................................................... 13, 17

Duke Power Co. v. Carolina Environmental Study Group,
    438 U.S. 59 (1978) ............................................................................ 8

FCC v. Beach Comms., Inc.,
    508 U.S. 307 (1993) ........................................................................ 10

FDIC v. Meyer,
    510 U.S. 471 (1994) .......................................................................... 7

Flemming v. Nestor,
    363 U.S. 603 (1960) ........................................................................ 20

Foggy Bottom Ass'n v. District of Columbia,
    441 F. Supp. 2d 84 (D.D.C. 2006) ................................................ 13

Franklin v. Massachusetts,
    505 U.S. 788 (1992) .......................................................................... 3

Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.,
    528 U.S. 167 (2000) .......................................................................... 2

Garelick v. Sullivan,
    987 F.2d 913 (2d Cir.), cert. denied, 510 U.S. 821 (1993) ............... 13, 14, 15

In re Grand Jury Subpoena,
    438 F.3d 1141 (D.C. Cir. 2006) ..................................................... 16

Hawaii Housing Auth. v. Midkiff,
    467 U.S. 229 (1984) ................................................................ 11, 15, 19

Hiland Dairy, Inc. v. Kroger Co,,
    402 F.2d 968 (8th Cir. 1968), cert. denied, 395 U.S. 961 (1969) ................... 10

Hosp. & Healthsystem Ass'n of Pa. v. Dep't of Public Welfare,
    888 A.2d 601 (Pa. 2005) ................................................................... 1

-iii-

Islamic American Relief Agency v. Gonzales,
    477 F.3d 728 (D.C. Cir. 2007) ...................................................... 10

Kaiser Aetna v. United States,
    444 U.S. 164 (1979) .................................................................... 13

Kelo v. City of New London,
    545 U.S. 469 (2005) ................................................ 13, 15, 16, 19

Knapp v. Hanson,
    183 F.3d 786 (8th Cir. 1999) ...................................................... 11

Kowal v. MCI Commn's Corp.,,
    16 F.3d 1271 (D.C. Cir. 1994) .................................................... 10

LTV Steel Co. v. Shalala (In re Chateaugay Corp.),
    53 F.3d 478 (2d Cir.), cert. denied, 516 U.S. 913 (1995) .............. 20

Lingle v. Chevron Corp.,
    544 U.S. 528 (2005) ............................................................. passim

Loretto v. Teleprompter Manhattan CATV Corp.,
    458 U.S. 419 (1982) .............................................................. 13, 18

Metropolitan Life Ins. Co. v. Ward,
    470 U.S. 869 (1985) .................................................................... 23

Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Welfare,
    742 F.2d 442 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985) ................. 14

Minn. Senior Fed'n v. United States,
    273 F.3d 805 (8th Cir. 2001), cert. denied, 536 U.S. 939 (2002) .................. 22

Montgomery v. Carter County,
    226 F.3d 758 (6th Cir. 2000) ...................................................... 13

Muskrat v. United States,
    219 U.S. 346 (1911) ................................................................. 1, 5

National Wrestling Coaches Ass'n v. Dep't of Educ.,
    366 F.3d 930 (D.C. Cir. 2004), cert. denied, 545 U.S. 1104 (2005) ............ 4, 8

In re NYAHSA Litig.,
    318 F. Supp. 2d 30 (N.D.N.Y. 2004), aff'd on opinion below,
    444 F.3d 147 (2d Cir. 2006) ...................................................... 20

Nova Health Sys. v. Gandy,
    416 F.3d 1149 (10th Cir. 2005) ........................................................... 3

Okpalobi v. Foster,
    244 F.3d 405 (5th Cir. 2001) (en banc) ...................................................... 2, 3

Palazzolo v. Rhode Island,
    533 U.S. 606 (2001) ........................................................................ 18

Parker v. District of Columbia,
    478 F.3d 370 (D.C. Cir. 2007) (petition for en banc rehearing filed) ............................. 7

Penn Central Transp. Co. v. New York City,
    438 U.S. 104 (1978) ........................................................................ 12

Porter v. BiBlasio,
    93 F.3d 301 (7th Cir. 1996) .............................................................. 13, 16

Ruckelshaus v. Monsanto,
    467 U.S. 986 (1984) ........................................................................ 15

Rye Psych. Hosp. Ctr., Inc. v. Shalala,
    52 F.3d 1163 (2d Cir.), cert. denied, 516 U.S. 913 (1995) ...................................... 34

San Remo Hotel, L.P. v. City and County of San Francisco,
    545 U.S. 323 (2005) ........................................................................ 13

Seegars v. Gonzales,
    396 F.3d 1248 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1187 (2006) ........................... 7

So. Pacific Transp. Co. v. Brown,
    651 F.2d 613 (9th Cir. 1980) ................................................................ 2

Turner Broad. Sys., Inc. v. FCC,
    520 U.S. 180 (1997) ........................................................................ 10

United States v. Lender,
    985 F.2d 151 (4th Cir. 1993) ............................................................... 22

United States v. Nixon,
    418 U.S. 683 (1974) ......................................................................... 7

United States v. Oakland Cannabis Buyers' Coop.,
    532 U.S. 483 (2001) ........................................................................ 24

Univ. Med. Ctr. of So. Nev. v. Shalala,
       173 F.3d 438 (D.C. Cir. 1999) ...................................................................... 1, 4

Vance v. Bradley,
       440 U.S. 93 (1979) ........................................................................................ 10

Velinkonja v. Mueller,
       362 F. Supp. 2d 1 (D.D.C. 2004) ................................................................... 5

Vt. Assembly of Home Health Agencies, Inc. v. Shalala,
       18 F. Supp. 2d 355 (D. Vt. 1998) ................................................................. 20

Wal-Mart Stores v. Knickrehm,
       101 F. Supp. 2d 749 (E.D. Ark. 2000) ......................................................... 24

Washington v. Glucksberg,
       521 U.S. 701 (1997) ...................................................................................... 21

West Virginia University Hospitals Inc. v. Casey,
       885 F.2d 11 (3d Cir. 1989), aff'd, 499 U.S. 83 (1991) ........................... 23, 24

## STATUTES AND REGULATIONS

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 6085, 120 Stat. 4, 121 ................. passim

Administrative Procedures Act, 5 U.S.C. § 702 .......................................................... 7

Administrative Procedures Act, 5 U.S.C. § 704 .......................................................... 8

28 U.S.C. § 516 ............................................................................................................. 7

28 U.S.C. § 1331 ........................................................................................................... 7

Emergency Medical Treatment and Active Labor Act,
       Social Security Act § 1867, 42 U.S.C. § 1395dd ........................... 6, 14, 18, 19

Social Security Act § 1903(m)(2)(A)(iii), 42 U.S.C. § 1396b(m)(2)(A)(iii) ................. 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 9, 11

Defendant respectfully submits this reply memorandum in support of his Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Failure to State a Claim.[1]

