IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE URBAN HEALTH CARE
COALITION, et al.

       Plaintiffs,

  v.

              Civ. A. No. 06-2220 (RWR)

MICHAEL O. LEAVITT, Secretary,
Department of Health and Human Services,

       Defendant.

**<u>PLAINTIFFS' MOTION AND INCORPORATED MEMORANDUM OF POINTS AND
AUTHORITIES FOR LEAVE OF COURT TO FILE A SUR-REPLY TO
DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE,
FOR FAILURE TO STATE A CLAIM</u>**

       Plaintiffs, the Urban Health Care Coalition, et al., hereby file this motion respectfully

requesting leave of court to file a sur-reply to Defendant's Reply Memorandum in Support of

Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Failure to

State a Claim (the "Reply Memorandum"). The reasons for seeking leave to file the sur-reply

attached as Exhibit "A" hereto are as follows:

       1.     Plaintiffs filed their First Amended Complaint on February 2, 2007, which raised

numerous constitutional issues in regard to Section 6085 of the Deficit Reduction Act of 2005,

Pub. L. No. 109-171.

       2.     Defendant filed his Motion to Dismiss for Lack of Subject Matter Jurisdiction, or,

in the Alternative, for Failure to State a Claim and accompanying Memorandum in Support

thereof (the "Motion to Dismiss") on February 27, 2007.

3.      Plaintiffs filed a comprehensive Opposition to Defendant's Motion to Dismiss (the "Opposition Memorandum") on April 11, 2007.

4.      Defendant filed his Reply Memorandum on April 23, 2007.  In the Reply Memorandum Defendant raised a number of new arguments and positions in support of his dispositive motion that Plaintiffs have not yet had an opportunity to address.   By way of examples:  Defendant predicated his Motion to Dismiss Plaintiffs' Takings claim on the substantially advances test.  After Plaintiffs pointed out in their Opposition Memorandum that the substantially advances test was no longer good law, Defendant replied with a host of new and expanded arguments to which Plaintiffs have not had the opportunity to respond; Defendant raised objections in the Reply Memorandum to Plaintiffs' attachment of and reliance on the Directive issued by the Secretary regarding Section 6085 and to certain other materials, the propriety of which are addressed in the sur-reply attached as Exhibit "A" hereto; Defendant raised new claims in support of his Motion to Dismiss Plaintiffs' Equal Protection claim, such as assertions that hospitals such as Plaintiffs would receive payments under § 6085 based on New Jersey's state plan when providing emergency services to New Jersey Medicaid beneficiaries.

5.      The decision to grant leave to file a sur-reply is committed to the sound discretion of the court.  Flynn v. Veazey Constr. Corp., 310 F.Supp.2d 186, 189 (D.D.C. 2004).  When, as here, the movant raises arguments for the first time in his or her reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply. Id. (citing Ben-Kotel v. Howard Univ., 319 F.3d 532, 536 (D.C. Cir. 2003); Natural Res. Def. Council, Inc. v. Envtl. Prot. Agency, 25 F.3d 1063, 1072 n.4 (D.C. Cir. 1994); Pa. Elec. Co. v. Fed. Energy Regulatory Comm'n, 11 F.3d 207, 209 (D.C. Cir. 1993); see also Herbert v. Nat'l

<u>Acad. of Scis</u>., 974 F.2d 192, 196 (D.C. Cir. 1992) (acknowledging that consideration of arguments raised for the first time in a reply would be "manifestly unfair" to the respondent)).

6.      This case raises novel issues of constitutional law and it is in the interest of justice that the issues be fully and fairly addressed.  Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs leave to file the sur-reply attached as Exhibit "A" hereto.

7.      Plaintiffs' Counsel sought the consent of the Defendant for the relief requested in this motion for leave.  Defendant reserves judgment on whether he will oppose this motion until after he reviews this filed motion and the attached sur-reply.

Dated: May 3, 2007                                        Respectfully submitted,

                                                          _____
                                                                        /s/
Of Counsel:                                               L. Barrett Boss (D.C. Bar No. 398100)
Mark H. Gallant (D.C. Bar No. 913111)                     COZEN O'CONNOR
Gregory M. Fliszar                                        1627 I Street, NW, Suite 1100
Melanie K. Martin                                         Washington, D.C., 20006
COZEN O'CONNOR                                            Telephone (202) 912-4800
1900 Market Street                                        Facsimile  (866) 413-0172
Philadelphia, PA  19103
Telephone: (215) 665-2000
Facsimile:  (215) 665-2013
                                                          Attorneys for Plaintiffs

PHILADELPHIA\3126095\1  193485.000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE URBAN HEALTH CARE :
COALITION, et al. :
 :
 :
 Plaintiffs, :
 :
 v. :
 : Civ. A. No. 06-2220 (RWR)
 :
MICHAEL O. LEAVITT, Secretary, :
Department of Health and Human Services, :
 :
 Defendant. :
 :
 :

**ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE OF COURT TO FILE A
SUR-REPLY TO DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN
THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

Upon consideration of Plaintiffs' Motion for Leave of Court to File a Sur-Reply to

Defendant's Reply Memorandum in Support Of Motion to Dismiss For Lack Of Subject Matter

Jurisdiction or, in the Alternative, for Failure to State a Claim, any opposition thereto, and the

entire record herein, it is hereby

ORDERED that Plaintiffs' motion is GRANTED.

Dated:_____  _____

       RICHARD W. ROBERTS
       United States District Judge

**EXHIBIT A**

Civ. A. No. 06-2220 (RWR)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE URBAN HEALTH CARE ) 
COALITION, et al., ) 
) 
       Plaintiffs, ) 
) 
    v. ) 
)    Civ. A. No. 06-2220 (RWR)
) 
MICHAEL O. LEAVITT, Secretary ) 
Department of Health and Human Services ) 
) 
       Defendant ) 
)

## PLAINTIFFS' SUR-REPLY TO DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE FOR FAILURE TO STATE A CLAIM

Mark H. Gallant (D.C. Bar No. 913111)
Gregory M. Fliszar
Melanie Martin
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

Of Counsel

L. Barrett Boss (D.C. Bar No. 398100)
COZEN O'CONNOR
1627 I Street, NW, Suite 1100
Washington, D.C., 20006
Telephone (202) 912-4800
Facsimile (866) 413-0172

Attorney for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

I.     PLAINTIFFS HAVE ART. III STANDING ..................................................... 1

II.    PLAINTIFFS HAVE ALLEGED THEIR INJURY IS FAIRLY TRACEABLE
      TO THE SECRETARY AND HAVE STATED CAUSE OF ACTION UNDER
      THE CONSTITUTION AND THE APA ........................................................... 5

      A.     Plaintiffs Have a Cause of Action Directly Under the Constitution ....................... 5

      B.     The Secretary is Subject to Suit Under the APA ................................................... 6

      C.     Plaintiffs Are Not Required To Separately Plead That the Secretary
            Issued A Directive ................................................................................................. 7

      D.     There is a Reviewable Agency Action .................................................................. 8

      E.     The Secretary's Efforts to Distinguish Abbott Labs Misconstrues the Law ........ 11

III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT § 6085, AS APPLIED,
      EFFECTS A TAKING ..................................................................................... 12

IV.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT § 6085, AS APPLIED,
      VIOLATES SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION
      UNDER THE LAW .......................................................................................... 22

      A.     Due Process ........................................................................................................... 23

      B.     Equal Protection .................................................................................................... 23

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## CASES

20th Century Ins. Co. v. Garamendi,
    878 P.2d 566 (Cal. 1994) ..........................................................................................21

Abbott Labs. v. Gardner,
    387 U.S. 139 (1967)............................................................................................ 11-12

Aetna Cas. & Sur. Co. v. Comm'r of Ins.,
    263 N.E.2d 698 (Mass. 1970) ...................................................................................21

Alabama Pub. Serv. Comm'n v. So. Ry. Co.,
    341 U.S. 341 (1951)...................................................................................................11

Animal Legal Def. Fund, Inc. v. Glickman,
    154 F.3d 426 (D.C. Cir. 1998) ................................................................................ 3-4