## I.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.    Plaintiffs Lack Standing to Sue the Secretary

Plaintiffs lack standing because they have sued only the Secretary of Health and Human Services ("Secretary") but have not alleged any injury that is traceable to an action by him, nor redressable through an order against him.  See, e.g., Muskrat v. United States, 219 U.S. 346, 361-62 (1911); Univ. Med. Ctr. of So. Nev. v. Shalala, 173 F.3d 438, 441-42 (D.C. Cir. 1999); So. Pacific Transp. Co. v. Brown, 651 F.2d 613, 614-15 & n.1 (9th Cir. 1980).  Similarly, this lawsuit is non-justiciable because it would produce little more than an advisory opinion relative to additional future litigation that plaintiffs would need to conduct against other parties in order to obtain actual, tangible redress of their alleged injury.  See Calderon v. Ashmus, 523 U.S. 740, 749 (1998); Coffman v. Breeze Corps., 323 U.S. 316, 324 (1945).[2]

---

[1] Defendant's opening memorandum is cited herein as "Def's Mem."  Plaintiffs' opposition memorandum is cited as "Pls' Mem."  Section 6085 of the Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4, 121, is referred to as "§ 6085."

[2] Plaintiffs' reliance on a Pennsylvania Supreme Court case for the proposition that they have Article III standing here (see Pls' Mem. at 9 (citing Hosp. & Healthsystem Ass'n of Pa. v. Dep't of Public Welfare, 888 A.2d 601, 608 (Pa. 2005) ("HAP")) is misplaced.  "[T]he constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability," ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989), and standing in Pennsylvania courts apparently is not coextensive with standing in federal courts, see 888 A.2d at 606-08 (articulating test differently).  Nor is Hospital & Healthsystem Association's holding on the merits analogous to any merits issue in this case; the ground of decision there rested solely on a provision of the Pennsylvania state constitution prohibiting the Pennsylvania legislature from including substantive legislation in its appropriations bills.  See id. at 616.

Plaintiffs correctly acknowledge that Article III standing requires, among other things, that "'the injury is fairly traceable to the challenged action of the defendant.'"  Pls' Mem. at 8 (quoting Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., 528 U.S. 167, 180-81 (2000)).  Their ensuing analysis then demonstrates how this requirement has not been met in this case. Plaintiffs state that they "are harmed directly by § 6085," not by any action of the Secretary.  Pls' Mem. at 10 (emphasis added).  "This law," not any action of the Secretary, "is aimed directly at plaintiffs as a class."  Id. (emphasis added).  "It," not any action of the Secretary, "prohibits plaintiffs from accepting more than the Default Rate for noncontracted EMS."  Id. (emphasis added).  "In short, plaintiffs have alleged with particularity that § 6085," not any action of the Secretary, "adversely impacted plaintiffs . . . ."  Id. at 9-10 (emphasis added).  We could not have put it better ourselves.  Any injury from not being able to charge more than the default rate flows directly from the statute, independent of any actions the Secretary has taken or failed to take.

Plaintiffs may wish to rewrite the standard to replace "traceable to the challenged action of the defendant" with "traceable to the challenged statute."  But the Supreme Court has framed the traceability prong the way it has for a reason.  As shown in our opening brief, a litigant does not automatically acquire standing to sue a public official simply because he has an injury traceable to a statute.  See Defs' Mem. at 16-18, and cases cited therein.  "[T]the self-enforcing nature of [a statute] is inapposite to the analysis of whether the plaintiffs have any controversy with th[is] defendant[]."  Okpalobi v. Foster, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (emphasis added).  Rather, standing depends on the plaintiff having an injury fairly traceable to something the defendant public official has done, is imminently likely to do, or has failed to do. Plaintiffs cite no case that would support relieving them of that burden merely because they

2

allege injury traceable to a <u>statute</u>.

Nor is the injury that plaintiffs claim is caused directly by § 6085 "redressable" by an injunction purely against the Secretary. Plaintiffs simply assume that any opinion declaring § 6085 either inapplicable to them or unconstitutional, no matter who the defendant is, will "automatically" and "immediately and conclusively" redress their injuries because then they will be able to collect "much higher rates" from the MCOs. Pls' Mem. at 17, 18. But there is a critical missing link in their analysis that makes redress anything but automatic, immediate, and conclusive: they won't actually be able to collect the higher rates unless the MCOs pay them. And the MCOs, indisputably, will be free to continue to rely on § 6085 as a defense to an action for payment of rates higher than the fee-for-service rates, because they are non-parties to this litigation and will not be bound by any relief issued herein. Of course, the Secretary "ha[s] no authority to prevent [an MCO] from invoking the statute in a civil suit" by hospitals for payment. <u>Okpalobi</u>, 244 F.3d at 427. Under redressability analysis, "it must be the effect of the court's judgment <u>on the defendant</u> that redresses the plaintiff's injury." <u>Nova Health Sys. v. Gandy</u>, 416 F.3d 1149, 1159 (10th Cir. 2005) (emphasis added). An "argument that a favorable declaratory judgment against these defendants would redress [plaintiffs'] injury by deterring other potential litigants," such as, in this case, MCOs, "from relying on [the challenged statute]" is wholly insufficient. <u>Id.</u>; <u>accord</u> <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 825 (1992) (Scalia, J., concurring) ("Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the

3

exercise of its power.").[3]

Thus, in analogous circumstances, the D.C. Circuit has held that a hospital's injury-in-fact from being excluded by the Secretary from eligibility for certain discounts on drug prices was not redressable in an action solely against the Secretary, because "[w]hether [the hospital] can get the retroactive discounts apparently depends on whether the manufacturers -- who are not parties to this action -- could be persuaded to pay them . . . ." Univ. Med. Ctr. of So. Nev. v. Shalala, 173 F.3d 438, 441-42 (D.C. Cir. 1999). Redress would instead require two steps: "first getting a declaratory judgment" against the Secretary, "and then suing the manufacturers" to force them to accept the lower price. Id. at 442. "But that," the Court explained, "is essentially a concession that the redressability requirement cannot currently be met. Redressability must be satisfied now to establish jurisdiction." Id. (emphasis in original). It cannot reasonably be disputed that the same two-step process would be necessary here -- after success in this lawsuit, plaintiffs would then have to relitigate the applicability and/or constitutionality of § 6085 against the MCOs in order to compel them to pay the higher rates. Thus, just as University Medical Center, the redressability requirement cannot currently be met.