Banks v. Sec'y of Indiana Family & Soc. Servs.,
    997 F.2d 231 (7th Cir. 1993) .....................................................................................2

Belizan v. Hershon,
    434 F.3d 579 (D.C. Cir. 2006)....................................................................................8

Berman v. Parker,
    348 U.S. 26 (1954)....................................................................................................15

Bluefield Water Works & Improvement Co., 262 U.S. 679 (1923) ...............................18

Bowen v. Massachusetts,
    487 U.S. 879 (1988)..................................................................................................10

Burditt v. HHS,
    934 F.2d 1362 (Fifth Cir. 1991)........................................................................... 16-17

Caesar v. United States,
    258 F.Supp. 2d 1 (D.D.C. 2003)................................................................................8

Calfarm Ins. Co. v. Deukmejian,
    771 P.2d 1247 (Cal. 1989) ........................................................................................21

Califano v. Sanders,
    430 U.S. 99 (1977)....................................................................................................10

Children's Healthcare is a Legal Duty, Inc. v. Deters,
    92 F.3d 1412 (6th Cir. 1996), cert. denied, 519 U.S. 1149 (1997)..............................6

ii

Coalition for Underground Expansion v. Minetta,
   333 F.3d 193 (D.C. Cir. 2003)...................................................................................8

Competitive Enter. Inst. v. NHTSA,
   901 F.2d 107 (D.C. Cir. 1990)...................................................................................2

Dandridge v. Williams,
   397 U.S. 471 (1970)..................................................................................................24

Di Giovanni v. Camden Fire Ins. Assoc.,
   296 U.S. 64 (1935)....................................................................................................11

Duke Power Co. v. Carolina Envtl. Study Group,
   438 U.S. 59 (1978)..................................................................................................2, 6

Dusquesne Light Co. v. Barasch,
   488 U.S. 299 (1989) .................................................................................................21

EEOC v. St. Francis Xavier Parochial Sch.,
   117 F.3d 621 (D.C. Cir. 1997)...............................................................................7-8

Foman v. Davis,
   371 U.S. 178 (1962)....................................................................................................8

Garelick v. Sullivan,
   987 F.2d 913 (2d Cir. 1993)........................................................................16, 18, 19

General Elec. Co. v. EPA,
   360 F.3d 188 (D.C. Cir. 2004).................................................................................12

Hawaii Hous. Auth. v. Midkiff,
   467 U.S. 229 (1975).................................................................................11, 15, 19, 23

Hicks v. Miranda,
   422 U.S. 332 (1975).................................................................................................11

Hosp. and Health System Ass'n. of Pa. v. Pa. Dep't. of Pub. Welfare,
   888 A.2d 601 (Pa. 2005)........................................................................................4-5

Int'l Ladies Garment Workers' Union v. Donovan,
   722 F.2d 795 (D.C. Cir. 1983)...................................................................................3

Jerome Stevens Pharm., Inc. v. FDA,
   402 F.3d 1249 (D.C. Cir. 2005)..................................................................................8

Kelo v. City of New London,
   545 U.S. 469 (2005).............................................................................................13-15

Land v. Dollar,
   330 U.S. 731 (1947)................................................................................................................8

Linda R.S. v. Richard D.,
   410 U.S. 614 (1973)................................................................................................................2

Lingle v. Chevron U.S.A.,
   544 U.S. 528 (2005).............................................................................12, 13, 15, 16, 19, 20

Loretto v. Teleprompter Manhattan CATV Corp.,
   458 U.S. 419 (1982).................................................................................................17, 18, 20

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992)................................................................................................................1

Marshall County Health Care Auth. v. Shalala
   988 F.2d 1221 (D.C. Cir. 2003).............................................................................................8

Methodist Hosps. Inc. v. Indiana Family & Soc. Servs. Admin.,
   860 F.Supp. 1309 (N.D. Ind. 1994) .....................................................................................17

Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dept. of Pub. Welf.,
   742 F.2d 442 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985)................................16, 18, 19

Missouri Pacific R-Co. v. Nebraska,
   164 U.S. 403 (1896)..............................................................................................................15

N.E. Energy Assoc's. v. FERC,
   158 F.3d 150 (D.C. Cir. 1998)...............................................................................................2

Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.,
   366 F.3d 930 (D.C. Cir. 2004)...............................................................................................3

Natural Res. Def. Council v. Envtl. Prot. Agency,
   25 F.3d 1063 (D.C. Cir. 1994).............................................................................................13

Nebia v. New York,
   291 U.S. 502 (1934)..............................................................................................................23

Penn Cent. Transp. Co. v. New York City,
   438 U.S. 104 (1978).................................................................................................17, 20, 21

Pennell v. City of San Jose,
   485 U.S. 1 (1988).................................................................................................................20

Petroleum Exploration, Inc. v. Pub. Serv. Comm'n of Kentucky,
   304 U.S. 209 (1938)..............................................................................................................11

PhRMA v. Thompson,
   251 F.3d 219 (D.C. Cir. 2001)..................................................................................9

Pub. Citizen v. Clerk, United States District Court,
   451 F.Supp. 2d 109 (D.D.C. 2006), appeal pending, No. 06-5232 (D.C. Cir.) ......................25

Seegars v. Gonzales,
   396 F.3d 1248 (D.C. Cir. 2005) ...............................................................................12

Shaughnessy v. Pedreiro,
   349 U.S. 48, 51 (1955)..........................................................................................10

Simon v. E. Ky. Welfare Rights Org.,
   426 U.S. 26 (1976)................................................................................................2

State Farm Mut. Ins. Co. v. State of New Jersey,
   590 A.2d 191 (N.J. Super. Ct. 1991) .......................................................................21

Texaco Puerto Rico, Inc. v. Rodriguez,
   749 F. Supp. 348 (D.P.R. 1990)..............................................................................21

Time Warner Entm't. Co. v. FCC,
   93 F.3d 957 (D.C. Cir. 1996)..................................................................................12

Univ. Med. Ctr. of So. Nevada v. Shalala,
   173 F.3d 438 (D.C. Cir. 1999) ......................................................................... 1, 2-3

Utah v. Evans,
   536 U.S. 452 (2002)...............................................................................................2

## STATUTES, RULES & REGULATIONS

Balanced Budget Act of 1997, §4711 ..........................................................................24

Deficit Reduction Act of 2005, §6085 ................................................................... Passim

Emergency Medical Treatment and Active Labor Act ("EMTALA")
   42 U.S.C. §1395dd........................................................................................ Passim

Pennsylvania Quality Health Care Accountability and Protection Act (Act 68)
   40 P.S. §991.2101 et seq...................................................................................... Passim

5 U.S.C. §704.........................................................................................................9

28 U.S.C. §1331......................................................................................................6

42 U.S.C. §1320a - 7b(d) (Social Security Act §1128B)...................................10, 12, 19

42 U.S.C. §1396b(m)(2)(A)(iii)...............................................................................................9

42 U.S.C. §1396b(m)(2)(A)(xii)...............................................................................................9

42 C.F.R. §438.806...............................................................................................9

N.J.A.C. 10:52-4.4...............................................................................................24-25

Fed. R. Civ. P. 8...............................................................................................7

Fed. R. Civ. P. 9(b)...............................................................................................7

Fed. R. Civ. P. 12(b)(1)...............................................................................................1, 6, 8

Fed. R. Civ. P. 12(b)(6)...............................................................................................1

Fed. R. Evid. 201(a) & (f)...............................................................................................8

## MISCELLANEOUS

Rev. Rul. 69-545...............................................................................................22

**PLAINTIFFS' SUR-REPLY TO DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION OR, IN THE ALTERNATIVE
FOR FAILURE TO STATE A CLAIM**

In his Reply Memorandum in Support of Motion to Dismiss for Lack of Subject Matter

Jurisdiction, or in the Alternative, for Failure to State a Claim ("Sec'y Reply"), the Secretary

continues to advance standing arguments that ignore the well pled facts and the import of

existing Pennsylvania law (i.e., Act 68) that is preempted solely and exclusively by § 6085 of the

DRA.[1]  The Secretary also advances new arguments to support dismissal of plaintiffs' claims

under Rules 12(b)(1) and 12(b)(6).  We will address those arguments herein.