Plaintiffs purport to distinguish University Medical Center, as well as National Wrestling Coaches Association v. Department of Education, 366 F.3d 930 (D.C. Cir. 2004), cert. denied, 545 U.S. 1104 (2005), on the ground that in those cases, "third parties remained free as a legal matter to take independent action that would perpetuate plaintiffs' injuries." Pls' Mem. at 18. Their assertion that the "opposite is true" here is perplexing at best. Because MCOs will not be

---

[3] Even if the general precedential effect of a decision on non-parties to the litigation could suffice for redressability, it would not help plaintiffs because a decision of this Court or of the D.C. Circuit would not have such precedential effect in Pennsylvania.

bound by any decree in this case, ipso facto they will remain free as a legal matter to take independent action that would perpetuate plaintiffs' injuries. Plaintiffs' belief that MCOs would "conclusively" be bound to pay the "much higher rates" apparently stems from their assumption that a judgment against the Secretary would automatically cause various state laws preempted by § 6085 to spring back to life. But that belief is legally erroneous because, again, a judgment against the Secretary would operate only against him and his Department, and would do nothing to stop other parties (e.g., MCOs) from continuing to rely on the preemptive effect of § 6085. The same flaw undermines plaintiffs' attempts (Pls' Mem. at 14) to distinguish Calderon v. Ashmus, 523 U.S. 740 (1998), and Coffman v. Breeze Corps., 323 U.S. 316 (1945).[4]

Although they failed to allege any action by the Secretary relating to § 6085 in the Complaint, plaintiffs now attempt to supplement their pleadings by referring to a notice sent by the Administrator of CMS to State Medicaid Directors, advising states of the enactment of § 6085 and the need to update contracts with MCOs to eliminate any provisions that conflict with it. See Pls' Mem. at 10-11, Ex. B. Even if this were proper, but see Velinkonja v. Mueller, 362 F. Supp. 2d 1, 3 n.2 (D.D.C. 2004) ("absent a formal motion to . . . amend the complaint, a court does not treat the contents of an opposition to a motion to dismiss as an amendment to a complaint" (internal quotation marks omitted)), it is notable that plaintiffs stop well short of alleging that their injury-in-fact is "fairly traceable" to the CMS Administrator's notice. Nor

_____

[4] Similarly, plaintiffs fail to distinguish Muskrat v. United States, 219 U.S. 346 (1911), where the Court found Article III jurisdiction lacking because a "judgment will not conclude private parties, when actual litigation brings to the court the question of the constitutionality of such legislation," id. at 362. Plaintiffs argue that Muskrat was brought under a statute that purported not to require a case or controversy, whereas here, "a controversy exists," Pls' Mem. at 18. That logic, of course, is perfectly circular; whether there is a true Article III case or controversy in this case is the very underlying issue we are addressing.

could they credibly make such a claim. As plaintiffs concede elsewhere, § 6085 has force in and of itself. Its operation is not dependent on the CMS Administrator's approval of contracts or distribution of a notice. The statute would preempt and render unenforceable any inconsistent contract provisions even if the CMS Administrator's notice had never been sent.[5]

Moreover, contrary to plaintiffs' overwrought rhetoric, they would not have to "defy the criminal law" (Pls' Mem. at 16) in order to litigate the validity of § 6085 against an MCO. The dilemma they portray is one of their own concoction. As we pointed out in our opening brief (Defs' Mem. at 20 n.13), nothing prevents plaintiffs from preserving their rights by making clear to MCOs that they are accepting the payment as limited by § 6085 under protest.[6] Indeed, plaintiffs could file a declaratory judgment action against one or more MCOs today, just as they could petition the appropriate authorities in Pennsylvania today to conform its fee-for-service rates to a level they consider more appropriate. In any case, plaintiffs are hard-pressed to characterize this action as genuinely motivated by apprehension of prosecution when they did not

---

[5] Of course, it is not sufficient for Article III standing purposes to refer to the Secretary's responsibilities for general administration of the Medicaid program (Pls' Mem. at 10 (citing Arkansas Dep't of HHS v. Ahlborn, 126 S. Ct. 1752, 1758 (2006)). Cf. Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1416 (6th Cir. 1996) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." (internal quotation marks omitted)), cert. denied, 519 U.S. 1149 (1997). Rather, plaintiffs must allege a specific injury-in-fact "fairly traceable" to some action or omission by the Secretary and redressable by an order against the Secretary. While the Secretary must approve prepaid contracts between states and MCOs, see 42 U.S.C. § 1396b(m)(2)(A)(iii), the operation of § 6085 is not contingent on anything in those contracts, so the contracts (or the Secretary's approval of them) cannot be seen as the source of plaintiffs' injury. Nor is the Secretary's enforcement of EMTALA relevant; plaintiffs have not challenged EMTALA.

[6] Plaintiffs misread our brief when they say we "suggested" that they "bill" the MCOs for in excess of the amount allowed by § 6085. Pls' Mem. at 14. We never said they need to overbill the MCOs. See Defs' Mem. at 20 n.13. Nor do plaintiffs explain why overbilling the MCOs would be a necessary predicate for appropriate litigation against them.

even name as a defendant the Attorney General, who alone has "the power to conduct the criminal litigation of the United States Government." United States v. Nixon, 418 U.S. 683, 694 (1974) (citing 28 U.S.C. § 516).[7]

**B.    Plaintiffs Have Identified Neither an Applicable Waiver of Sovereign Immunity Nor an Available Cause of Action**

No litigation against the federal government can proceed unless there is an applicable waiver of sovereign immunity. See, e.g., FDIC v. Meyer, 510 U.S. 471, 475 (1994). The only waiver of sovereign immunity that plaintiffs purport to invoke is the one contained in the Administrative Procedures Act ("APA"). See Pls' Mem. at 21-22.[8] As we previously explained, however, that waiver does not apply because by its terms it requires that an officer or employee have "'acted or failed to act.'" See Def's Mem. at 24 (quoting 5 U.S.C. § 702). Plaintiffs' response is that the Secretary is required by statute to generally oversee and approve MCO

---

[7] As we explained in our opening brief, plaintiffs have failed to meet the rigorous standard set forth in Seegars v. Gonzales, 396 F.3d 1248, 1254, 1255 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1187 (2006), for an advance challenge to potential criminal enforcement of a statute, which standard was reiterated just last month in Parker v. District of Columbia, 478 F.3d 370, 374-75 (D.C. Cir. 2007) (petition for en banc rehearing filed). Plaintiffs now attempt to distinguish Seegars on the ground that they are challenging only the constitutionality of § 6085, not the separate, general provision through which they suspect § 6085 might be enforced criminally. Pls' Mem. at 16-17 n.17. The District of Columbia's gun control laws, which were at issue in Parker and Seegars, happen to be codified as criminal prohibitions, but there is no reason in law or logic why a different standard should obtain merely because a substantive provision and the criminal provision that might be used to enforce it are not codified together in the same statutory section. Moreover, plaintiffs' reliance (Pls' Mem. at 15-16) on Abbott Labs. v. Gardner, 387 U.S. 136 (1967), is misplaced because the law in this Circuit is that Abbott governs only challenges to agency regulations, not constitutional challenges to statutes. See Seegars, 396 F.3d at 1253-54.

[8] Contrary to plaintiffs' contention, neither 28 U.S.C. § 1331 nor the Constitution itself provide a waiver of sovereign immunity. See, e.g., Buaiz v. United States, 471 F. Supp. 2d 129, 138 (D.D.C. 2007).