**I.    PLAINTIFFS HAVE ART. III STANDING**

Plaintiffs have amply pled that Pennsylvania hospitals are entitled as a matter of state law

under Act 68 to be paid "all reasonably necessary costs" related to non-contracted EMS, and that

their payments for EMS were decreased effective January 1, 2007, exclusively due to § 6085, as

implemented by the Secretary.  In his Reply, the Secretary principally asserts that plaintiffs

cannot satisfy the redressability component of Art. III standing because the MCOs who currently

must pay plaintiffs in accordance with § 6085 are not parties to the suit and would not

individually be "bound" by a Court Order invalidating § 6085.  In so arguing the Secretary

effectively incorrectly substitutes an "absolute legal certainty" redressability standard for the

standard formulated by the Supreme Court.

Under the actual standard, "[i]t must be 'likely,' as opposed to 'merely speculative' that

the injury will be 'redressed by a favorable decision.'"  Univ. Med. Ctr. of So. Nevada v. Shalala,

173 F.3d 438, 441 (D.C. Cir. 1999) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561

(1992), quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).  The standard

---

[1] Abbreviations used in this Sur-Reply Brief will be consistent with those in Plaintiff's
Memorandum in Opposition to Defendant's Motion to Dismiss (hereinafter, "Pltf's. Oppos.").

is not whether all MCOs will be absolutely bound by a judgment to pay plaintiffs in accordance

with controlling state law if § 6085 is enjoined, but whether it is more likely than not that they

will do so. See, e.g., Competitive Enter. Inst. v. NHTSA, 901 F.2d 107, 117-118. (D.C. Cir.

1990) (where ultimate relief from a claim against NHTSA depended on actual response of

automobile manufacturers, "Petitioners need not prove that granting the requested relief is

certain to redress their injury"); N.E. Energy Assoc's. v. FERC, 158 F.3d 150, 154 (D.C. Cir.

1998) (holding that the "possibility, though not a certainty," of a favorable determination on

remand "is sufficient to meet the redressability requirement").[2]

    In Univ. Med. Ctr., on which the Secretary heavily relies, providers challenged the

Secretary's failure to include them on a listing that would have made them eligible to obtain

discounts on drugs from pharmaceutical manufacturers under a certain federal program. A ruling

against the Secretary in that case was found *un*likely to result in plaintiffs receiving the program

discounts they sought, not because the manufacturers were not named as parties, but because

they had discretion to withhold the retroactive discounts plaintiff coveted, even if they were

listed by the Secretary. In so ruling, the D.C. Circuit stated: "[i]f it could be said that UMC was

---

[2] See also Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59 (1978) (standing is
properly based on reasonable prediction of redress resulting from anticipated third party
behavior); Utah v. Evans, 536 U.S. 452, 459-463 (2002) (suit against Secretary of Commerce
over conduct of Census is proper where it was "substantially likely" that a favorable ruling and
revised Census report would cause the President and congressional officials to reverse one-seat
shift in House of Representatives); Banks v. Sec'y of Indiana Family & Soc. Servs., 997 F.2d
231, 236-241 (7th Cir. 1993) (standing exists to sue Secretary, even though redress would require
third party action, where the desired third party action was reasonably predictable). Contrast
Linda R.S. v. Richard D., 410 U.S. 614 (1973). In that case, plaintiff, the mother of an
illegitimate child, sought a judgment declaring unconstitutional a Texas criminal child support
statute which limited responsibility to the "parents" of only "legitimate" children. The Court
found lack of redressability not merely because a third party (the father) was implicated, but
because it was, at best, highly speculative that, if plaintiff prevailed, she would obtain child
support. Because relief thus hinged on both the future initiation of a prosecution against the
father, and the speculative likelihood the recalcitrant father would ultimately make child support
payments. Here, state law already prohibits the use of Medicaid FFS rates, and it would be
unreasonable to presume that on Order against § 6085 would not yield plaintiffs relief.

*legally entitled* to get the discounts as a result of [the Secretary being ordered to place them] on

the list ... then we might have a different situation." 173 F.3d at 442 (emphasis in original).

Here, plaintiffs are *legally entitled* to be paid in excess of the FFS rates under the state law (Act

68) that was preempted by § 6085 on January 1, 2007.

The Secretary would rely on Nat'l Wrestling Coaches Ass'n v. Dept. of Education, 366

F.3d 930, 940-942 (D.C. Cir. 2004) – where it was highly questionable that relief against the

Department of Education would redress plaintiffs' injuries given a wide range of actions left to

the discretion of third party colleges. That decision, however, is most germane for its discussion

of Animal Legal Defense Fund, Inc. v. Glickman, 154 F.3d 426, 440-444 (D.C. Cir. 1998)

(ALDF). As summarized in Nat'l Wrestling:

> In *ALDF* we upheld a plaintiff's standing to challenge U.S. Department of
> Agriculture ("USDA") regulations concerning the treatment of primates by zoos
> and other exhibitions of animals. *See* 154 F.3d 426. *   *   * *Although
> this injury resulted from the actions of third parties that chose to maintain their
> captive primates in such conditions, we held that the plaintiff had standing to
> challenge the USDA regulations. See id.* at 438-44. The plaintiff alleged that the
> regulations permitted exhibitors to maintain primates in inhumane conditions,
> even though such conduct would have been illegal in the absence of those
> regulations. *See id.* at 438. Accordingly, a favorable decision would redress the
> plaintiff's injury because animal exhibitors would no longer be able to keep
> animals in inhumane living conditions without violating the law. *See id.* at 443.
> *Causation and redressability thus are satisfied in this category of cases, because
> the intervening choices of third parties are not truly independent of government
> policy. Moreover, they could only preclude redress if those third parties took the
> extraordinary measure of continuing their injurious conduct in violation of the
> law. See id.* at 441 (citing Int'l Ladies' Garment Workers' Union v. Donovan, 722
> F.2d 795, 811 (D.C. Cir. 1983)).

366 F.3d at 940-941 (italics added).

As pled by plaintiffs, MCOs have been expressly contractually bound as a condition of

serving in the HealthChoices program to pay for non-contracted EMS at the rates prescribed by

Act 68 (40 P.S. § 991.2116), "but for" § 6085. See FAC ¶¶ 74-81; Pennsylvania Form Medicaid

MCO Agreement at §§ IV.C.1 & V.A.9. (Exhibit "C" to Pltf's Oppos.) Because the "third

3

parties" are themselves bound by § 6085 – which mandates non-contracted EMS payments to be based on Medicaid FFS rates – the "intervening choices of [the MCOs] are not truly independent of government policy." ALDF, 154 F.3d at 441. Plaintiffs also allege that MCOs were bound by Pennsylvania case law to pay in excess of the Medicaid fees under Act 68, and had recognized their obligations to do so until the effective date of § 6085. FAC ¶¶ 81, 91. They ceased doing so on January 1, 2007 due to § 6085. FAC ¶ 91.

To continue paying plaintiffs pursuant to § 6085 after it has been declared unlawful, MCOs would have to violate the terms of their contracts with the State (which explicitly requires compliance with Act 68 except to the extent it is preempted by federal law), violate governing Pennsylvania law, and subject themselves to bad faith claims in the process. It is thus overwhelmingly likely, not "merely speculative," that an Order prohibiting the application or enforcement of § 6085 would immediately reinstate the *status quo ante*, and that plaintiffs will obtain such relief from a favorable ruling in this case. It is therefore clear that plaintiffs have standing.

Faced with the fatal blow Act 68 delivers to his standing arguments, the Secretary attempts to dismiss the import of this statute and plaintiffs' reliance on Hosp. and Health System Ass'n. of Pa. v. Pa. Dep't. of Pub. Welfare, 888 A.2d 601 (Pa. 2005) (HAP v. DPW) in a footnote. Sec'y Reply at 1 and 2. In HAP v. DPW, the Pennsylvania Supreme Court invalidated a State default rate statute virtually identical to § 6085 in a suit hospitals brought against the Pennsylvania Department of Welfare. The Pennsylvania Supreme Court found, first, that the state law had directly caused plaintiff's injury in fact. In determining on the merits that the state law was unconstitutional because it was enacted as part of a budget bill, the Court had to determine whether the use of a Medicaid FFS default rate for EMS would conflict with existing substantive law. The Court held that it would, because Act 68's command to pay "all reasonably

4

necessary costs" of EMS could not be satisfied by the use of below-cost Medicaid FFS rates that

would have obtained under the state default rate permission.