7

contracts, and that he caused a notice to be sent to State Medicaid Directors informing them about the new law. But, as discussed above, those actions are irrelevant to the injury plaintiffs claim to suffer, which flows directly from § 6085, with or without the approval by the Secretary of any particular MCO contract, which need not even contain any provisions to implement § 6085. See supra at 5-6 & n.6.[9] Moreover, this Circuit has held that the APA's waiver of sovereign immunity only applies to claims "for which there is no other adequate remedy in a court." 5 U.S.C. § 704; see Nat'l Wrestling Coaches, 366 F.3d at 947. As discussed above, plaintiffs do have adequate remedies in a court, namely, litigation against MCOs to test the constitutionality of § 6085 in a proceeding where the required adversity and the possibility of actually redressing plaintiffs' injuries is present.

Similarly, plaintiffs still fail to identify any cause of action. See Pls' Mem. at 20-21. They appear to argue that one can always sue a federal official to challenge the constitutionality of a federal statute. But such suits still must be predicated on some cause of action (as well as, of course, Article III standing). Frequently that cause of action is the one found in the APA.[10]

---

[9] Cases brought against the Secretary challenging his oversight and approval of contested payment rates or payment rules (Pls' Mem. at 22 & n.20) say absolutely nothing about whether the APA's waiver of sovereign immunity applies here. As plaintiffs concede, those cases were challenges to specific final agency action -- approval of a state plan amendment in one case, approval of a state demonstration waiver program in another. Thus, no issue of sovereign immunity even came up in those cases because challenges to final agency action fall squarely within the APA's waiver of sovereign immunity. Here, in contrast, plaintiffs have failed to allege any action by the Secretary that has caused their injuries.

[10] In Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59 (1978), cited in Pls' Mem. at 20, the Supreme Court expressly declined to decide whether an implied cause of action existed under the Constitution to challenge the Price-Anderson Act. 438 U.S. at 70-72. It described plaintiffs' theory as "sufficiently substantial and colorable to sustain jurisdiction," id. at 72, but ultimately did not need to decide whether a cause of action existed because it held

(continued...)

Indeed, the three suits plaintiffs cite that challenged the Deficit Reduction Act on bicameralism grounds and named the applicable agency head as defendant (Pls' Mem. at 20-21 & n.18) were all typical challenges to specific, final agency action, fully appropriate under the APA.  Here, in contrast, plaintiffs do not have a cause of action under the APA because they are challenging only a bare statute, not any agency action, and because they have adequate remedies at law.  <u>See</u> Def's Mem. at 25-26.  If plaintiffs who find the APA's requirements inconvenient were permitted to circumvent them by simply invoking some unspecified, general cause of action to sue an agency official, the APA requirements would obviously cease to have any meaning or force.  That cannot possibly be the law.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

For the reasons stated above, the Court should dismiss this case for lack of subject matter jurisdiction.  If, however, this Court finds that it does have subject matter jurisdiction, the Complaint should be dismissed for failure to state a claim upon which relief can be granted.

### A.    Plaintiffs' Statement of the Standard of Review is Materially Incomplete

As a threshold matter, plaintiffs misapprehend the standard of review under Federal Rule of Civil Procedure 12(b)(6) for constitutional challenges to statutes.  Dismissal is appropriate if "it appears beyond doubt that [plaintiffs] can prove no set of facts in support of [their] claim which would entitle [them] to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). Importantly, although on a motion to dismiss factual allegations in the complaint are taken as true, the Court "need not, however, accept inferences that are unsupported by the facts, nor will it

---

[10](...continued)
adversely to the plaintiffs on the merits.

9

accept legal conclusions cast in the form of factual allegations." Islamic American Relief Agency v. Gonzales, 477 F.3d 728, 732 (D.C. Cir. 2007) (citing Kowal v. MCI Commn's Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Nor it is appropriate to take as true "unreasonable inferences or unwarranted deductions of fact." Hiland Dairy, Inc. v. Kroger Co., 402 F.2d 968, 973 (8th Cir. 1968), cert. denied, 395 U.S. 961 (1969).

Moreover, in analyzing the constitutionality of a statute, the purposes and effects Congress could reasonably envision for a statute are not "issues of fact" subject to pleading, discovery, and fact-finding in the traditional judicial sense. "In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true." Vance v. Bradley, 440 U.S. 93, 110-11 (1979). In equal protection or most other constitutional challenges to statutes, however, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Id. at 111; see also FCC v. Beach Comms., Inc., 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). Thus, "in reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress." Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997) (internal quotation marks omitted).

The Supreme Court has specifically emphasized this principle in the Takings Clause context, explaining that it is improper for "courts to substitute their predictive judgments for those of elected legislatures" and "[t]he reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established." Lingle v.

Chevron U.S.A. Inc., 544 U.S. 528, 544-45 (2005) (referring to trial-court evidentiary hearing to examine economic effects of rent control statute as "remarkable"); see also Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 242 (1984) ("[O]ur cases make clear that empirical debates over the wisdom of takings -- no less than debates over the wisdom of other kinds of socioeconomic legislation -- are not to be carried out in the federal courts.").

Thus, plaintiffs are flat wrong to assume that under "rules of notice pleading," a constitutional challenge to a statute avoids Rule 12(b)(6) dismissal simply by loading the complaint with legal conclusions such as that "'[t]he takings effected by § 6085 are not for a public purpose'" that § 6085 "directly, substantially, and overwhelmingly, if not exclusively, benefits private parties," or that "[th]e federal regulatory taking effected by § 6085 is attended by a 'physical invasion,'" Pls' Mem. at 27-28 (quoting Compl. ¶¶ 135, 136, 137), or by disputing Congress's predictive judgments about the long-run budgetary impact of § 6085 (Pls' Mem. at 34 (citing Compl. ¶¶ 42-43). Legal issues involving constitutional challenges to statutes are commonly resolved on Rule 12(b)(6) motions to dismiss, and can be appropriately so resolved here. See, e.g., Knapp v. Hanson, 183 F.3d 786, 789 (8th Cir. 1999).

## B.    Section 6085 Does Not Violate the Takings Clause

The Court need not reach the various specific theories of liability under the Takings Clause advanced by plaintiffs, because the Takings Clause claim here fails for two independent threshold reasons. First, any "taking" that may occur here is not effected by § 6085, but rather by the particular rates that plaintiffs allege are inadequate, i.e., the Pennsylvania fee-for-service rates. Second, numerous courts have rejected health care providers' challenges to the level of their compensation under the Medicare and Medicaid programs because of the voluntary nature

11

of those programs.  In any event, each of plaintiffs' Takings Clause theories is without merit even if § 6085 is analyzed as a potential "taking."