The Secretary would dismiss plaintiffs' reliance by analogy on HAP v. DPW to support

their allegations of injury in fact because Art. III "does not apply to state courts." That argument

is disingenuous because the Pennsylvania Supreme Court applies the *identical* standard to

determine standing under Pennsylvania law. The Secretary also blithely dismisses HAP v. DPW

as inapposite because it "rested solely on a provision of the Pennsylvania state constitution

prohibiting the Pennsylvania legislature from including substantive legislative in its

appropriations bills." Sec'y Reply, id. That characterization ignores the fact that the state

Default Rate law was held unconstitutional because it was found to conflict with the existing

substantive law – Act 68 – which the Court held did not permit the use of Medicaid FFS rates for

non-contracted EMS.

## II.   PLAINTIFFS HAVE ALLEGED THEIR INJURY IS FAIRLY TRACEABLE TO THE SECRETARY AND HAVE STATED CAUSES OF ACTION UNDER THE CONSTITUTION AND THE APA

### A.   Plaintiffs Have a Cause Of Action Directly Under the Constitution

The FAC includes allegations that the Default Rate Provision, in terms aimed directly at

providers, prohibits hospitals as a class, from "accepting" more than the Medicaid Default Rate

as "payment in full." The Secretary continues to assert that plaintiffs have not alleged their

injury is fairly traceable to any action by the Secretary. That argument is unconvincing.

First, this argument continues to ignore the body of case law – and the substantial body of

recent and pending cases – confirming that an action challenging a federal statute on

constitutional grounds is properly advanced through a suit against the head of the executive

branch agency responsible for its administration. See Pltf's Oppos. at 20. The Secretary's Rule

12(b)(1) Motion would fail because it is established that a cause of action under § 1331 may be

5

predicated directly on the constitution itself. See Pltf's Oppos. at 20-21; Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59 (1978).

The Secretary attempts to dismiss Duke Power Co. by claiming that that the Supreme Court did not find that a cause of action existed under the Constitution to challenge the Price–Anderson Act. Sec'y Reply at 8 n. 10. To the contrary, the Supreme Court concluded that the plaintiff's two Fifth Amendment challenges to the Price-Anderson Act were "sufficient to sustain jurisdiction under § 1331(a)." Duke Power Co., 438 U.S. 59, 71. Not only is that holding clearly stated in the majority opinion, but is repeated in Justice Rehnquist's concurrence where he voiced his opposition to it. Id. at 98-99, 102 n.4. The Secretary's effort to duck these precedents is unpersuasive and relies solely on a "cf." citation to Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1416 (6th Cir. 1996), cert. denied, 519 U.S. 1149 (1997). Sec'y Reply at 6 n. 5. Deters is inapposite: it deals with challenges to a state law, not a constitutional challenge of a self-effectuating, federal statute.

**B.      The Secretary is subject to Suit Under the APA**

Plaintiffs also have more than adequately alleged that the Secretary, in his official capacity, is responsible for their injuries through adverse actions he has taken. He is thus also subject to a claim under the Administrative Procedures Act ("APA"). Defendant argues that "the Complaint does not contain a single allegation regarding anything the Secretary has done that has caused plaintiff any harm." Sec'y Br. at 12. That argument conveniently disregards plaintiffs' allegations that the Secretary "administers and enforces" § 6085, and, is responsible through the Centers for Medicare & Medicaid Services ("CMS") for the "[d]ay to day administration of Medicaid and enforcement of" § 6085 which is "invested in the Secretary." FAC ¶ 3, 4, 18. The Secretary's reference to the absence of "a single allegation" about "anything the Secretary has done" also conveys, through carefully chosen words, the misimpression that the Secretary has

taken no action to "enforce" § 6085, as plaintiffs have alleged. That suggestion is completely undermined by the Secretary's issuance of a Directive, telling all State Medicaid Directors that they "must amend" existing MCO agreements to incorporate the obligation to limit payments to hospitals based on § 6085 "before January 1, 2007." (Exhibit "B" to Pltfs. Oppos.)

### C.    Plaintiffs Are Not Required To Separately Plead That the Secretary Issued A Directive

Confronted at this stage with his own Directive – a document the Secretary would be required to produce in discovery – Secretary's principal response is to "go on the offense" and claim that plaintiffs are "attempt[ing] to supplement their pleadings by referring" to the Directive supplied as Exhibit "B" to Pltf's. Oppos. Sec'y Reply at 5. This case, however, is a "notice pleading" case governed by Fed. R. Civ. P. 8, which requires only a "short and plain statement of the claim."[3] Plaintiffs have sufficiently alleged that the Secretary administers and enforces § 6085. They were not required by the Rules to further plead that he has done so by issuing a particular piece of paper. Further, on review of a motion to dismiss, plaintiffs are entitled to the benefit of all favorable inferences supported by the allegations of the Complaint. EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). These allegations logically support the inference that the Secretary's "day to day administration and enforcement" of § 6085 includes taking specific actions such as issuing Directives to implement and enforce § 6085.

Moreover, it is not merely a logical inference that the Secretary "did something" to implement § 6085, but a concrete fact proven by the Secretary's Directive. In this case, the existence of the Directive is not only logically inferred from plaintiffs' allegations, but it is an official record of HHS that is subject to mandatory judicial notice at any time, under Rule 201(a)

---

[3] This case does not entail any of the claims, such as fraud, subject to Special Pleadings that must be "stated with particularity." Fed. R. Civ. P. 9(b).

& (f) of the Federal Rules of Evidence. See St. Francis Xavier Parochial Sch., 117 F.3d at 624;

Marshall County Health Care Auth. v. Shalala 988 F.2d 1221, 1226 n.6 (D.C. Cir. 2003).

Finally – and contrary to the Secretary's argument – it is well settled that a court may

consider documents outside the pleadings in ruling on a motion to dismiss. See Land v. Dollar,

330 U.S. 731, 735 n.4 (1947); Coalition for Underground Expansion v. Minetta, 333 F.3d 193,

198 (D.C. Cir. 2003) (stating that, in determining a Motion to Dismiss under Rule 12(b)(1), a

court may "consider the complaint supplemented by undisputed facts evidenced in the record");

Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (same); Caesar v.

United States, 258 F.Supp. 2d, 1, 2-3 (D.D.C. 2003)[4] and cases cited therein (same).[5]

## D.    There is a Reviewable Agency Action

Despite hard evidence that he specifically ordered the states to modify their MCO

agreements to incorporate the Default Rate limits, the Secretary bizarrely persists in asserting

there is no waiver of immunity under the APA because there is no claim that "an officer or

employee [of a federal agency has] 'acted or failed to act.'" Sec'y Reply at 7. That statement

makes no sense in the face of plaintiffs' allegations and the Secretary's Directive. Similarly

---

[4] As long as the Court considers matters outside the pleadings only with respect to issues raised
pursuant to Fed. R. Civ. P. 12(b)(1), and relating back to subject matter jurisdiction, a motion to
dismiss is not converted to one for summary judgment." Caesar v. United States, 258 F.Supp. 2d
at 2-3.

[5] Even if plaintiffs were required to specifically plead that defendant has issued the Directive –
which they are not – plaintiffs would in any event be entitled under the exceedingly liberal rules
in this area to amend their complaint to mention the Directive. See Foman v. Davis, 371 U.S.
178, 182 (1962) (stating that "[i]n the absence of any apparent or declared reason-such as undue
delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies
by amendments previously allowed, [or] undue prejudice to the opposing party ... the leave [to
amend] ...should be 'freely given'"); Belizan v. Hershon, 434 F.3d 579, 582 (D.C. Cir. 2006)
(stating that the rule governing amendments should be "construed liberally"). This case is still in
the prediscovery stage, and the Secretary would not be prejudiced by an amendment referring to
the Directive because it is the Secretary's own notice.

without merit is the Secretary's suggestion that the only type of specific agency "action" by the

Secretary reviewable under the APA is CMS' approval of a state plan. Sec'y Reply at 8 n. 9.