           1.      <u>Any Taking Here Is Not the Result of Section 6085</u>

As we discussed in our opening brief, § 6085 does not set any particular rates.  It merely extends a pre-existing framework of Medicaid rates, determined by the government of Pennsylvania in a process pursuant to federal statute, that has long applied to hospitals in Pennsylvania when they bill the state directly.  If these rates are, as plaintiffs claim, "confiscatory," it is of course the <u>rates</u> themselves that are confiscatory, not § 6085.  But for the particular amount of the rates set by Pennsylvania, no "taking" would exist even under plaintiffs' theory.  Indeed, plaintiffs' Takings Clause theory necessarily implies that Pennsylvania's fee-for-service rates have constituted a long-running violation of the Takings Clause, present well before the advent of § 6085.  After all, if rate X is below plaintiffs' cost to provide emergency medical services, rate X is below cost regardless of by whom it is paid.  All that § 6085 does is make pre-existing rate X applicable as the default rate for a new class of payors -- MCOs -- that is an increasingly significant part of the Medicaid program.

Significantly, plaintiffs cite no case that has treated a statute as a "taking" merely because it extends the applicability of a system of rates set by an independent sovereign as compensation for services provided under a government program.  In <u>every</u> <u>one</u> of the Takings Clause cases plaintiffs cite, the alleged taking resulted from a statute, regulation, or action of a singular governmental actor that, in and of itself, caused the deprivation of which the plaintiff complained.[11]  Here, in contrast, it is only because of the particular Pennsylvania fee-for-service

---

[11] <u>See</u> <u>Lingle</u>, 544 U.S. 528 (Hawaii statute); <u>Penn Central Transp. Co. v. New York City</u>,
(continued...)

rates in place that plaintiffs have to accept the levels of compensation that they claim are inadequate. Plaintiffs ask this Court to adopt, as a matter of first impression, a form of vicarious intergovernmental liability that would impute alleged deficiencies in rates set by the state to a federal statute to render the latter unconstitutional, even though they have neither named the state as a defendant nor, apparently, challenged or sought to remedy the alleged deficiencies directly. Nothing in the cases they cite remotely supports such a novel result.[11]

2.    Section 6085 Cannot Be a Taking Because Plaintiffs Are Not
Legally Compelled to Participate in Medicare or Medicaid

Second, plaintiffs' Takings Clause claim also fails because a long line of cases has recognized that health care providers' participation in the Medicaid and Medicare programs is voluntary, precluding takings challenges to the level of their compensation provided under those programs. See Defs' Mem. at 29 n.19 (citing cases). Indeed, it is notable that not one of the cases plaintiffs cite in support of their Takings Clause claim involves Medicaid or Medicare,

---

[11](...continued)
438 U.S. 104 (1978) (city's denial of certificate); Foggy Bottom Ass'n v. District of Columbia, 441 F. Supp. 2d 84 (D.D.C. 2006) (city's alleged failure to enforce zoning laws); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) (New York law); Kaiser Aetna v. United States, 444 U.S. 164 (1979) (federal requirement of access to marina); Kelo v. City of New London, 545 U.S. 469 (2005) (condemnation by local government); Calder v. Bull, 3 Dall. 386 (1798) (Connecticut statute setting aside probate decree); Montgomery v. Carter County, 226 F.3d 758 (6th Cir. 2000) (county's refusal to abandon claim to driveway); Porter v. BiBlasio, 93 F.3d 301 (7th Cir. 1996) (county seizure of horses); Dolan v. City of Tigard, 512 U.S. 374 (1994) (city placed conditions on development); San Remo Hotel, L.P. v. City and County of San Francisco, 545 U.S. 323 (2005) (city hotel conversion ordinance and fee); see also Broad v. Sealsaska Corp., 85 F.3d 422 (9th Cir. 1996) (action by private corporation; no taking at all because no government action), cert. denied, 519 U.S. 1092 (1997).

[11] At least one case has specifically refused to recognize an analogous Takings Clause claim predicated on this type of confluence of federal and state action. See Garelick v. Sullivan, 987 F.2d 913, 917 (2d Cir.) (refusing to "impute" state-driven compulsion to the federal government in challenge to certain limitations on Medicare charges), cert. denied, 510 U.S. 821 (1993).

despite the fact that those programs have been around for over forty years and frequently impose

limitations on health care providers' compensation.  See supra note 10 (surveying plaintiffs'

cases).

Responding to this point, plaintiffs contend that § 6085 applies to all providers of

emergency services, not just providers who participate in Medicaid, and thus it is not voluntary

because they would still have to comply even if, hypothetically and "against any practical factual

possibility," ceased to participate in Medicaid.  Pls' Mem. at 33.  They miss the point.  The

source of plaintiffs' legal compulsion to provide emergency medical services is not § 6085 but

the Emergency Medical Treatment and Active Labor Act ("EMTALA"), Social Security Act

§ 1867, 42 U.S.C. § 1395dd, which plaintiffs concede is "a condition of Medicare participation."

Compl. ¶¶ 62, 66.  Courts have uniformly held that Medicare participation is legally voluntary for

Takings Clause purposes, even if "business realities" effectively dictate participation.  Minn.

Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Welfare, 742 F.2d 442, 446 (8th

Cir. 1984), cert. denied, 469 U.S. 1215 (1985); accord Garelick, 987 F.2d at 917.  Indeed, a

Takings Clause challenge to EMTALA itself has been rejected on these very grounds.  See

Burditt v. U.S. Dep't of Health & Human Servs., 934 F.2d 1362, 1376 (5th Cir. 1991).

Accordingly, if plaintiffs ceased to participate in Medicare and Medicaid, they would be under no

federally imposed legal mandate to provide the services to which § 6085 applies in the first

place.[12]  "[W]here a service provider voluntarily participates in a price-related program or

---

[12] In the Complaint plaintiffs allege in passing that state law requirements or conditions of
nonprofit status also require them to provide emergency services, but they do not develop these
issues in their brief, and in any event, courts have rejected similar arguments.  See Garelick, 987
F.2d at 917 (rejecting plaintiffs' reliance on New York statute and professional ethics rules
requiring treatment of Medicare beneficiaries to establish compulsion).

activity, there is no legal compulsion to provide service and thus there can be no taking."

Garelick, 987 F.2d at 916.

         3.    Plaintiffs' Various Takings Theories Are Without Merit

Even if § 6085 is subjected to Takings Clause analysis on the merits, it easily passes

muster.  Plaintiffs allege three discrete takings theories, which we will address in turn.  First,

plaintiffs allege that § 6085 violates the Takings Clause on the ground that it provides a "private

benefit" to MCOs by enabling them to pay less for out-of-network emergency medical services.