Actions by the Secretary subject to review under the APA may take many forms.[6] As the

Secretary well knows, Medicaid managed care programs are implemented not through State Plan

Amendments, but through contracts that States must enter into with MCOs. Just like State Plans,

MCO agreements are subject to the approval of the Secretary through CMS, including,

specifically, scrutiny of whether they "compl[y] with the requirements of section 1932," which

was amended by the DRA to include § 6085.  § 1903(m)(2) of the Social Security Act (the

"Act"), 42 U.S.C. § 1396b (m)(2)(A)(iii) & (xii); accord 42 C.F.R. § 438.806 (providing that

federal funding of managed care risk contracts is available only if the Secretary, through CMS,

determines that "the [MCO] contract meets all the requirements of section 1903(m)(2)(A)," and

receives "prior approval from CMS"). Here, the Secretary's approval of MCO agreements,

effective January 1, 2007, is subject to their conformance to his Directive. This scheme, under

which the Secretary ensures that the operative agreements limit payments to plaintiffs in

accordance with § 6085, parallels and is substantially equivalent to the Secretary's role in

approving a State Plan governing the states' fee-for-service programs.

The Secretary invokes 5 U.S.C. § 704 to suggest that the existence of a potential claim

against MCOs under state law precludes a federal cause of action. That section provides, in part,

that "[a]gency action made reviewable by statute and final agency action for which there is no

other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Secretary,

however, greatly inflates the scope of § 704. That provision was intended to "remove obstacles

to judicial review of agency action" and facilitate court review of administrative action by

---

[6] For example, PhRMA v. Thompson, 251 F.3d 219 (D.C. Cir. 2001), the adverse agency action
was the approval of a § 1115 Medicaid Expansion Demonstration project containing rates that
the plaintiffs contended were unconstitutional.

9

authorizing judicial review of agency action *unless* expressly precluded by statute or where an adequate remedy exists in a court. Bowen v. Massachusetts, 487 U.S. 879, 904 (1988) (quoting Shaughnessy v. Pedreiro, 349 U.S. 48, 51 (1955)).[7] The Secretary argues that plaintiffs have adequate remedies in court, "namely, litigation against MCOs to test the constitutionality of sect. 6085." (Def. Reply at 8) The Secretary misunderstands the meaning of "adequate remedy in a court."

Plaintiffs are entitled to challenge § 6085 because it is directed at them as a class: its impact it not some indirect byproduct of independent discretionary behavior by MCOs. The "alternative" the Secretary poses to directly challenging a federal law aimed squarely at plaintiff is for plaintiffs to: defy § 6085; sue dozens of individual MCOs in state court seeking payments that are squarely prohibited by § 6085 (as administered by the Secretary); risk criminal prosecution for violating § 1128B of the Act; and then hope that the MCOs will raise § 6085 as a defense to the claim. The Secretary's proposed alternative remedy is strained on its face, and is no "adequate remedy" at all.

Furthermore, Plaintiffs' claims are federal claims that "arise under" the constitution. The Secretary's proposed "alternative remedy" would deprive plaintiffs of any affirmative claim to adjudicate a federal question (i.e. to challenge the constitutionality of a federal law that is directed at plaintiffs), and would depend instead on a third party raising § 6085 as a defense. Because the Secretary wants plaintiffs to test the waters by separately suing all local HMOs under contract law principles, local courts would be given the task of potentially deciding the federal constitutional issues. Plaintiffs may not legitimately be deprived of their rights to

---

[7] It is a "well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed," and that courts "will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence." Califano v. Sanders, 430 U.S. 99, 109 (1977).

advance an affirmative challenge to a federal law based on the convoluted approach concocted
by the Secretary. Further, one of plaintiffs' two central injuries arising out of § 6085 is the
adverse impact the default rate for non-contracted EMS has on the ability of hospitals to
negotiate fair contracts with MCOs. There is no "standing" for plaintiffs to sue MCOs to redress
this injury because it is § 6085, not any remediable action on the part of the MCOs, that is
undermining plaintiffs' bargaining leverage and free market rights.

Finally, "[i]t is settled that no adequate remedy at law exists, so as to deprive federal
courts of equity jurisdiction, unless it is available in the *federal courts*" (emphasis added).
Petroleum Exploration, Inc. v. Pub. Serv. Comm'n of Kentucky, 304 U.S. 209, 217 (1938).
"[T]he inadequacy prerequisite to the relief in a federal court of equity is measured by the
character of remedy afforded in federal rather than in state courts of law. If a plaintiff is entitled
to be heard in the federal courts he may resort to equity when the remedy at law there is
inadequate, regardless of the adequacy of the legal remedy which the state courts may afford."
Di Giovanni v. Camden Fire Ins. Assoc., 296 U.S. 64, 69 (1935). Accord Alabama Pub. Serv.
Comm'n v. So. Ry. Co., 341 U.S. 341, 359 (1951). Accordingly, the Secretary is doubly wrong
in arguing that plaintiffs have an "adequate remedy at law" merely because they may bring suit
in the state courts.[8]

### E.    The Secretary's Efforts to Distinguish *Abbott Labs* Misconstrues the Law

Finally, the seminal decision in Abbott Labs. v. Gardner, 387 U.S. 139 (1967), instructs
that a regulated party may not be required to act in derogation of a requirement subjecting that

---

[8] What the Secretary proposes is less an available alternative remedy than a claim that this Court
should "abstain" from deciding an immediate constitutional issue to await developments in
potentials future state lawsuits. Such abstention is only required, if at all, when there already is a
state court proceeding pending that concerns important state law interest. See Hicks v. Miranda,
422 U.S. 332 (1975). "In other cases, federal courts must normally fulfill their duty to adjudicate
federal questions properly brought before them." Hawaii Hous. Authority v. Midkiff, 467 U.S.
229, 238 (1975).

11

party to a *per se* violation of a criminal law as the "ticket" to adjudicating the legality of the federal law. In response, the Secretary represents that Abbott does not apply to challenges to statutes, as opposed to regulations, and smugly suggests that if plaintiffs were "really" concerned with the potential for criminal prosecution they would have sued Attorney General Gonzales.

Even a cursory reading of Seegars reveals that defendant's contentions that the Abbott doctrine is limited to review of agency regulations (Sec'y Reply at 7 n. 7) is grossly exaggerated. As the D.C. Circuit recently observed, "courts reviewing agency action commonly give pre-enforcement review not only to statutory claims, but to constitutional attacks on the underlying statute." Seegars v. Gonzales, 396 F.3d 1248, 1254 (D.C. Cir. 2005) (citing to Time Warner Entm't Co. v. FCC, 93 F.3d 957, 973 (D.C. Cir. 1996). Cf. General Elec. Co. v. EPA, 360 F.3d 188 (D.C. Cir. 2004)). Further, plaintiffs are not challenging the constitutionality of the criminal law enforced by the Attorney General (i.e., § 1128B)[9] – as in Seegars – but rather that of § 1932 (as amended by § 6085). For that reason, the Secretary of HHS – the executive agency responsible for its administration – not the Attorney General, is the proper defendant, just as Secretary Gardner, and not the Attorney General, was the proper defendant in Abbott Labs.

## III.  PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT § 6085, AS APPLIED, EFFECTS A TAKING

Defendant's Motion to Dismiss for failure to state a claim under the Takings Clause was short and to the point: he argued that § 6085 could be presumed to "substantially advance" a series of presumed congressional purposes. The "substantially advances" test on which Secretary relies, however, was invalidated by the Supreme Court as "having no proper place in . . . Takings jurisprudence" in Lingle v. Chevron U.S.A., 544 U.S. 528, 548 (2005). Undaunted by this facial deficiency in his Motion, the Secretary asserts a variety of new theories to support his Motion to Dismiss plaintiffs' Takings claim in the guise of a Reply. These arguments are

---

[9] Even this provision was codified in the Social Security Act, not in Title 18 of the U.S. Code.

improperly raised at this juncture and in a reply brief, Natural Res. Def. Council v. Envtl. Prot. Agency, 25 F.3d 1063, 1072 n.4 (D.C. Cir. 1994), and are unpersuasive.