See Pls' Mem. at 28-29.  This argument is directly refuted by Kelo v. City of New London, 545

U.S. 469 (2005).  As the Supreme Court explained there, citing a long line of cases, a private

benefit does not make a government action a prohibited "taking" as long as the action ultimately

serves a public purpose:

> Petitioners contend that using eminent domain for economic development
> impermissibly blurs the boundary between public and private takings. Again, our
> cases foreclose this objection. Quite simply, the government's pursuit of a public
> purpose will often benefit individual private parties. For example, in [Hawaii
> Housing Authority v.] Midkiff, [467 U.S. 229 (1984)] the forced transfer of
> property conferred a direct and significant benefit on those lessees who were
> previously unable to purchase their homes. In [Ruckelshaus v.] Monsanto, [467
> U.S. 986 (1984)] we recognized that the "most direct beneficiaries" of the data-
> sharing provisions were the subsequent pesticide applicants, but benefiting them
> in this way was necessary to promoting competition in the pesticide market. 467
> U.S., at 1014, 104 S.Ct. 2862.  The owner of the department store in Berman [v.
> Parker, 348 U.S. 26 (1954)] objected to "taking from one businessman for the
> benefit of another businessman," 348 U.S., at 33, 75 S.Ct. 98, referring to the fact
> that under the redevelopment plan land would be leased or sold to private
> developers for redevelopment.  Our rejection of that contention has particular
> relevance to the instant case: "The public end may be as well or better served
> through an agency of private enterprise than through a department of government-
> or so the Congress might conclude. We cannot say that public ownership is the
> sole method of promoting the public purposes of community redevelopment
> projects." Id., at 34, 75 S.Ct. 98.

Kelo, 545 U.S. at 485-86 (footnotes omitted; emphasis added).[13]  As another of the cases

plaintiffs themselves cite stresses, "a taking fulfills the public use requirement if it serves any

legitimate purpose within the government's authority."  Porter v. DiBlasio, 93 F.3d 301, 310 (7th

Cir. 1996).

Here, as discussed in our opening brief, § 6085 aims to serve the legitimate public

purpose of checking the unprecedented growth in costs of the Medicaid program, which are

driven largely by the charges of providers of health care, and are ultimately underwritten by the

state and federal governments.  Indeed, the Congressional Budget Office estimated that it would

save the federal government alone $130 million between 2006 and 2015, a projection that

plaintiffs simply ignore.  See Def's Mem. at 10 (citing report).  Plaintiffs dismiss the anticipated

savings as "attenuated, remote and indirect" (Pls' Mem. at 29), or as "insubstantial," "at best . . .

a drop in the bucket" compared to the overall size of the Medicaid program (id. at 35).  These

arguments go nowhere.  The Supreme Court in Kelo specifically rejected the petitioners'

argument "that for takings of this kind we should require a 'reasonable certainty' that the

expected public benefits will actually accrue."  Kelo, 545 U.S. at 487-88.  While $130 million

---

[13]  Incredibly, plaintiffs invert the various opinions in Kelo, relying heavily on the dissent
and the concurrence of a single Justice at the expense of the actual opinion of the Court, which
they apparently mistake for that of a "four member plurality" (Pls' Mem. at 25).  There should be
no confusion:  since the main opinion in Kelo commanded the votes of five Justices (including
Justice Kennedy's), it, not Justice Kennedy's concurring opinion, is the binding opinion of the
Court.  See Kelo, 545 U.S. at 471 ("Justice STEVENS delivered the opinion of the Court."); In re
Grand Jury Subpoena, 438 F.3d 1141, 1148 (D.C. Cir. 2006) (holding that opinion of five
Justices constitutes majority, not plurality opinion, and therefore is "authoritative precedent"
even if one of those five also writes a separate concurring opinion accentuating different nuances
in reasoning).  In any event, § 6085 passes muster even under the analysis suggested by Justice
Kennedy's concurring opinion because it clearly satisfies rational-basis review and its public
benefits, i.e., helping to stem the long-run escalation of Medicaid costs, are hardly "incidental or
pretextual."  Kelo, 545 U.S. at 491 (Kennedy, J., concurring).

admittedly is small relative to the overall Medicaid budget, cost containment by its very nature involves addressing discrete categories of outlays one at a time. Plaintiffs cite no case suggesting that projected savings do not count as a public benefit for Takings Clause purposes merely because the overall size of the program to which they relate is much larger.

Second, plaintiffs allege that § 6085 is a taking because they believe long-term costs savings the statute seeks to achieve "should be more fairly and appropriately borne by the public as a whole." Pls' Mem. at 30. But the public already bears the burden of financing the Medicaid program, and the whole point of this statute is to help stem out-of-control growth of that burden. The only case plaintiffs cite for this part of their argument, Dolan v. City of Tigard, 512 U.S. 374 (1994), has little, if anything, in common with this case. In Dolan, the Court found that a planning commission's decision requiring a single property-owner to "deed portions of [her] property to the city" as public easements for a bike trail and storm drainage, as a condition for receiving a building permit, was a taking that should fairly be compensated by the public at large. Id. at 385. The Court contrasted this type of individualized land use decision with "legislative determinations" of general applicability. More recently, the Court described Dolan as involving a "dedication[] of property so onerous that," if it it had been mandated outright instead of as a condition for a benefit, it would have been deemed a "per se physical taking." Lingle, 544 U.S. at 547. As discussed below, this case involves economic legislation of general applicability that is not remotely akin to a condemnation or per se physical taking. Rather than requiring a property owner to deed portions of her property to the public, or anything remotely equivalent, it merely brings the default rates that can be charged to non-contracted Medicaid MCOs for emergency services into parity with those chargeable to the state in the fee-for-service side of

17

Medicaid, in an effort to eliminate incongruities in the system and help contain the long-term costs of the program.[14]

Finally, § 6085 plainly does not effect any kind of "permanent physical occupation of another's property" in the nature of <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419, 435 (1982), plaintiffs' third takings theory (Pls' Mem. at 30-31). Section 6085, after all, simply caps the rates that providers may accept for certain emergency medical services that are paid for under the Medicaid program, by eliminating a loophole that previously allowed providers to charge some Medicaid MCOs contracting with the state far more than they would have been able to charge the state directly. It does not involve anything akin to "[t]he placement of a fixed structure on land or real property," as in <u>Loretto</u>, which involved a mandate to install cable television equipment on the roofs of buildings. See <u>Loretto</u>, 458 U.S. at 437. Plaintiffs complain that they are required to treat "any patient who presents to [their] ED with a perceived

––––––––––––––––––––––––––

[14] Plaintiffs also argue that Pennsylvania's fee-for-service rates "pay less than a fair rate of return that might be expected by an investor (such as a bond financier)." Pls' Mem. at 30. But the Medicaid program obviously does not exist to guarantee bond financiers any particular rate of return. Assuming <u>arguendo</u> (1) that this consideration even applies where plaintiffs consist exclusively of nonprofit organizations (Compl. ¶ 10), and (2) that a hospital investor would focus on a rate of return for a particular service for a particular class of patients enrolled in a particular class of MCOs, rather than on the hospital's entire economic picture, any expectation that Congress would indefinitely keep open a loophole allowing charges on the managed care side of Medicaid that vastly exceed fee-for-service rates determined by the state to be appropriate for the same services would manifestly not be "reasonable." See <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 617 (2001) (recognizing "the extent to which the regulation has interfered with <u>reasonable</u> investment-backed expectations" as a factor in takings analysis (emphasis added)). Hospitals that participate in Medicare and Medicaid are subject to frequent legislative and regulatory changes in those programs, and Pennsylvania law itself has widely oscillated on these issues over the past few years (Compl. ¶¶ 76-80). As the Supreme Court remarked in rejecting a "reasonable investment-backed expectations" argument underlying a takings claim, "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." <u>Connolly v. Pension Ben. Guar. Corp.</u>, 475 U.S. 211, 227 (1986).