Recycling the argument he previously made to challenge plaintiffs' standing, the Secretary contends that § 6085 does not effect a Taking because it merely borrows below cost rates from Pennsylvania. This is sophistry. *Pennsylvania* did not impose these rates on plaintiffs for non-contracted EMS for MCO patients, *§ 6085* did. Medicaid FFS rates do not apply to Pennsylvania managed care patients under state law. Contract rates with MCOs are individually negotiated, and non-contracted EMS rates are set under Act 68; neither are based on the Medicaid FFS rates. FAC ¶¶ 46, 75, 78. Defendant's argument that plaintiffs' harm is not caused by Act 68 because § 6085 borrows the state's Medicaid FFS rates and incorporates them as the EMS payments for non-contracted MCOs is equivalent to saying that a fee schedule incorporated by reference into a contract is not mandated by the contract.

The Secretary also argues for the first time in his Reply Brief that plaintiffs' claim should be dismissed because § 6085 does not effect a Taking for a private benefit, under what he describes as the "majority opinion" in Kelo v. City of New London, 545 U.S. 469 (2005). First, the Secretary's argument incorrectly treats Justice Kennedy's crucial swing vote as a simple endorsement of the views of the four Justices who sustained the condemnations on the basis that a Takings may legitimately advance a "private benefit." The four dissenting Justices concluded that a Taking is *per se* unconstitutional unless it advances a *purely* "public benefit." Justice Kennedy joined in the decision affirming the condemnation as advancing a public purpose, but wrote separately to underscore that he did so because the detailed record clearly demonstrated that the benefit obtained by the private developer was incidental and secondary to the broad economic benefit of the redevelopment to New London. Justice Kennedy emphasized, however, that the Court "should strike down a taking that, by a clear showing, is intended to benefit a

13

particular private party, with only incidental or pretextual public benefit." (Pltf's Oppos. at 26) 545 U.S. at 491 (Kennedy, J.).

In this case, plaintiffs' allegations make out a *per se* Taking under the opinions of the four dissenters and Justice Kennedy's swing vote. Plaintiffs had alleged that the HMO industry "engineered" the adoption of this provision for their personal pecuniary benefit and to overcome laws like Act 68 that were reducing their profit margins. FAC ¶¶ 84, 85. It is hard to fathom any primary public benefit here given plaintiffs' allegations that the states (and, indirectly, the United States) pay MCOs fixed fees under long-term agreements, and that the enhanced profit margins MCOs realize at plaintiffs' expense as a result of § 6085 are not passed through to the government. FAC ¶¶ 86-89, 135. Further, § 6085 does not result in EMS being made available to more people – it just enables MCOs to pay hospitals less than for it. Under the reasoning underlying Justice Kennedy's swing vote, plaintiffs would prevail.

To support his arguments that plaintiffs have not validly advanced a "private purpose" claim, the Secretary would ignore both plaintiffs' well pled factual allegations – including the allegation that this provision was inserted without debate or oversight hearings by lobbyists for the HMO industry seeking to preempt fair and reasonable reimbursement rates under state laws, like Pennsylvania's Act 68 – and the complete absence of any legislature findings of a public benefit. Under the Secretary's reasoning, plaintiffs should be precluded from even asserting this claim because the Court must simply presume the existence of a bona fide and substantial and primary public purpose. This position is incorrect.

The Secretary contends that the Court must presume any set of hypothetical facts that Congress might have relied upon to support an adequate public purpose is unjustifiably borrowed from Equal Protection and Due Process jurisprudence. The Supreme Court, however, has not simply "presumed" without more that legislated Takings advance a principally private benefit.

14

Where a Takings on its face appears designed to transfer value directly from one private party to another, the Court has found it invalid. See, e.g., Missouri Pacific R-Co. v. Nebraska, 164 U.S. 403 (1896) (holding invalid a state law that required a railroad to grant a right to build a grain elevator to commercially benefit a group of private farmers).[10] In Kelo, Justice Kennedy's vote hinged entirely on the quality of the legislative record and the facts of record that concretely, and specifically confirmed the predominantly public purpose of the redevelopment at issue.[11]

Similarly, in Hawaii Hous. Auth. v. Midkiff, supra, on which the Secretary relies, the Supreme Court did not simply "presume" that the forced redistribution of property at issue would legitimately advance an important public purpose. Rather, the Court discussed at length the predicate legislative determination that the condemnations at issue were a necessary means of "reduc[ing] … perceived social and economic evils of [a unique] land oligopoly traceable to … [the Island's original feudal] monarchs," and further observed that the condemnations were attended by "a public hearing" in which the state governmental agency specifically "made the statutorily required finding that the acquisition … would effectuate the public purpose." Midkiff, 467 U.S. at 233-234, 241-242. See also Berman v. Parker, 348 U.S. 26 (1954) (justifying the forced condemnation and sale of blighted property as a public benefit based on

---

[10] The Midkiff Court also said that, "[t]o be sure, the Court's cases have repeatedly stated that 'one persons' property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." 467 U.S. at 241 (citations omitted).

[11] The Secretary cites to Lingle at 544 U.S. at 544-45, for the proposition that this Court may not consider the actual record findings pertaining to a public purpose. Lingle did not involve a private benefit claim. Rather, petitioners there argued exclusively that the challenged state law did not rationally and legitimately advance its ends. The Court rejected that argument in *toto* at an inappropriate basis on which to advance a Takings claim. That discussion involved the Court's rejection of the "substantially advances" test and pertained to the potential use of heightened scrutiny for review of legislative facts. The same decision simultaneously observed the lower court had already properly scrutinized the economic impact of the challenged regulation – which is the gravaman of a regulatory Takings claim against Hawaii's statute restricting rental fees for company owned gas stations.

15

express congressional findings and justification set forth in a "legislative determination" in § 2 of the District of Columbia Redevelopment Act").

Here, in contrast, there are <u>no</u> legislative findings or determinations about the basis or purpose of § 6085. Nor were there any public or oversight committee hearings to justify the extraordinary step of forcing private (and mostly non-profit) hospitals to accept below cost reimbursement for the pecuniary benefit of private, often for-profit HMO companies. Rather, § 6085 simply was inserted, in conference, in the budget bill. This "record" renders § 6085 invalid *per se* under the view of the four dissenters in <u>Lingle</u>, and shifts the burden of justifying § 6085 to the Secretary under Justice Kennedy's tie-breaking decision.

The Secretary next argues (Sec'y Reply at 13) that plaintiffs' Taking claims are legally defective because plaintiff hospitals "voluntarily" subject themselves to § 6085. The Secretary argues that because EMTALA compliance is "voluntary," hospitals voluntarily accept any payment limits imposed by government. To support that claim, he relies on a series of older cases from other circuits rejecting providers' challenges to Medicare or Medicaid FFS rates under the Takings Clause on the basis that the providers "voluntarily" accepted those rates by electing to participate in Medicare or Medicaid in the first place.[12] These cases do not defeat plaintiffs' claims.

First, the only case defendant cites to demonstrate that the provision of emergency care under EMTALA precludes a Taking claim because it is voluntary is <u>Burditt v. HHS</u>. There, a physician refused to treat a seriously compromised patient in active labor and was fined for ordering the patient transferred in violation of the hospital's EMTALA obligations. The physician argued, in part, that EMTALA itself violated the Taking clause. The Fifth Circuit

---

[12] <u>Garelick v. Sullivan</u>, 987 F.2d 913 (2d Cir. 1993); <u>Burditt v. HHS</u>, 934 F.2d 1362 (5th Cir. 1991); <u>Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dept. of Pub. Welfare</u>, 742 F.2d 442 (8th Cir. 1984), <u>cert. denied</u>, 469 U.S. 1215 (1985).