medical emergency or the apparent onset of labor" and to use their real property, staff, and personal property for such treatment. Pls' Mem. at 30. But to the extent those requirements could somehow be deemed to create a "permanent physical occupation" in the nature of the cable lines in Loretto, they derive from EMTALA, not from § 6085. See generally Social Security Act § 1867, 42 U.S.C. § 1395dd (requiring hospitals with emergency departments generally to "provide for an appropriate medical screening examination" and "such further medical examination and such treatment as may be required to stabilize the medical condition" for "any individual (whether or not eligible for benefits under this subchapter) [who] comes to the emergency department"). Plaintiffs have not challenged the constitutionality of EMTALA, and when EMTALA has been challenged under the Takings Clause it was upheld without equivocation. See Burditt, 934 F.2d at 1376.[16]

---

[16] Plaintiffs' argument that defendants rely on a "moribund legal standard" (Pls' Mem. at 31-32) is wholly without merit and grossly misconstrues Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005). According to plaintiffs, (1) the Secretary analyzed the takings issue using what they call a "substantially advances" test, and (2) Lingle abolished that test for Takings Clause purposes. They are wrong on the first count and misleading on the second. We never used any "substantially advances" test in our opening brief. But more importantly, what Lingle actually abolished was the "substantially advances" test as a method through which plaintiffs could establish liability (by showing that a law does not substantially advance government interests), because that method would subject government actions to unduly onerous scrutiny. See Lingle, 544 U.S. at 544 (expressing concern that plaintiff's theory could lead to "heightened means-ends review of virtually any regulation of private property," with courts "substitut[ing] their predictive judgments for those of elected legislatures and expert agencies"). In other words, the Court rejected the "substantially advances" test because it concluded that a standard more deferential to the government was appropriate. Indeed, in Kelo, decided one month after Lingle, the Court reiterated that "'[w]hen the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings – no less than debates over the wisdom of other kinds of socioeconomic legislation – are not carried out in the federal court.'" Kelo, 545 U.S. at 488 (quoting Midkiff, 467 U.S. at 242) (emphasis added).

### C.    Section 6085 Does Not Violate Substantive Due Process

As we explained in our opening brief, § 6085 does not violate substantive due process because it serves the legitimate governmental interests of containing the costs of the Medicaid program, eliminating program incongruities, and countering disincentives for emergency services providers to contract with Medicaid MCOs.  See, e.g., In re NYAHSA Litig., 318 F. Supp. 2d 30, 41 (N.D.N.Y. 2004), aff'd on opinion below, 444 F.3d 147 (2d Cir. 2006); Vt. Assembly of Home Health Agencies, Inc. v. Shalala, 18 F. Supp. 2d 355, 368 (D. Vt. 1998); see generally Flemming v. Nestor, 363 U.S. 603, 611 (1960) (substantive due process bars only statutes that "manifest[] a patently arbitrary classification, utterly lacking in rational justification").

In response, plaintiffs cite no precedential case law, only policy arguments that essentially boil down to a disagreement with Congress about the likely long-run macroeconomic effects of § 6085.[17]  See Pls' Mem. at 33-36.  But these are precisely the type of "predictive judgments" as to which courts have long accorded Congress the utmost deference.  Indeed, plaintiffs go down exactly the road that the Court in Lingle warned would improperly "empower . . . courts to substitute their predictive judgments for those of elected legislatures."  Lingle, 544 U.S. at 544. There, the Court found it "remarkable, to say the least," that the lower court adjudicated the constitutionality of the statute by weighing competing empirical arguments about likely

---

[17] Plaintiffs' failure to cite case law to support their substantive due process claim is not surprising.  The Supreme Court has not invalidated federal economic legislation like § 6085 on substantive due process grounds since 1935.  See LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 487 (2d Cir.), cert. denied, 516 U.S. 913 (1995).

economic effects.  See Lingle, 544 U.S. at 544-45.  Such a proceeding is no more appropriate

here – for either a Takings Clause or a substantive due process claim – than it was in Lingle.[18]

### D.    Section 6085 Does Not Violate Equal Protection

Section 6085 plainly does not violate equal protection principles.  As a threshold matter,

it does not even contain the classification that plaintiffs attribute to it.  Plaintiffs allege that it

"discriminates against EMS providers based solely on their geographic location."  Pls' Mem. at

36.  But this is inaccurate.  Section 6085 requires a provider of emergency medical services to

"accept as payment in full no more than the amounts . . . that it could collect if the beneficiary

received medical assistance under this title other than through enrollment in [a Medicaid MCO],"

i.e., through the state fee-for-service program in which that beneficiary would otherwise be

enrolled.  The fee-for-service program in which the beneficiary would otherwise be enrolled is

that of the beneficiary's state of residence.  Thus, if a Philadelphia hospital provides emergency

services to a New Jersey Medicaid beneficiary enrolled in a non-contracted Medicaid MCO, the

default rate it can collect under § 6085 is controlled by New Jersey's state plan, not

Pennsylvania's.  Conversely, if a New Jersey hospital provides emergency services to a

---

[18] In addressing substantive due process, plaintiffs repeatedly misstate the standard by talking about whether the statute "substantially advances" the government interests at stake.  See Pls' Mem. at 33-36 (using this or similar formulation five times).  While plaintiffs do not cite any precedential case law in their substantive due process section, elsewhere in their brief they characterize Lingle v. Chevron, a Takings Clause case, as "affirm[ing] the continuing propriety of [the 'substantially advances'] standard for adjudicating substantive due process claims."  Pls' Mem. at 32.  Once again, plaintiffs read Lingle for the opposite of what it really says.  The Court in Lingle traced the origins of the "substantially advances" test to early substantive due process cases, but stressed that today "we have long eschewed such heightened scrutiny when addressing substantive due process challenges to government regulation."  Lingle, 544 U.S. at 545; see also Washington v. Glucksberg, 521 U.S. 702, 728 (1997) (holding that inquiry on substantive due process claims not involving any "fundamental liberty interests" is limited to whether the statute is "rationally related" to a legitimate governmental interest).

Pennsylvania Medicaid beneficiary enrolled in a non-contracted Medicaid MCO, the default rate it can collect under § 6085 is controlled by Pennsylvania's state plan, not New Jersey's. To the extent there is any classification under § 6085, it is by the domicile of Medicaid beneficiaries, not the domicile of emergency services providers.