16

rejected that defense because only hospitals, not doctors, are subject to EMTALA, and because the plaintiff physician could have avoided the claim by not entering into an agreement with the hospital to provide EMS subject to EMTALA. 934 F.2d at 1376. The court stated *in dicta* that the hospital – which was not fined – had a choice in whether to subject itself to EMTALA through participation in Medicare.

The Secretary disregards Methodist Hosps., Inc. v. Indiana Family & Soc. Servs. Admin., 860 F.Supp. 1309 (N.D. Ind. 1994). In that case, a physician and hospitals challenged Indiana's use of low Medicaid fees, derived from non-emergency care data, to dictate Medicaid payments for EMS. While rejecting the *physician's* claim on ground of voluntariness based on EMTALA (as in Burditt), the court found the *hospitals'* regulatory Takings claim to present "a more interesting question." Id. at 1335. Applying the standards of Penn Cent. Transp. Co., v. New York City, 438 U.S. 104 (1978), the court found that the hospitals' claims of confiscatory rates presented questions of material fact which *could not properly be dismissed* on a motion for summary judgment.

Thus, no case holds that participation in Medicare precludes a Takings claim against confiscatory payment limits on EMS (let alone those imposed for the direct benefit of private HMOs). The Secretary also claims that the obligation to provide EMS, unlike the running of a cable across the roof in Loretto v. Teleprompter Manhattan CATV, Corp., 458 U.S. 419 (1982), is not a "physical invasion." To the contrary, having to devote hospital exam and treatment space, staff and equipment to all emergency patients clearly deprives hospital owners of the right to unfettered use of their property to a far greater degree than the mere placement of a cable across the roof. Even if the Secretary's EMTALA/Medicare voluntariness argument were accepted, it would, at most, bear on plaintiffs' contention that that EMTALA combines with § 6085 to render the Taking that is accompanied by a governmentally mandated physical invasion,

17

which is a Takings *per se* under <u>Loretto</u>. It could not, in any case, justify a dismissal of plaintiffs' Takings claims.

In <u>Minn. Ass'n. of Health Care Facilities, Inc.</u>, nursing facilities and trade associations challenged a state law limiting the amounts facilities could charge for treating state funded general assistance recipients as a condition of their Medicaid participation as a Taking and substantive due process violation. The Eighth Circuit declined to apply Supreme Court case law pertaining to payment of "unjust, unreasonable and confiscatory rates [to] ... public utilities companies"[13] because "unlike public utilities," which are required to provide services, nursing homes are not required to accept Medicaid residents and could avoid any obligation to provide services at the capped amounts. The appeals court did <u>not</u> separately address the Takings claim. Rather it sustained the general assistance limit as arising out of the voluntary Medicaid participation and bearing a "reasonable relation to a proper legislative purpose." (It also held that the retroactive imposition of the limit effected a "substantial impairment" of the facilities' constitutionally protected contract rights.) In <u>Garelick v. Sullivan</u>, the Second Circuit held that an amendment to Title XVIII that precluded plaintiff-anesthesiologists from "balancing billing" Medicare payments for charges in excess of the Medicare fees did not effect a compensable Taking of the physicians' services, because their participation in the Medicare program, which included the anti-balance billing requirement, was entirely voluntary and not a mater of governmental compulsion.

The short answer to the Secretary's "voluntariness" argument is that these non-precedential decisions – aside from involving no "private benefit" claim – are inapposite because § 6085 applies to "<u>any</u> provider" who renders EMS to a patient of a non-contracted MCO. Plaintiff hospitals could (theoretically) withdraw from participating in the Medicare and

---

[13] See <u>Bluefield Water Works & Improvement Co.</u>, 262 U.S. 679, 690 (1923).

Medicaid fee-for-service programs tomorrow, and still be subject to § 6085 to potential criminal sanctions under § 1128B for billing Medicaid MCOs in excess of the Default Rates. There is no voluntary escape route from having to subsidize MCOs under § 6085, short of obtaining judicial relief from § 6085. Moreover, Minn. Ass'n. and Garelick (as well as Midkiff) rested on the conclusion that there was no Taking because the laws at issue bore a "reasonable relationship" to the legislative goals – the test that was rejected as inappropriate for Takings jurisprudence in Lingle.

The Secretary further suggests that if they voluntarily terminated their Medicare participation (and thus ceased treating all older patients – something that not only would be ethically questionable, but a practical impossibility for any general hospital) plaintiffs would not be bound by EMTALA. If they were not bound by EMTALA, the Secretary continues, plaintiffs would not be "forced" to provide emergency care, and, hence, would not "involuntarily" be subjected to the confiscatory level of payments dictated by § 6085. That approach stretches the concept of voluntariness beyond recognition. Moreover, neither the Supreme Court nor the D.C. Circuit has held that "voluntary" participation in Medicare or Medicaid obviates the right to be justly compensated when payment levels are mandated by government.

Under the Secretary's theory, there could almost never be regulatory Takings because the person whose business interests are being impaired by the government almost always could avoid the impairment by totally withdrawing from the business subject to the regulations. We submit that neither the Supreme Court nor the D.C. Circuit would impose the all encompassing bar against regulatory Takings claims advocated here by the Secretary. The "voluntary/involuntary" dichotomy the Secretary advocates has not been adopted by the Supreme Court or the D.C. Circuit. There is no hint that a regulatory Takings claim was unavailable *per se* to Chevron U.S.A. (which was challenging certain state caps imposed on fees

19

for rental of company owned gas stations) in the recent decision in Lingle. The real issue, as described by the Court's comprehensive opinion, was not whether Chevron could "elect" to stop renting its service stations or withdraw from the business of selling gasoline, but rather whether the state law was confiscatory under regulatory Takings standards derived from Penn Cent. Transp. Co. v. New York City, 438 U.S. 104 (1978) and Loretto.

The opinions in Pennell v. City of San Jose, 485 U.S. 1 (1988) are insightful. In Pennell, a landlord challenged a city rent control ordinance. While not generally contesting the City's right to impose rent control to prevent "excessive and unreasonable" price increases that were detrimental to society, plaintiffs challenged as unconstitutionally effecting a private benefit, a specific provision of the ordinance that prohibited an otherwise permissible rent increase upon a showing that it would cause "hardship" to a particular renter. The majority did not reach the Takings claim because there was no record of the hardship provision actually having been invoked. In a separate concurring and dissenting opinion, Justices Scalia and O'Connor disagreed that the facial challenge to the ordinance was "premature." They went on to conclude that the provision plainly was a prohibited Taking on its face because it prevented the landlords from being paid fair value for the particular benefit of private individuals whose hardships should more properly be borne by the public as a whole, and not redressed through forced subsidies by individual landlords. 485 U.S. at 19-24. These facts are closely analogous to those at bar. In neither the majority nor the concurring and dissenting opinion in Pennell was there any suggestion that plaintiffs had no valid Takings claim because the regulation impacted rental property, rather than public utilities, or because plaintiffs could have avoided the legislatively required subsidy by "voluntarily" discontinuing the business of property rental.

Even if plaintiffs "voluntarily" provided EMS as an attribute of operating hospitals, they should be entitled to non-confiscatory rates when they provide such services. In highly regulated

20

industries, where there is no risk because participants enjoy governmental enforced monopolies or oligopolies, the regulated parties are entitled to be amounts that are just and reasonable. See Dusquesne Light Co. v. Barasch, 488 U.S. 299 (1989). Even courts that have distinguished between heavily regulated industries and "voluntary" regulation have recognized that rates limits may be stricken under the Takings Clause. See Texaco Puerto Rico, Inc. v. Rodriguez, 749 F. Supp. 348, 359 (D.P.R. 1990) (applying a "hybrid or modified, 'just and reasonable' return standard," that asks whether price limits imposed on gasoline wholesalers jeopardizes their business); 20th Century Ins. Co. v. Garamendi, 878 P.2d 566, 614-18 (Cal. 1994) (stating that the "crucial question under the Takings Clause is whether the rate" causes the regulated party "deep financial hardship" – "when it does not earn enough revenue for both 'operating expenses' and 'the capital costs of the business'").[14]