Even assuming arguendo that plaintiffs can assert an equal protection claim based on a distinction among their patients, the claim goes nowhere. As we have pointed out in our opening brief, state-by-state differences are inherent in the Medicaid program, which, after all, is based on the fundamental premise that each state runs its own program of medical assistance. See Defs' Mem. at 30 n.20. Since each state runs its own program, different states may well compensate providers differently for services furnished to their respective beneficiaries. Whatever variance exists between what a provider can charge non-contracted MCOs for emergency care provided to a Pennsylvania Medicaid beneficiary as opposed to a New Jersey Medicaid beneficiary is no different than the variance between what those two states' fee-for-service programs will pay them in general. While plaintiffs may perceive such state-by-state disparities as "arbitrary," they are "no more intentionally arbitrary than our system of federalism itself." United States v. Lender, 985 F.2d 151, 156 n.* (4th Cir. 1993). Taken to its logical conclusion, plaintiffs' equal protection argument would require that the current joint federal-state Medicaid scheme be replaced with a system in which the federal government sets uniform nationwide rates. Nothing in any case law or equal protection principles remotely suggests such a bizarre result.[19]

---

[19] Even in the Medicare program, a purely federal rather than joint federal-state program, a court rejected an equal protection challenge to a managed care formula that "results, for example, in Medicare beneficiaries in southern Florida receiving more benefits at less cost than their similarly situated counterparts in Minnesota." Minn. Senior Fed'n v. United States, 273 F.3d 805, 808 (8th Cir. 2001), cert. denied, 536 U.S. 939 (2002). Affirming the district court's

(continued...)

In any event, it is clear beyond doubt that § 6085 satisfies the deferential rational-basis review standard, the applicability of which is conceded by plaintiffs (Pls' Mem. at 36).  See, e.g., Rye Psych. Hosp. Ctr., Inc. v. Shalala, 52 F.3d 1163, 1172 (2d Cir.), cert. denied, 516 U.S. 913 (1995).  Rational-basis review "require[s] only that the classification challenged be rationally related to a legitimate state interest."  City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976). Section 6085 is rationally related to the goal of cost containment, as well as to the elimination of incongruities, such as those caused when vastly different rates must be paid for emergency medical services to Medicaid beneficiaries depending on whether the payor is the state itself or an MCO acting under contract with the state, even though the federal government subsidizes both payors.

The cases plaintiffs cite contribute nothing meaningful to the analysis.  Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869 (1985), West Virginia University Hospitals Inc. v. Casey, 885 F.2d 11 (3d Cir. 1989), aff'd, 499 U.S. 83 (1991), and Children's Hospital and Medical Center v. Bonta, 97 Cal. App. 4th 740 (Cal. Ct. App. 2002), all involved the very different situation of state laws favoring in-state over out-of-state businesses.  In MetLife, the Supreme Court held that "promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose," 470 U.S. at 882, and in Children's Hospital, the state apparently "failed to present any . . . governmental interest," 97 Cal. App. 4th at 769.  As such, neither case is relevant here, where we rely on a governmental purpose that plaintiffs concede is legitimate (Pls'

_____

[19](...continued)
dismissal of the complaint on a Rule 12(b)(6) motion, the Eighth Circuit reasoned that the goals of "containing costs and expanding health care delivery options" were legitimate, that the formula Congress adopted was not "irrational or arbitrary," and that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  Id. at 808-09 (internal quotation marks omitted).

Mem. at 38).  No equal protection claim was even before the Third Circuit (or Supreme Court) in

West Virginia University Hospitals.  See 885 F.2d at 30 n.9.[20]

### E.    Plaintiffs' Statutory Interpretation Claim is Wholly Without Merit

In our opening brief, we pointed out that plaintiffs' claim for a declaratory judgment that

the statute exempts hospitals in Pennsylvania defies the plain language of the statute.  See Def's

Mem. at 26-27.  Plaintiffs offer a halfhearted response in which they contend that the statute

should be construed as they suggest in order to avoid unnecessarily deciding constitutional

issues.  See Pls' Mem. at 41-42.  However, not only are there no substantial constitutional

questions here, but "the canon of constitutional avoidance has no application in the absence of

statutory ambiguity."  United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 494

(2001).  Plaintiffs do not argue that § 6085 is ambiguous, and it decidedly is not.  The Court

would have to completely rewrite the statute to accomplish the result that plaintiffs seek, i.e., a

Pennsylvania exemption they apparently tried but failed to secure through the legislative process

(see Pls' Ex. A).

Section 6085 does not set up two non-exclusive "alternative circumstances for its

application," leaving all other situations unaffected, as plaintiffs contend.  Rather, it establishes a

general rule that is universally applicable:  a provider who furnishes emergency medical services

to a beneficiary enrolled in a non-contract MCO "must accept as payment in full in more than the

---

[20]  Nor is Wal-Mart Stores v. Knickrehm, 101 F. Supp. 2d 749 (E.D. Ark. 2000), on point.
In that case, the court rejected an Arkansas regulation that reimbursed chain pharmacists at a
significantly lower rate than small, independent pharmacists.  Notably, the only governmental
interest the state asserted was to protect small pharmacies against competition, not, as plaintiffs
posit (Pls' Mem. at 37), a "cost savings objective."  This case, in contrast, involves a
governmental interest -- containing costs under the Medicaid program -- that plaintiffs concede is
legitimate and that has repeatedly been recognized by the courts as such.

amounts . . . that it could collect if the beneficiary received medical assistance under this title other than through enrollment in such an entity," i.e., if the beneficiary were enrolled in the state's fee-for-service program rather than in an MCO.  The second sentence of § 6085 merely places a special gloss on this general rule by specifying how it should apply in states "where rates paid to hospitals under the State plan are negotiated by contract and not publicly released."[21]  In states that do not fall under this special situation, the general rule set forth in the first sentence of § 6085 remains fully operative.  Moreover, as we explained in our opening brief, nothing in this general rule even refers to, let alone makes its force conditional upon, the particular nature or quality of a given state's rate-setting process.  It simply limits the provider to what it could collect for the same emergency services under the fee-for-service system in the applicable state, irrespective of the history, provenance, or objectionability of that fee structure.[22]  Thus, plaintiffs' statutory argument is wholly without merit.

## CONCLUSION

For the foregoing reasons and those set forth in our opening memorandum, defendant respectfully requests that his motion to dismiss be granted and that the case be dismissed.

 Dated: April 23, 2007                                    Respectfully submitted,

---

[21] In those states, the amount the provider "could collect" if the beneficiary were enrolled in the state's fee-for-service program is deemed to be the average contract rate.  This gloss is necessary because in states that do not have generally applicable and publicly known rates for emergency medical services under Medicaid, the amount that the provider "could collect" under the fee-for-service regime would be indeterminate.

[22] As we said in our opening brief, if plaintiffs find the fee-for-service rates that Pennsylvania has set so objectionable, they should direct their efforts toward trying to get Pennsylvania to change those rates.

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associated General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
  for Litigation

SUSAN MAXSON LYONS
ROBERT W. BALDERSTON
Attorneys
Department of Health and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

 _/s/ Robert J. Katerberg_____
ROBERT J. KATERBERG
 (D.C. Bar No. 466325)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6112
Washington, D.C. 20001
Telephone:    (202) 616-8298
Facsimile:    (202) 616-8460
Robert.Katerberg@usdoj.gov
Attorneys for Defendant

26