The Supreme Court has emphasized that the finding of a regulatory Takings is fluid and highly fact specific and depends largely "upon the particular circumstances" of each case. Penn Cent. Transp. Co., 438 U.S. at 124 (citations omitted). Here, plaintiffs have alleged that hospitals tend to operate at low to negative margins, and that the Default Rates may in some cases shift hospitals from positive to negative margins, or jeopardize "going concern" value by worsening negative operating margins. FAC ¶¶ 93, 94. Plaintiffs also have alleged that there is

---

[14] See also State Farm Mut. Ins. Co. v. State of New Jersey, 590 A.2d 191, 199 (N.J. Super. Ct. 1991) (stating in a suit by automobile insurance companies challenging a state statute prohibiting pass-through costs to consumers that the Takings Clause requires a business regulated by government rate or price controls a return sufficient to assure its financial health); Calfarm Ins. Co. v. Deukmejian, 771 P.2d 1247, 816-821 (Cal. 1989) (stating, in a suit by insurance companies challenging an initiative that reduced rates and suspended rate increases for one year, that a discrete, regulated rate "which deprives persons of a fair return" may only be justified in an emergency); Aetna Cas. & Sur. Co. v. Comm'r of Ins., 263 N.E.2d 698 (Mass. 1970) (stating, in an action by automobile insurance companies challenging validity of state statute lowering liability rates, that while the Commonwealth is "not constitutionally required to fix rates which will guarantee a profit to all insurers, it may not constitutionally fix rates which are so low that if the insurers engage in business they may do so only at a loss. The insurers are not required to either submit to confiscatory rates or go out of business.")

21

a current crisis in funding and maintaining hospital emergency services, including emergency labor and delivery services, so that forcing confiscatory rates on providers of EMS, as a (theoretical) indirect means of costs under the Medicaid program as a whole, is particularly insidious. FAC ¶¶ 112-115. Plaintiffs' allegations that they are being paid confiscatory rates for the direct benefit of private HMOs crosses the line far enough that the theoretical ability to voluntarily "stop providing EMS" should not deprive them of their rights to be justly compensated for EMS, even under case law that applies a less rigorous test to those who "voluntarily" participate in a regulated business.

Finally, plaintiffs all are nonprofit hospitals and have alleged that the refusal to provide emergency care would threaten their ability to continue under their legal identifies as not-for-profits under IRS Rev. Ruling 69-545 in addition to the requirement to provide EMS under EMTALA. FAC ¶ 73. Under that Ruling, the IRS treats the provision of EMS to all patients as central to operating as a tax exempt hospital. That obligation is unrelated to their voluntary Medicare participation but goes to the heart of their legal identities as non-profits entities. That aside, the presumed fact that hospitals "voluntarily" provide EMS still does not entitle the government to force them to provide those services at below cost for the pecuniary benefit of large private MCOs.

## IV.    PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT § 6085, AS APPLIED, VIOLATES SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION UNDER THE LAW

Most points raised by defendant's Reply concerning plaintiffs' substantive Due Process and Equal Protection claims were anticipated in Plaintiffs' Memorandum in Opposition to the Secretary's motion to dismiss. Defendant's supplemental arguments are addressed below.

22

## A.    Due Process

With respect to plaintiffs' substantive due process claims, the Secretary continues to focus on the ends he alleges Congress might have sought to achieve through § 6085. The issue, however, is not whether the "goals were within the bounds of the [government's] police power" but whether "the means the legislature had chosen to serve those goals were not arbitrary, capricious or selected in bad faith." Midkiff, 467 U.S. at 235, 243-43. See also Nebbia v. New York, 291 U.S. 502 (1934) (to satisfy substantive due process requirements, laws may be "neither arbitrary nor discriminating").

In this case, the "means" chosen do nothing to enhance the availability of EMS – which is separately compelled by EMTALA – and, in fact, are detrimental to ensuring the availability and economic viability of providing EMS. See FAC ¶¶ 112-115. Nor does § 6085 rationally or logically serve to save money – as would, for example, some overall limit on payments to MCOS – because the benefit of the savings goes directly into the bank accounts of the MCOs and any public cost savings is grossly attenuated, if not completely imaginary. Thus, the link between the "ends" and the "means" is entirely arbitrary. The Secretary simply avoids discussing these points.

## B.    Equal Protection

The Secretary tries to distinguish the Equal Protection case law cited by plaintiffs to demonstrate that discriminatory pricing against similar entities providing similar services without regard to the costs of the services is arbitrary and capricious. The Secretary claims that all of the cases cited by plaintiffs "involved the very different situation of state laws favoring in-state over out-of-state businesses." Sec'y Reply at 23. This attempted distinction misses the point. The case law cited by plaintiffs demonstrates that although there is broad discretion to discriminate in economic situations, the Equal Protection line is crossed when a law discriminates economically against two similarly situated businesses providing similar services unless their underlying costs

23

are different. Such is the impact of § 6085. The logic of the caselaw does not turn on whether the discriminatory laws are state or federal.

The Secretary also asserts that no Equal Protection claim can go forward because state by state differences in the FFS rates are inherent in the Medicaid program. However, the Secretary fails to acknowledge that under § 4711(a)(1) of the Balanced Budget Act of 1997[15] Congress eliminated any requirement that States set Medicaid FFS rates for hospital services at levels that are even "reasonable and adequate" for economical and efficient hospitals to meet the costs of providing quality care. Pltfs Oppos. at 2. While variations in state Medicaid rates might have survived an Equal Protection challenge on this basis in the past, the assumption that varying state rates all were required to achieve at least "rough justice," under a unifying federal "reasonable and adequate" standard, is no longer legally viable. Plaintiffs acknowledge that Equal Protection does not demand that rates be set with "mathematical nicety." Dandridge v. Williams, 397 U.S. 471, 485 (1970). However, some states, like Pennsylvania, now employ FFS rates that are grossly unreasonable and inadequate and widely disparate from those of other states whose FFS rates cover or exceed costs. It is arbitrary and caprious even, under this deferential standard, to simply transform these widely varying rates into the federally mandated EMS rates.

The Secretary also claims in his Reply that if one of the plaintiff hospitals provided emergency services to a New Jersey Medicaid beneficiary enrolled in a non-contracted Medicaid MCO, the default rate it could collect under § 6085 is controlled by New Jersey's state plan, not Pennsylvania's. Sec'y Reply at 21. However, even that statement is incorrect. New Jersey regulations provide that payment in that situation would be made based on the Pennsylvania Medicaid rates. N.J.A.C. 10:52-4.4 (stating that reimbursement for inpatient hospital services provided by an out-of-state hospital is based on the Medicaid rate in the state where the hospital

---

[15] Pub. L. No. 105-33.

24

is located). Thus, even when they treat New Jersey patients, plaintiffs are "stuck" with the below

cost Pennsylvania FFS rates under § 6085. The Secretary further argues that "[t]o the extent

there is any classification under § 6085, it is by the domicile of the Medicaid beneficiaries, not

the domicile of emergency service providers." Sec'y Reply at 22. Again, the Secretary is wrong.

Section 6085 clearly governs rates to <u>providers</u> for the provision of emergency services.

**CONCLUSION**

For the reasons stated, defendant's motion to dismiss Counts I through IV of the FAC

should be denied. A ruling on Count V should be deferred pending decision in <u>Pub. Citizen v.</u>

<u>Clerk, United States District Court</u>, 451 F.Supp. 2d 109 (D.D.C. 2006), <u>appeal</u> <u>pending</u>, No. 06-

5232 (D.C. Cir.), which will be controlling precedent as to plaintiffs' challenge to the DRA

under the Bicameralism requirement.

Dated: May 3, 2007                              Respectfully submitted,


                                                _____/s/_____
Of Counsel:                                     L. Barrett Boss (D.C. Bar No. 398100)
Mark H. Gallant (D.C. Bar No. 913111)           COZEN O'CONNOR
Gregory M. Fliszar                              1627 I Street, NW, Suite 1100
Melanie Martin                                  Washington, D.C., 20006
COZEN O'CONNOR                                  Telephone (202) 912-4800
1900 Market Street                              Facsimile (866) 413-0172
Philadelphia, PA 19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013
                                                Attorneys for Plaintiffs


PHILADELPHIA\3124984\3  193485.000

25
